**D.B., individually and as Guardian ad litem of R.H., Plaintiff,**

v.

**OCEAN TOWNSHIP BOARD OF EDUCATION, Defendant.**

**No. CIV. A. 96–2361(MLP).**

United States District Court, D. New Jersey.

Nov. 21, 1997.

468

Theodore A. Sussan, Staci Greenwald, Sussan & Greenwald, Spotswood, NJ, for Plaintiff.

Honora O'Brien Kilgallen, Kramer, Kramer & Kilgallen, P.A., Hazlet, NJ, for Defendant.

**MEMORANDUM OPINION**

PARELL, District Judge.

TABLE OF CONTENTS PAGE

I. Introduction ................................................... 470

II. Statutory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 471

III. Factual and Procedural History
 A. R.H.'s educational history . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 472
 B. The due process hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 472
 C. The post-hearing administrative results . . . . . . . . . . . . . . . . . . . . . . . 476
 D. Proceedings in the district court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 481

IV. Dual Requirements for "Appropriate Education" under IDEA . . . . . . . . . . . 482
 A. Some meaningful educational benefit . . . . . . . . . . . . . . . . . . . . . . . . . . 482
 B. Least restrictive educational environment . . . . . . . . . . . . . . . . . . . . . . 487

V. Burden of Proof under Dual Requirements of IDEA . . . . . . . . . . . . . . . . . . . 498

VI. Standard for District Court Review of ALJ Decision . . . . . . . . . . . . . . . . . . 499

VII. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 500
 A. Residential placement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 501
 i. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 501
 ii. Diagnosis, classification and testing . . . . . . . . . . . . . . . . . . . . . . 501
 iii. Residential placement—procedural issue . . . . . . . . . . . . . . . . . . . 502
 iv. Residential placement—substantive issue . . . . . . . . . . . . . . . . . . 503
 a. Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 503
 1. Inclusion efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 503
 2. Comparison of likely benefits . . . . . . . . . . . . . . . . . . . . 508
 3. Mainstreaming effects . . . . . . . . . . . . . . . . . . . . . . . . . . 516
 4. Physical or emotional conditions . . . . . . . . . . . . . . . . . . 518
 5. Behavior or regression . . . . . . . . . . . . . . . . . . . . . . . . . . 518
 6. Prior assessments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 520
 7. Potential . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 520
 8. Past experience . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 525
 9. Purpose of placement . . . . . . . . . . . . . . . . . . . . . . . . . . . 526
 b. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 530
 B. IEP format—procedural issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 530
 C. Bias allegation by school district against ALJ . . . . . . . . . . . . . . . . . . . 537
 D. Attorneys' fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 540

VIII. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 542

## I. Introduction

This case arises under the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. §§ 1400–1485, and its implementing statute in New Jersey, N.J. Stat. Ann. §§ 18A:46–1 to :46–46.[1] The underlying administrative proceeding against the Ocean Township Board of Education ("the school district" or "the district") was commenced on behalf of R.H., a mentally retarded sixteen-year-old girl, by her mother, D.B. ("plaintiff"). Plaintiff claimed that the school district had not fulfilled its statutory obli-

gations to R.H. under IDEA because it declined to place her in a full-time residential facility, and because the format of the proposed Individual Education Program ("IEP") for the 1995–96 school year lacked certain required components. The Administrative Law Judge ("ALJ") ordered residential placement and related relief, and the school district appealed to this Court.

Currently before us are: (1) plaintiffs motion for judgment affirming the ALJ's ruling; (2) plaintiffs motion for attorneys' fees; and (3) the school district's motion for judgment in its favor.[2] Having reviewed the entire

---

1. As used in this Opinion, New Jersey Statutes Annotated will be cited as "N.J.S.A.," and New Jersey Administrative Code will be cited as "N.J.A.C."

2. Also before us is plaintiff's renewed motion for residential placement pending the conclusion of this litigation, which was filed after oral argument before this Court, based upon the decision of our court of appeals in *Susquenita School*

administrative record, the parties having presented no additional evidence at the district court level, we now render our decision on the issues presented.

We conclude that the district has met its burden of demonstrating that the current educational placement and program are appropriate, and that residential placement is not necessary in order to provide R.H. with a free appropriate public education under IDEA. We further find that although the proposed written IEP was procedurally deficient in format, the school district took timely action to address that deficiency under the circumstances, and no declaratory relief should be entered by the Court on that issue. We have also considered whether to make an award of attorneys' fees limited to that issue, and have concluded that in the sound exercise of discretion conferred upon the Court under the Act, no such award should be granted.[3]

## II. Statutory Background

The IDEA, originally known as the Education of the Handicapped Act,[4] ("EHA") "represents an ambitious federal effort to promote the education of handicapped children." *Board of Educ. of Hendrick Hudson Central School District Westchester County v. Rowley*, 458 U.S. 176, 179, 102 S.Ct. 3034, 3037, 73 L.Ed.2d 690 (1982). The Act was passed in order "to assure that all children with disabilities have available to them ... a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(c).

States receiving federal funding under IDEA are required to comply with federal guidelines and regulations established to as-

sure the availability of a "free appropriate public education" (sometimes referred to as FAPE) for all of their disabled children. *Id.* § 1412(1). They must develop a plan containing the policies and procedures which insure the provision of that right for all children "regardless of the severity of their handicap." *Id.* § 1412(2)(C).

The Act also requires participating states to educate handicapped children with non-handicapped children whenever possible. *Id.* § 1412(5); *Rowley*, 458 U.S. at 202–03, 102 S.Ct. at 3048–49. This congressional mandate, also embodied in federal and state regulations, is known as the "mainstreaming," "inclusion," or "least restrictive environment" requirement of IDEA. *See Oberti v. Board of Educ.*, 995 F.2d 1204, 1206–07, 1213–15 (3d Cir.1993). "The use of 'appropriate' in the language of the Act, although by no means definitive, suggests that Congress used the word as much to describe the settings in which handicapped children should be educated as to prescribe the substantive content or supportive services of their education." *Rowley*, 458 U.S. at 197 n. 21, 102 S.Ct. at 3036 n. 21.

Special education and related services must be tailored to the unique needs of the handicapped child by means of an individualized education program. *Id.* § 1401(a)(18). The IEP must be reviewed and revised by the local educational agency at least annually. *Id.* § 1414(a)(5).

New Jersey participates in the federal funding program established by IDEA. That participation is reflected in state statutes, N.J.S.A. §§ 18A:46–1 to :46–46, and regulations, N.J.A.C. §§ 6:28–1 to –11. *See Lascari v. Board of Educ.*, 116 N.J. 30, 34, 560 A.2d 1180, 1182 (1989). The New Jersey

District v. Raelee S., 96 F.3d 78 (3d Cir.1996). *See* Section III(D) of this Opinion. We have consolidated that motion with the ruling on the merits of this appeal pursuant to Fed.R.Civ.P. 65(a)(2). The accompanying Judgment Order addresses our disposition of that motion. However, we have also prepared a Supplemental Opinion discussing the precedential effect of the *Raelee S.* decision, and that Supplemental Opinion will be filed separately.

**3.** The full Opinion filed herewith is extremely long due to the necessary citations to the record,

so we have also prepared this Memorandum Opinion which is drawn verbatim from the full Opinion. We have omitted some of the footnotes in making the deletions to prepare the Memorandum Opinion. As a result, the footnote numbering differs in the two versions.

**4.** Pub.L. No. 91–230, 84 Stat. 175 (codified as amended at 20 U.S.C. § 1401 *et seq.*). For a summary of the history of IDEA, *see Heldman v. Sobol*, 962 F.2d 148, 150 n. 1 (2d Cir.1992).

statutory scheme provides for the initial evaluation and classification of a child by a "child-study team," consisting of a school psychologist, a learning disabilities teacher-consultant, and a school social worker. *Id.* at 35, 560 A.2d at 1183 (citing N.J.A.C. § 6:21–3.1(b)). The child-study team determines whether a child is eligible for special education, then develops, monitors, and evaluates the child's IEP. *Id.* (citing N.J.A.C. § 6:28–3.1(a)). Parents have the right to be involved in the formation of the IEP, and the team must meet with the parents in developing the IEP for the child. *Id.* (citing N.J.A.C. § 6:28–3.6(b)).

The Act creates significant procedural safeguards for handicapped children and their parents. Whenever the local agency proposes to change, or refuses to change, the identification or evaluation of a child, or the provision of a free appropriate public education to a child, the child's parents or guardian must be notified and must be given the opportunity to present complaints about any such matter. 20 U.S.C. § 1415(b)(1). Parents dissatisfied with their child's IEP are entitled to an "impartial due process hearing," featuring numerous procedural protections. *Id.* § 1415(b), (d).

These safeguards are meant to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate." *Honig v. Doe,* 484 U.S. 305, 311–12, 108 S.Ct. 592, 598, 98 L.Ed.2d 686 (1988). "Congress repeatedly emphasized throughout the Act the importance of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness. *See* §§ 1400(c), 1401(19), 1412(7), 1415(b)(1)(A), (C), (D), (E), and 1415(b)(2)." *Id.* at 311, 108 S.Ct. at 598; *see also Rowley,* 458 U.S. at 208, 102 S.Ct. at 3052 ("Congress sought to

protect individual children by providing for parental involvement in the development of state plans and policies, ... and in the formulation of the child's individual education program.").

States may choose either a one-tier or a two-tier administrative review system. Some states, including our neighboring state of Pennsylvania, have a two-tier system in which the initial hearing occurs at the local educational agency level followed by an "independent" review at the state administrative appeals level. *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 527 (3d Cir.1995) (citing 20 U.S.C. § 1415(c)), *cert. denied,* 517 U.S. 1135, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996). New Jersey employs the one-tier administrative system, under which due process hearings are conducted before an administrative law judge of the New Jersey Office of Administrative Law. *Lascari,* 116 N.J. at 39, 560 A.2d at 1185 (citing N.J.A.C. § 6:28–2.7(b)(4)(iv), N.J.A.C. § 6:28–2.7(a)(6)).

Any party aggrieved by the decision at the administrative level has a right to appeal to a state court of competent jurisdiction or to a federal district court. 20 U.S.C. § 1415(e)(2). That court conducts an independent review of the case, but should give "due weight" to the findings of the administrative agency. *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3050–51. The Act was supplemented in 1986 to provide for the recovery of attorneys' fees after a successful challenge by the parents or guardian. 20 U.S.C. § 1415(e)(4)(B).

III. Factual and Procedural History

A. R.H.'s educational history [5]

The child in this case, a sixteen-year-old girl named R.H., was born to plaintiff on December 9, 1980. She is diagnosed with a

---

**5.** The administrative record was made during the due process hearing which was conducted during the 1995–96 school year, when R.H. was age 14–15. All factual references in this Opinion are to that record, except as otherwise noted. There are 16 volumes of hearing transcripts, totaling approximately 2,500 pages, and numerous exhibits in evidence. For reference purposes in this Opinion, the transcripts are cited by volume number and page rather than by date, for exam-

ple, "Tr. 12 at 22–25." The docket file from the Office of Administrative Law ("OAL"), not marked in evidence, was also transmitted to this Court as part of the record, and is cited as "OAL docket file." The briefs of the parties on the pending cross-motions for judgment in this Court are cited as defendant's main brief ("Def.'s Main Br."), plaintiffs brief ("Pl.'s Br."), and defendant's reply brief ("Def.'s Reply Br.").

chromosomal defect known as trisomy 18 mosaic, a multiple malformation syndrome which typically causes mental retardation and various related physical and neurological conditions. She has a composite I.Q. score of approximately thirty-six, and has an educational classification of Trainable Mentally Retarded ("TMR").

Her most recent triennial educational re-evaluation, in June, 1995, summarized her functional status as follows:

Current evaluation results indicate that [she] is functioning within the mentally retarded range of intelligence at the trainable level. Significant developmental delays were recorded in cognitive development, gross and fine-motor skills and adaptive behaviors. Language development also represented an area of significant deficit, with receptive language skills falling at a somewhat higher level than expressive language skills. [She] is a highly distractible adolescent, but responds at least momentarily to directions to focus attention to task. Socially, [her] mood is generally positive, she is compliant and docile, and appears to enjoy being with her classmates.

She has physical anomalies associated with trisomy 18 syndrome including short stature, stooped posture, malocclusion of the jaw, and high arched palate. She has had orthopedic surgery for congenital problems with her legs and feet; her ears are located low; "her hands are very crooked (and) all of her bone structure is a little off." (Tr. 9 at 96 (plaintiffs description)). She has an open-mouthed appearance and frequent drooling, which are not considered to be under her control, and the drooling is partially controlled with medication.

A brief description of her current abilities and limitations would include the following. She has poor motor coordination. She can walk and use stairs, but not run or jump. Her fine motor abilities include opening doors and scribbling, but she cannot draw a line or circle or use scissors. Her "receptive language" level permits her to respond to more than fifteen simple verbal directions. She has an oral vocabulary of only a few words, although she does sign some words to communicate, and can sign additional words in response to being shown pictures or objects. She is also able to express messages concerning her likes and dislikes by means of manual gestures and facial expressions, but she is basically nonverbal. She can clear dishes from a table with directions, perform other household chores with assistance, and pour liquid with "considerable spilling." (Ex. J–57 at 3.) "Self care is a struggle for [her]. She is not toilet trained and does not make [her] needs known.[6] She needs assistance with all areas of self care." (*Id.*) "She is a social child. She enjoys greeting familiar others and attempts to assist others involved in simple tasks." (Ex. J–55 at 2.) She rarely displays temper. She cooperates with adult requests and is not disruptive. Her general development is summarized as being at the eighteen-month level.

R.H. began school when she was approximately three and one-half years old, at the Ocean Township preschool handicapped program during the 1984–85 school year. Speech therapy was provided to her when she entered school. Prior to that, from birth, R.H. had received special services for her disabilities from an assigned agency, including physical therapy at home and at the agency facility. During the 1985–86 school year, R.H. was placed by Ocean Township School District at the Aldrich School in Howell Township, in a self-contained TMR class. The child remained in that placement until in or about 1988. At that time, plaintiff moved to Toms River, New Jersey. R.H. attended a self-contained class in the Toms River School District for less than a year, and then plaintiff moved with R.H. to Richmond, Virginia in April, 1989. There, R.H.'s educational placement was in a self-contained TMR class in the Virginia Randolph Special Education Center, a self-contained school for disabled children. R.H. continued in that placement during the school years from 1989

---

**6.** As discussed below, R.H. does not make her toileting needs known. *See* Section VII(B), discussion of Factor Seven. She does make her other wants and needs known in her primary modes of communication. *See* note 39.

until January, 1995, when plaintiff returned to reside in Ocean Township.

When they were living in Virginia, R.H. attended a church-based after school and weekend respite program for which plaintiff paid on a sliding scale based on need. The same private day care program was run as a summer day camp, which R.H. attended in the summers of 1990 through 1992. The school district IEP did not provide R.H. with an extended day or summer program in Virginia. The district made plaintiff aware of the church-sponsored programs, and plaintiff enrolled R.H. on her own. During the summers of 1993 and 1994, plaintiff was in the child care business at her home, and she kept R.H. at home with her except for a two-week attendance at a sleep-away camp in 1994, at plaintiffs expense.

The Virginia Randolph School provided a comprehensive program at the trainably mentally retarded level that addressed R.H.'s individual educational needs in the general areas of gross and fine motor skills, communication, self-help and social skills, and vocational skills. Related services in her IEPs for those years included, at various times, speech therapy and physical therapy. Plaintiff consistently expressed satisfaction with R.H.'s educational program while they were in Virginia, and at no time did she request that the IEP include any additional services or parent training. Plaintiff also did not request residential placement for R.H. during any of those years until the spring of 1994. Plaintiff testified that during that spring, she brought up the subject in conversation with R.H.'s teacher, but made no formal request.

Plaintiff moved to Ocean Township from Virginia in January, 1995 and contacted the school district to enroll R.H. The child-study team for the district was Mr. Briard (social worker), who served as case manager for R.H., Ms. Venino (school psychologist), and Ms. Beirne (learning consultant). They were supplied with R.H.'s extensive records which they reviewed, and met with plaintiff and R.H. on January 10, 1995. They conferred with plaintiff, observed R.H., and after considering several possible placements, they proposed to plaintiff that R.H. be placed in the TMR class headed by Ms. O'Keefe, located within the district at the Ocean Township Intermediate School. This class provided a program that was consistent with the program R.H. had been receiving in her TMR class in the Virginia school. Plaintiff met the child-study team and Ms. O'Keefe, toured the school and briefly visited the class that day. The district and plaintiff agreed at that time that R.H. would enter that class and be monitored to see whether it was appropriate.

Plaintiff indicated at that initial meeting that she was very anxious to have R.H. start in the program immediately. The child-study team was able to accommodate her so that R.H. entered Ms. O'Keefe's class the very next day, January 11, 1995. At the same time, the team and Ms. O'Keefe advised plaintiff that while R.H. was being placed at least initially in that class, "we certainly would look at a continuum of alternate placements, which we have." Also at that meeting plaintiff was informed that the previous IEP would be considered while the district was working with R.H., and during that initial period an IEP would be developed and presented.

Plaintiff did not request residential placement for R.H. during the initial meeting on January 10, 1995. She did indicate to Ms. O'Keefe and Mr. Briard at that meeting that she was interested in a residential placement, and had been looking into that in Virginia before she moved, but had not been able to accomplish it there. However, during that meeting and the ensuing three months, plaintiff made no requests for different or additional educational services relating to her daughter except a bus aide, nor voiced any objections to the program that R.H. was receiving at her school. She did not attend the meeting for the development of the interim IEP, (Ex. J–44), despite the school's efforts to include her in the process. She also did not sign that document, which was adopted as a working outline by the district on or about April 3, 1995. At the hearing plaintiff testified that in March or early April, 1995, she had retained counsel. On April 19, 1995, counsel directed a letter to the district requesting residential placement for R.H.

When the school district received the April 19 letter from counsel, they immediately suggested a meeting to discuss the request. A meeting was conducted between the parties on May 10, 1995. At that meeting it appears that plaintiff stated, through counsel, that she was seeking residential placement because she felt that in the present placement R.H. was not progressing; that she was not generalizing skills learned at school to the home; that she was not toilet trained and was deficient in other daily living skills; and that R.H. needed more structure and consistency in order to make progress. The response of the district was to the effect that R.H. had been in its program for only a few months, and residential placement did not appear to be indicated as she was adjusting well and was showing progress in the current placement; and that having been made aware of plaintiffs concerns about the home situation, it would continue to work in cooperation with the parent. It appears that no specific changes to the day program were suggested by either party during that meeting, and that the focus of the meeting was entirely on plaintiffs request for residential placement.

The child-study team conducted a full triennial evaluation of R.H.'s current educational status in May and early June, 1995, as part of the process of drafting her proposed IEP for the 1995–96 school year. Evaluation reports were prepared by each of the child-study team members and by R.H.'s speech therapy teacher. Ms. O'Keefe also provided data from her experience as R.H.'s primary teacher. Plaintiff participated in the evaluation process in interviews with the school psychologist, Ms. Venino, and the school social worker, Mr. Briard.

Mr. Briard testified that in the course of his meeting with plaintiff to prepare for the social assessment portion of the evaluation in early June, 1995, he brought up the subjects of after school and respite care in order to help her as a parent to be aware of resources that might be available in the community.[7]

Mr. Briard determined that plaintiff had taken the initiative to register R.H. with the Division of Developmental Disabilities ("DDD") for respite care. He also discussed with plaintiff the fact that the Association for Retarded Citizens ("ARC") had a location nearby with various programs and services that might be of interest to her. He also asked whether plaintiff had any plans for R.H. for the summer, and when plaintiff inquired whether the school district would provide a summer program for R.H., he said that he would look into the question and respond at the upcoming IEP meeting. Plaintiff made no formal request for an extended summer program at any time.

The district presented and explained its evaluation reports and proposed IEP for the 1995–96 school year to plaintiff at the formal IEP meeting conducted on June 16, 1995. There is no indication that plaintiff was accompanied by her counsel at that meeting, although the notice letter from the district invited plaintiff to bring anyone she wished to bring. Based upon the district's evaluation, the IEP proposed at that time set forth essentially the same program identified in the interim IEP adopted in April, with the addition of transitional planning for R.H., as required by federal and state regulations. 34 C.F.R. § 300.346(b); N.J.A.C. § 6:28–3.6(d)(5). That proposed IEP specified the current TMR class program, with speech therapy and van transportation as related services. (Ex. J–48.) It did not include an extended summer program. Mr. Briard testified that at the time of that meeting it was the judgment of the district, based upon all currently available information, that the proposed IEP for 1995–96 was appropriate for R.H. Plaintiff later enrolled R.H. for two two-week sessions at Camp Mary Heart during the summer of 1995, and obtained a grant from DDD covering the full expense.

Plaintiff's participation in the June 16, 1995 IEP meeting was limited to signing the IEP with the notation "for attendance purposes only." Plaintiff did not, at or about the

---

7. New Jersey regulations provide in pertinent part:

> School personnel may give advice to parents regarding additional services which are not required by this chapter. Such advice places no obligation on the district board of education to provide or fund such services.

N.J.A.C. § 6:28–3.8(b).

time of that meeting, either individually or through counsel, request any specific changes or additions to the program as proposed in that IEP. During that period, however, her previously communicated request for residential placement and her inquiry regarding an extended summer program remained outstanding.

Subsequent to the IEP meeting of June 16, 1995, plaintiff requested mediation within the New Jersey Department of Education as permitted by N.J.A.C. § 6:28–2.6. A mediation conference was conducted on July 26, 1995 by due process mediator Thomas Frost, which was attended by the parties and their counsel. Two issues were raised on behalf of plaintiff at the mediation session: (1) her request for residential placement, and (2) her objection to the fact that the IEP as proposed did not include an extended summer program. On the latter issue, the district again explained, as it had at the June IEP meeting, that it did have such a program available and had considered it for R.H. in the current summer. The district said, however, that an extended summer program would be indicated in cases where significant regression over the two summer months was likely to occur. In R.H.'s case, because she had not had an extended summer program in her IEPs in Virginia and this would be R.H.'s first summer in their district, the district explained that it could better evaluate that question when she returned to school in the fall, which it would do. The mediator then suggested that when the district did make its evaluation on that question based on observations in the fall, it should document those observations.[8] On the issue of residential placement, the district relied upon its previously stated position that based upon the information presently available, in its view the current educational placement was appropriate for R.H. From the record before this Court, it appears that residential placement and the summer program were the only two issues raised by plaintiff at the mediation conference, and that the parties reached no agreement.

By letter from counsel dated August 2, 1995, plaintiff withdrew from mediation and presented her complaint for a due process hearing before the Office of Administrative Law, pursuant to 20 U.S.C. § 1415(b) and N.J.A.C. § 6:28–2.7. The matter was assigned to the designated Administrative Law Judge, and the hearing commenced on October 12, 1995.

## B. The due process hearing

Plaintiff's due process complaint sought two forms of relief at the administrative level: an order for residential placement, as previously requested; and "[r]eformation of the district's IEP in order to comply with the requirements of federal and state law set forth in N.J.A.C. § 6:28–1.1 et seq. and specifically N.J.A.C. § 6:28–3.6."[9] The essence of the latter issue, as contended on behalf of plaintiff in the course of the hearing, was that the IEP document itself, as drafted and proposed by the district in June, 1995, failed to meet the legal requirements for specificity as to current educational status, annual goals and interim objectives, and evaluation criteria. *See* Section VII(B). That issue was raised for the first time in the relief requested in the due process complaint letter.[10]

8. The district followed the mediator's suggestion and did prepare updated observation reports after R.H. returned to school in the fall. Those showed no regression over the summer.

9. The sole reference to this issue in plaintiffs due process request letter, other than the citation to N.J.A.C. § 6:28–3.6 in the relief requested section, was the following sentence in the body of the letter: "[t]he proposed IEP developed for R.H. is inappropriate, does not comply with the requirements of federal and state law and is not reasonably geared towards conferring significant educational benefit."

10. *See* note 9. This impression is further supported by the mediator's notations on the two transmittal forms with which he sent the case to the OAL. Those documents were prepared following the required pre-hearing conference on August 10, 1995, which was conducted by the Department of Education with the parties, for purposes which included specifying the issues in dispute. *See* N.J.A.C. § 6:28(d)(4). One of those forms provided lines for identifying the issues as follows: Referral, Evaluation, Classification, IEP, Program, Placement, or Other. The mediator, Mr. Frost, checked only the lines for Program and Placement, and did not check the line for IEP. On the other form, only the words "program" and "placement" were written in as the issues to be transmitted for hearing.

There is no indication in the record that it was ever mentioned to the district by plaintiff or her counsel during any of the communications between the parties before due process was invoked on August 2, 1995.

The hearing proceedings took what can accurately be described as a bizarre and tortured path. Initially the district, as the party bearing the burden of proof, presented its employee witnesses, beginning with R.H.'s teacher, Ms. O'Keefe, continuing with the three members of the child-study team, and concluding with Joseph Petillo, the Coordinator of Special Services for the district. On the fifth day of the hearing, the testimony of the first four witnesses had been concluded and Mr. Petillo was testifying on cross-examination. The ALJ at that point initiated a sidebar conference which was off the record, and when the record was resumed the ALJ made a statement that he had called the sidebar "because of a timely need to review where we were going with the direction of the case up to this point;" that he had "address[ed] some of [his] own concerns to the parties;" that he had "instructed counsel however that there are ways that this matter can be approached that maybe can perhaps address a significant amount of concerns raised by the mother in this matter;" and that he was inviting the parties to adjourn the hearing, "my purpose, of course, is to give you all the opportunity to embrace what I addressed to both counsel in that sidebar, if nothing else."

As events developed, that break in the hearing began on October 27, 1995, and the parties and the ALJ were engaged in off-the-record settlement efforts until the hearing resumed on February 5, 1996. No settlement had been reached, and the case had been rendered vastly more convoluted by the off-the-record events. Those events featured as major distractions in the subsequent testimony and the ALJ decision.

What occurred during the hiatus before the settlement efforts were exhausted and the hearing resumed was largely off the record, but certain events from that period later became of record because of the further disputes which those events produced. The "concerns" which the ALJ had communicated to counsel at sidebar, to which he made reference in the text quoted above, were not otherwise spelled out by him on the record. However, during the settlement discussions which followed (involving the ALJ and both counsel) it appears of record that "[counsel for plaintiff] demanded and [the ALJ] agreed that it would be of assistance to have a specialist in IEP development retained[,]" such person to have a "background in applied behavior analysis," and that "[t]he name Dr. Howard Margolis which theretofore had been unknown to [counsel for the district] was thrown out as somebody who would be good."[11]

Next, through a series of contacts involving members of the child-study team and counsel for plaintiff, the services of Dr. Margolis were retained pursuant to letters from each side which, later in retrospect, revealed different views of the scope of his retention. The undisputed basis of his retention, however, was that he was to be jointly consulted by the parties, paid by the district, and that: "You will not testify for the district, nor the parent. You are not an advocate for the district, nor the parent, but an advocate for the child." (Ex. R-26.) Dr. Margolis was not designated by the ALJ as a court-appointed expert as permitted under the regulations. *See* N.J.A.C. § 6:28-2.5. Rather, he was retained by the parties under the stated arrangement.

Dr. Margolis had met with the child-study team and briefly discussed the case on the first day that he was involved in it. After being formally retained he proceeded to review all of R.H.'s educational records, observed R.H. in the classroom and conferred with Ms. O'Keefe and the classroom aide, and observed R.H. in the home setting and interviewed her mother and grandmother. A letter was sent by Dr. Margolis to Mr. Petillo and counsel for plaintiff dated December 23, 1995, which stated, "[e]nclosed is the 8th draft of my recommended IEP which I re-

---

11. Howard Margolis, Ed.D., is a learning consultant. When he later testified at the hearing, he was stipulated as an expert in the areas of applied behavior analysis, IEP development, and development of programs for developmentally disabled students.

viewed in part (draft 7) with Mrs. B. Your comments would be appreciated." The enclosure was a "suggested IEP for R.H." Dr. Margolis had discussed one earlier draft with the parent, and made some revisions. He had not shown that draft or any previous drafts to the district. After delivering the "eighth draft," he conferred by telephone with Mr. Briard and went over some of the goals and objectives and orally agreed to delete certain items, but he produced no further drafts of his proposed IEP. The district indicated at that time that it had no major problems with the formulation of goals and objectives in the draft IEP prepared by Dr. Margolis, which it viewed as a more detailed description of some portions of the program which it was already providing to R.H. However, both the district and Dr. Margolis viewed it as only a draft to be used in further discussions between the parties leading to development of a revised IEP to meet plaintiffs contentions regarding measurable goals and objectives and evaluation criteria. *See* Section VII(B).

The parties were scheduled to meet with Dr. Margolis on January 12, 1996. The prior day he faxed to both sides a one-page document which he had written, entitled "Implementation Points for Proposed Program for R.H.—Minimal Needs." The accompanying cover sheet referred to the possibility of inclement weather and stated, "[t]o expedite matters, in case I cannot physically make tomorrow morning's meeting, I have listed some implementation particulars for discussion. . . . Hope this helps." The "implementation plan," as it came to be referred to in the later testimony, included specifications as follows:

- A program scheduled for 365 days a year, an average of 6 or so hours each day (e.g., 1.5 hours in the morning, before school; 4.5 hours in the afternoon and evening).
- Instructor . . . needs masters level skills in special education instruction and applied behavior analysis. To reduce costs and provide for instruction over a 7–day a week, 52–weeks a year, the instructor should be complemented by a well-trained (in applied behavior analysis)

bachelor's level teaching assistant, who is supervised by the instructor. . . .

- [I]nstructor . . . should work with R.H. at least weekly[,] . . . observe the teaching assistant work with R.H., instruct Mrs. B. and R.H.'s grandmother, and attend weekly meeting to make instructional decisions. . . .

 . . . .

- Frequent and planned use of the community, to teach R.H. about the community and meet her community-based goals and objectives.

Frequent and planned social activities outside of the home, to help R.H. meet her social (and related) goals and objectives.

No plan such as this had ever been proposed by Dr. Margolis in all of his approximately thirty years of experience in his career. It was unprecedented in the experience of the district in working with handicapped students. · It was predictably unworkable, as both Dr. Margolis and plaintiff observed when they later testified. It was the functional equivalent of residential placement, as plaintiff and her own expert Dr. Gallina indicated in their testimony. Yet Dr. Margolis rendered no expert report at all, nor did his later testimony, under plaintiffs subpoena at the resumed hearing, go so far as to recommend residential placement. Instead, he opined during his hearing testimony that if his plan did not succeed, which he predicted it would not, then that failure would be a "very strong indicator [for] residential placement in a high quality residential facility. . . ."

The suggested "implementation plan" drafted by Dr. Margolis was virtually identical in its essential elements to the settlement demand which had been detailed by plaintiffs counsel during the *in camera* settlement negotiations with the ALJ after the hearing was halted. That phase of the negotiations had occurred at or about the time that the name of Dr. Margolis was first mentioned (whether by the ALJ or counsel for plaintiff, the record does not reveal). When Dr. Margolis was questioned under oath about the conspicuous similarity between plaintiffs set-

tlement demand and his implementation plan, he denied that any request for an implementation plan came from plaintiffs counsel. He asserted that he himself developed the implementation plan with its six-hour-a-day additional instruction component, stating, "[w]ell, then maybe who [sic] understand the literature and understand the kids would independently come up with the same kind of plan." Plaintiff testified that she never suggested such a plan to Dr. Margolis, nor did he mention it to her before drafting and circulating it.

The parties met with each other and with the ALJ at the hearing location on January 23, 1996 for several hours of negotiations concerning the suggested implementation plan. Two days later, on January 25, after more hours of settlement discussions, some with Dr. Margolis and some with the ALJ, the negotiations were concluded without resolution. There ensued six more days of testimonial hearings and an additional day devoted to closing arguments.

Dr. Margolis testified as one of the hearing witnesses, under subpoena by plaintiff.[12] During the cross-examination of Dr. Margolis by counsel for the district, he acknowledged that he was well acquainted with the attorneys for plaintiff; that he had been retained as an expert on behalf of parents in educational disputes in more than 100 cases (and never for a school district when he accepted the R.H. assignment); and that he had worked in such capacity for the law firm representing plaintiff. He also testified that the ALJ in this case knew of his working relationships with that firm, and the fact was no secret. He asserted that he had made it very clear to the district, at the time he was retained in this matter, that he had worked with that firm previously. Dr. Margolis declared that he had been independent in the work that he undertook in this case.

The district vigorously disputed Dr. Margolis' claim of independence, based upon the nature of the services that he had rendered and also its perception that he had not been forthright in informing it of his connections to the Sussan firm. The district recalled the child-study team and Mr. Petillo to testify to their conflicting recollections as to whether Dr. Margolis had disclosed to them his prior working relationship with the firm representing plaintiff. It is not necessary for us to resolve that issue here. However, we note that by his own testimony, Dr. Margolis did have an extensive and virtually exclusive background of providing expert services on behalf of parents in these disputes.

We have been obliged to provide a description of the circumstances surrounding the settlement negotiations and participation of Dr. Margolis in the case because those events heavily influenced the entire remaining course of the administrative proceedings. After that hiatus in the hearing, much of the testimony of the other witnesses focused upon Dr. Margolis and his suggested implementation plan.

When the ALJ decision ("ALJ Op.") was rendered, it also largely concentrated upon Dr. Margolis and his relationship to the case. *See* Section III(C). This was not surprising, given the fact that the ALJ played a dominant role in procuring both the initial participation of Dr. Margolis as a consultant and his eventual appearance as a witness. However, this emphasis was misplaced because it tended to divert attention from the historical facts about R.H., none of which were in dispute. It also obscured the need to deal with the information and opposing inferences and opinions offered by all of the other witnesses, who were called in the usual and customary course of litigating the issues in a case of this type.

---

**12.** Having been instructed to appear in response to the summons, Dr. Margolis placed on the record his position that he had not been retained as an expert witness on behalf of either party, despite having been subpoenaed by plaintiff. At no time did Dr. Margolis render any expert report in the case. In those circumstances, his status as a witness was comparable to that described in Rule 45(c)(3)(B)(ii) of the Federal Rules of Civil Procedure, which pertains to an unretained expert being compelled to provide opinion or information. *See also* Fed.R.Civ.P. 45, advisory committee's notes to 1991 Amendment ("A growing problem has been the use of subpoenas to compel the giving of evidence and information by unretained experts. Experts are not exempt from the duty to give evidence, even if they cannot be compelled to prepare themselves to give effective testimony. . . .").

## C. The post-hearing administrative results

The Administrative Law Judge rendered a decision granting the following relief:

Based upon all the foregoing, it is OR-DERED that (1) R.H. shall, subject to its approval and acceptance, be placed at the Bancroft School, Haddonfield, New Jersey immediately and she shall remain there so long as it is educationally appropriate and (2) the Ocean Township School District shall immediately create and implement an appropriate individualized education program for R.H. which shall accurately and adequately reflect all of her defined needs and pursuant to the requirements set forth in *N.J.A.C.* § 6:28–3.6 including but not limited to the specified goals and objectives created on behalf of the parties by Dr. Howard Margolis and (3) R.H.'s program and placement at the Bancroft School shall include a related service of an extended school year in accordance with the current programming and schedule of the Bancroft School and (4) D.B. shall be provided with a related service of parental training henceforth in order to assist her in coping with and providing consistency for R.H.; and (5) all costs attendant to R.H.'s matriculation at the Bancroft School shall be borne by respondent Ocean, and shall also include all reasonable transportation costs incurred by D.B. in transporting her daughter back and forth from Bancroft as well as the cost of one visitation per month by D.B. with R.H. at the Bancroft School; and (6) in light of my conclusion relative to the services of R.H.'s attorney, it is RECOMMENDED that an ORDER be granted for attorneys' fees and costs incurred with this action.

The decision was eighty-two pages in length, excluding witness and exhibit lists. The bulk of the decision consisted of summaries of the testimony of each witness.[13] The discussion section of the decision, entitled "Legal Analysis," consisted of an apparently emotional discourse, largely devoid of analysis, in which the ALJ criticized the district and its witnesses and passionately extolled Dr. Margolis.

The ALJ focused his discussion on only two of the witnesses in deciding the issue of residential placement in favor of plaintiff. First, he dismissed the testimony of Dr. Pietrucha, the district's expert child neurologist, characterizing her testimony as bleak, harsh, and suspect. In contrast, the ALJ lavishly praised and defended Dr. Margolis, and then expressly likened Margolis to himself in terms of their role in the case, stating:

[S]pecifically I would hope that Dr. Margolis shall not become jaded by his involvement in this matter so as to preclude him from appropriately participating in further matters on a professional basis in the future. As indicated earlier on, it is unfortunate that Dr. Margolis has been unfairly drawn into this matter because of the uncalled-for attacks made upon him and his professional integrity during the course of this matter. I trust that he will appreciate the concern with which I view such unfounded attacks and that he shall stand even taller and more resolute on behalf of children with special needs. For, in reality, Dr. Margolis does not represent parents and Dr. Margolis does not represent school districts. Dr. Margolis represents children.

And that is akin to the mission of this tribunal *i.e.,* to ensure that children receive a free and appropriate public education in the least restrictive environment. That of course is the requirement of each district board of education under *N.J.A.C.* § 6:28–2.1(a). And, where a district fails to meet that obligation, then it is incumbent upon this tribunal to demand that steps be taken to appropriately address concerns raised on behalf of those affected children.

That portion of the ALJ opinion also gives the strong impression that while verbally espousing the proper standard of educational benefit under *Rowley,* the ALJ actually employed the rejected "best achieve success-in-learning" standard, or even the wholly inapposite "best interests of the child" approach. Those inapplicable standards are discussed in note 36.

---

**13.** There were several portions of the ALJ decision which erroneously summarized certain facts

of record. Those points are noted in the full Opinion but are omitted here.

It is also problematical that in stating his reasons for an award of residential placement, the ALJ relied almost exclusively on his own conclusions drawn from the testimony of Dr. Margolis, even while acknowledging that Margolis "never was asked and nor did he ever volunteer to provide any input with reference to any residential placement in this matter." The ALJ decision contained no comparison or analysis of the testimony presented by the numerous witnesses who did express their positions for and against residential placement.

Following the issuance of the ALJ decision, a series of correspondence was exchanged among counsel for plaintiff, counsel for the district, and personnel of the New Jersey Department of Education. In that exchange, counsel for plaintiff sought the assistance of the Department to compel the district to implement the ALJ decision by transferring R.H. to residential placement immediately. The district responded that the matter was on appeal, and cited the stay-put provision of IDEA and related state and federal regulations in support of its position that the current educational placement of the student was not changed by the ALJ decision.[14] According to the certification of counsel for the district, following that exchange of correspondence she was advised by Department of Education personnel that "no enforcement proceedings would take place as the Department did not think that such was appropriate under the law cited," and also "that there was an Attorney General's opinion on a matter similar to this which went back many years. This opinion also apparently confirmed that the provisions cited in [counsel's] letter would mandate that R.H. 'stay put'." The result of that exchange was that the Department of Education took no steps to compel the district to implement a placement change for R.H. while the district appealed the decision of the Office of Administrative Law.

**14.** The provision of IDEA which is commonly referred to as the "stay-put" provision provides in pertinent part:
 [D]uring the pendency of any proceedings conducted pursuant to this section, unless the

**D. Proceedings in the district court**

Plaintiff filed her action in this Court on May 8, 1996, seeking an award of attorneys' fees and costs as the prevailing party below. *See* 20 U.S.C. § 1415(e)(4)(B). The school district filed its appeal of the administrative decision in the New Jersey Superior Court, Chancery Division, which action was removed to this Court by plaintiff, and the two actions were consolidated by consent.

Plaintiff initially moved for preliminary injunctive relief directing the school district to implement immediately the decision of the Administrative Law Judge. Following briefing and oral argument directed to that limited issue, we denied the motion in an unpublished written Memorandum and Order filed July 2, 1996. In that opinion, we found that R.H.'s current educational placement was the pendent placement under the "stay-put" provision of IDEA, 20 U.S.C. § 1415(e)(3), and that no injunctive relief should be issued by the Court to change that placement while the appeal was pending here. Plaintiff did not appeal from that denial of injunctive relief. *See* 28 U.S.C. § 1292(a)(1).

The parties next filed cross-motions for affirmance and reversal, respectively, of the decision of the ALJ. At oral argument on the cross-motions for judgment in this Court, each party agreed that the matter was ripe for review, and neither party requested the Court to take additional evidence. *See* 20 U.S.C. § 1415(e)(2) ("[T]he court shall receive the records of the administrative proceedings, [and] shall hear additional evidence at the request of a party...."). Also at oral argument on the motions for judgment, on October 21, 1996, counsel for plaintiff requested that we reconsider the denial of preliminary relief in view of the decision of our court of appeals issued September 18, 1996, in *Susquenita School District v. Raelee S.*, 96 F.3d 78 (3d Cir.1996). We advised that we did not believe that case to be controlling under the facts presented here.

State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child....
20 U.S.C. § 1415(e)(3).

Plaintiff subsequently filed another motion to enforce the decision of the ALJ, but because the motions for judgment on the merits had already been briefed and argued and the decision on those motions was in preparation, we advised the parties that the renewed interlocutory motion would be addressed in the final decision rather than separately decided at that time.[15]

## IV. Dual Requirements for "Appropriate Education" under IDEA

■ Courts interpreting IDEA have recognized that the statutory framework imposes dual requirements on states and their school districts. *See, e.g., Scott P.,* 62 F.3d at 533–34. First, they must "provide personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley,* 458 U.S. at 203, 102 S.Ct. at 3049. Second, and equally important, they must "construct a program in the least restrictive educational environment appropriate to the needs of the child." *Scott P.,* 62 F.3d at 534 (citing 20 U.S.C. § 1412(5)(B)); *see also Rowley,* 458 U.S. at 202, 102 S.Ct. at 3049 ("The Act requires participating states to educate handicapped children with nonhandicapped children whenever possible.").

■ Courts have also observed the inherent "tension within the Act between the strong preference for mainstreaming . . . and the requirement that schools provide individualized programs tailored to the specific needs of each disabled child." *Oberti,* 995 F.2d at 1214 (citations omitted). However, both policies are clearly and strongly reflected in the Act as written. *See Rowley,* 458 U.S. at 189, 102 S.Ct. at 3042 ("[T]he face of the statute evinces a congressional intent to bring previously excluded handicapped children into the public education systems of the States and to require the States to adopt procedures which would result in individualized consideration of and instruction for each child."). Accordingly, public school officials are admonished to "devise means to reconcile these conflicting but compelling interests." *Scott P.,* 62 F.3d at 536 n. 7.

In this section we examine these dual statutory requirements, particularly as they have been interpreted to apply in the education of severely and profoundly impaired children. Also in this section and the following section, we note the interplay between the various procedural and substantive rights and obligations embodied in the Act.

### A. Requirement of some meaningful educational benefit

The starting point for interpretation of both the substantive and procedural requirements of IDEA is the decision of the Supreme Court in *Rowley.* In that case, a deaf student in a regular class with certain support services, who was performing better than average but definitely not as well as she would have been with a full-time sign language interpreter for her assistance, sought to receive that assistance under the Education of the Handicapped Act of 1975, which in its relevant provisions was the same as the present IDEA. *Rowley,* 458 U.S. at 184, 102 S.Ct. at 3039–40. The district court and the Court of Appeals for the Second Circuit had held in her favor. The Supreme Court reversed, holding that based upon the findings of the lower courts that the child was receiv-

---

**15.** We acknowledge that the review at this level has consumed a lengthy period of time, confirming that at least in some cases "the review process is ponderous." *School Committee of the Town of Burlington v. Department of Educ.,* 471 U.S. 359, 370, 105 S.Ct. 1996, 2002–03, 85 L.Ed.2d 385 (1985); *Raelee S.,* 96 F.3d at 87. Normally, the review in this Court could be accomplished much more expeditiously. However, this review has been extraordinarily difficult due to a host of factors in this case, including: (1) the extremely peculiar course of the administrative hearing and the sheer volume and fragmentation of the record below; (2) the additional disputes engendered by the off-the-record events during the administrative proceedings; (3) the fact that each party disputed the recitation of transcript contents set forth in the adversary's brief, which rendered the 2,500–page transcript virtually a trackless wilderness that we were obliged to master in order to perform the "independent review" mandated by IDEA; and (4) the relatively amorphous state of the law on the relevant factors for evaluating demands for residential placement of the severely mentally handicapped under IDEA, which we found to be sufficiently illustrated in the cases at this stage to be ready for some summarization and explication, as we have attempted to articulate here.

ing personalized instruction and related services calculated to meet her educational needs, the education she was receiving was "adequate," thus satisfying the substantive requirement of the Act. *Id.* at 209–10, 102 S.Ct. at 3052–53.

■ The Court drew upon the express language of the Act and its legislative history in searching for the substantive standard of benefit required for a "free appropriate public education." Reading the language of the statute, the Court made these observations:

According to the definitions contained in the Act, a "free appropriate public education" consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child "to benefit" from the instruction. Almost as a checklist for adequacy under the Act, the definition also requires that such instruction and services be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP. Thus, **if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a "free appropriate public education" as defined by the Act.**[16]

*Id.* at 188–89, 102 S.Ct. at 3042 (emphasis added).

The express language of the Act, however, was seen to provide no substantive standard by its own terms. "Noticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children." *Id.* at 189, 102 S.Ct. at 3042.

**16.** Throughout this Opinion, where bold face type is used to highlight legal rules drawn from case precedent, the emphasis is added.

**17.** The *Rowley* Court was careful to confine its analysis and its actual holding to the factual situation before it, which involved "a handicapped child who is receiving substantial special-

The legislative history of the Act, which the Court also carefully considered, prompted the following conclusions:

By passing the Act, Congress sought primarily to make public education available to handicapped children. **But in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful.** Indeed, Congress expressly "recognize[d] that in many instances the process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome." ... Thus, the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside.

*Id.* at 192, 102 S.Ct. at 3043.

■ The Supreme Court's conclusion on this issue in *Rowley* was expressed in terms of "some educational benefit":

Implicit in the congressional purpose of providing access to a "free appropriate public education" is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child. It would do little good for Congress to spend millions of dollars in providing access to a public education only to have the handicapped child receive no benefit from that education.... **We therefore conclude that the "basic floor of opportunity" provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child.**[17]

*Id.* at 200–01, 102 S.Ct. at 3048.

■ Two important related issues were resolved by the Court in reaching its holding

ized instruction and related services, and who is performing above average in the regular classrooms of a public school system." *Rowley,* 458 U.S. at 202, 102 S.Ct. at 3049.

in *Rowley*. First, the Court considered and rejected the notion that the Act imposes a standard of maximizing the potential of handicapped students. The Court explained that "[c]ertainly the language of the statute contains no requirement ... that States maximize the potential of handicapped children 'commensurate with the opportunity provided to other children.'" *Id.* at 189–90, 102 S.Ct. at 3042 (citation omitted). Furthermore, the Court added, "[w]hatever Congress meant by an 'appropriate' education, it is clear that it did not mean a potential-maximizing education." *Id.* at 197 n. 21, 102 S.Ct. at 3046 n. 21. Second, the Court rejected the suggestion that the goal of reducing the dependency of the handicapped and thus increasing their self-sufficiency—as frequently mentioned in the legislative history—was intended as a substantive legal standard:

> Despite its frequent mention, we cannot conclude ... that self-sufficiency was itself the substantive standard which Congress imposed upon the States. Because many mildly handicapped children will achieve self-sufficiency without state assistance while personal independence for the severely handicapped may be an unreachable goal, "self-sufficiency" as a substantive standard is at once an inadequate protection and an overly demanding requirement. We thus view these references in the legislative history as evidence of Congress' intention that the services provided handicapped children be educationally beneficial, whatever the nature or severity of their handicap.

*Id.* at 201 n. 23, 102 S.Ct. at 3048 n. 23.

*Rowley* also addressed the role of the courts in providing the judicial review granted by the Act under 20 U.S.C. § 1415(e)(2). *See* Section VI. During that discussion, the Court stressed the importance of the extensive procedural safeguards provided to parents and guardians under the Act as a means of promoting the substantive goals of the legislative scheme. *Rowley*, 458 U.S. at 205–06, 102 S.Ct. at 3051–52.

■ The Third Circuit, in its decisions both before and after *Rowley*, has pointed out that the statutory requirement of educational benefit has both procedural and substantive aspects. *See, e.g., Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171 (3d Cir.1988) (discussing plaintiffs procedural and substantive claims under IDEA), *cert. denied*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989). The *Polk* decision is also noteworthy for purposes of the present analysis because it arose in the context of a severely mentally and physically handicapped child, unlike the situation in *Rowley*.[18]

Christopher Polk, age fourteen, had the functional and mental capacity of a toddler due to having contracted encephalopathy, a disease of the brain similar to cerebral palsy, during infancy. He could sit and kneel, was learning to stand independently, and was showing "some potential for ambulation." *Id.* at 173. His education "consist[ed] of learning basic life skills such as feeding himself, dressing himself, and using the toilet." He was cooperative, but found such learning difficult because of his short attention span. All parties agreed that he required "special services" in order to learn. Placed in a class for the mentally handicapped in his own school district, he was also assigned a full-time classroom aide. Previously he had also received direct physical therapy as part of his education program, but this had been replaced by a "consultative model" in which a physical therapist came once a month to train his teacher in how to integrate physical therapy with his education. His parents did not object to the consultative model itself, but argued that his individual needs also required direct, hands-on physical therapy.[19] *Id.* at 173–74. The court of appeals reversed

---

18. This factual distinction was emphasized by the Supreme Court when it decided *Rowley*, stating that it would not even attempt at that point to set down a blanket rule for assessing the adequacy of educational benefit across the entire spectrum of special education students to be served under the Act. *Rowley*, 458 U.S. at 202, 102 S.Ct. at 3049.

19. Here, it should be noted that the relief requested for Christopher Polk was not residential placement, despite his severe handicapping condition, but rather an addition to the consultive physical therapy so as to include direct physical therapy in his day placement.

summary judgment in favor of the school district, holding that there were factual issues under both the procedural and substantive aspects of the educational benefit inquiry. In so holding, the court articulated the relevant tests to be applied.

The decision in *Polk* first addressed plaintiffs' argument that the school district violated the *procedural* requirements of the Act. More specifically, the parents contended that the district in fact had an inflexible rule that it applied to all students, offering only consultative therapy and prohibiting direct physical therapy. The district contended that they had no such rigid policy. Without deciding the factual issue (which was for the district court), the court of appeals held that in its view, **"a rigid rule under which defendants refuse even to consider providing [the specified service] ... would conflict with [the child's] procedural right to an individualized program."** *Id.* at 177.

The court's rationale for this holding was based primarily upon *Rowley's* emphasis on parental participation in the formulation of the IEP as being one of the essential procedural protections under the Act. Thus, according to the court in *Polk*, "[t]his system of procedural protection only works if the state devises an individualized program and is willing to address the handicapped child's 'unique needs.'" *Id.* (citing 20 U.S.C. § 1401(16); *Rowley,* 458 U.S. at 208, 102 S.Ct. at 3051–52). Other significant support for this holding was found in decisions including *Battle by Battle v. Comwlth. of Pennsylvania,* 629 F.2d 269 (3d Cir.1980), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981), in which Pennsylvania's inflexible policy of limiting special education

to 180 days per year had been held to violate the Act because such an across-the-board policy conflicted "with the Act's emphasis on the individual." *Id.* 629 F.2d at 280.

Turning then to the *substantive* issue of whether the child's education was adequate to meet his unique needs, the court in *Polk* noted that the Supreme Court had not been forced in *Rowley* to confront "the question of how much benefit is sufficient to be 'meaningful,'" because the deaf Amy Rowley had nevertheless been receiving quite substantial benefit from her education. In the case of a severely handicapped individual such as presented in *Polk,* however, the court found that substantive issue "inescapable." *Polk,* 853 F.2d at 180.

Simply put, the court in *Polk* announced that as a substantive educational standard, **"[w]e hold that the [Act] calls for more than a trivial educational benefit."** *Id.* The Court explained, **"[p]ut differently, and using *Rowley's* own terminology, we hold that Congress intended to afford children with special needs an education that would confer meaningful benefit."** [20] *Id.* at 184. That holding was based upon the court's reading of *Rowley* (which it found partially distinguishable on the facts), its own analysis of the statutory language and legislative history, as well as precedent in the Third Circuit and other courts addressing these issues as relating to the severely handicapped. The court particularly relied upon the decisions in *Battle* and *Board of Education v. Diamond,* 808 F.2d 987, 991 (3d Cir.1986) ("*Rowley* makes it perfectly clear that the Act requires a plan of instruction under which educational progress is likely.").[21]

---

**20.** The court of appeals, in announcing this substantive rule in *Polk,* also made the following pertinent observations in support of its holding:

Implicit in the legislative history's emphasis on self-sufficiency is the notion that states must provide some sort of meaningful education—more than mere access to the schoolhouse door. We acknowledge that self-sufficiency cannot serve as a substantive standard by which to measure the appropriateness of a child's education under the Act. *See Rowley,* 458 U.S. at 201 n. 23, 102 S.Ct. at 3048 n. 23.... Indeed, Christopher Polk is not likely ever to attain this coveted status, no matter how excellent his educational program....

Therefore, the heavy emphasis in the legislative history on self-sufficiency as one goal of education, where possible, suggests that the "benefit" conferred by the [Education of the Handicapped Act] and interpreted by *Rowley* must be more than de minimis.

*Polk,* 853 F.2d at 182.

**21.** The *Polk* decision also included a detailed discussion of *Diamond* as it dealt with the problem of regression in relation to the education of the severely handicapped. *See* discussion of Factor Five in this Section and in Section VII(A)(iv)(a)(5).

Education of severely and profoundly impaired children, as well as severely emotionally disturbed ("SED") children was the sole focus of the earlier landmark Third Circuit decision in *Battle*. That case was a consolidated class action on behalf of "all handicapped school aged persons in ... Pennsylvania who require or who may require a program of special education and related services in excess of 180 days per year and the parents or guardians of such persons...." *Id.* at 270. The holding of the case established that at least under the circumstances then presented, "inflexible application of a 180 day maximum prevents the proper formulation of appropriate educational goals for individual members of the plaintiff class," *id.* at 281, in violation of plaintiffs' procedural rights under the Act which "require individual attention to the needs of each handicapped child." *Battle*, 629 F.2d at 280.

The facts found by the district court and relied upon by the circuit court in *Battle* included the following description:

> The Severely and Profoundly Impaired (SPI) are generally regarded as children whose I.Q. is below 30. The severely retarded are likely to be physically handicapped and have difficulty moving. They may enter the school system without toilet training and lack many basic self-help skills, such as dressing and feeding. Their language deficit is usually significant. Academically, one expects their achievements to be very limited, although they may be able to count, tell time and identify a few words on sight at the completion of their education.... The profoundly retarded are the next and lowest subgroup ... unlikely to possess any vocabulary or to be ambulatory. Communication is typically limited to gesturing.... SPI children tend to learn much more slowly than nonhandicapped children and tend much more quickly to forget what they have learned. Additionally, SPI children tend to have great difficulty generalizing skills they have learned from one environment to another.
>
> ....
>
> The educational programs of SPI and SED children depend on the individual

abilities of each child. Where basic self help and social skills such as toilet training, dressing, feeding, and communications are lacking, formal education begins at that point. If the child masters these fundamentals, the education moves on to more difficult but still very basic language, social, and arithmetic skills, such as counting, making change, and identifying simple words.

> The modest objectives of the educational programs of SPI and SED children are related to each child's potential and typically include acquiring additional self help skills, avoiding institutionalization or attaining that level of independence with regard to self care that he or she can live in a community living arrangement or at home and work in a sheltered workshop.

*Id.* at 274–75 (quotations and citations omitted).

This quoted language from *Battle*, although originally appearing as findings of fact in that case, has found its way into subsequent decisions as a generally accurate description of the educational process for severely and profoundly handicapped students. *See, e.g., Polk*, 853 F.2d at 176 (citing *Battle*); *Kruelle v. New Castle Cty. Sch. Dist.*, 642 F.2d 687, 693 (3d Cir.1981) (same).

■ The *Battle* decision was the first case in the Third Circuit to address the challenges of providing educational services under the Act to severely and profoundly handicapped students. In it, the court of appeals highlighted the great difficulty faced by courts in setting or enforcing substantive educational standards in those circumstances:

> [T]he Act probably anticipates that, where possible, educational objectives should be set with reference to those objectives established for the nonhandicapped.... However, even where educational objectives may be established with reference to those objectives set for the nonhandicapped, the determination of appropriate educational programming required by the statute raises extremely difficult problems both in selecting the standard for comparison and in making the appropriate comparison.... Where, as in this case, the hand-

icap in question profoundly affects the child's learning ability, this comparison reaches a level of difficulty, which, in the absence of legislative guidance, approaches the perimeter of judicial competence.

*Battle,* 629 F.2d at 277 (citations omitted). Thus, as to such substantive standards, the court in *Battle* concluded "that the Act contemplates that the determination of appropriate educational goals, as well as the method of best achieving those goals, are matters which are to be established in the first instance by the states." *Id.* at 278.

This view was confirmed by the Supreme Court in *Rowley,* which cautioned that "[i]n assuring that the requirements of the Act have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the states. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." *Rowley,* 458 U.S. at 207, 102 S.Ct. at 3051 (footnote omitted).

■ By the same token, however, our court of appeals stated, with reference to the "meaningful educational benefit" test announced in *Polk,* "we do not read the Supreme Court's salutary warnings against interference with educational methodology as an invitation to abdicate our obligation to enforce the statutory provisions that ensure a free and appropriate education to [each handicapped child]." *Polk,* 853 F.2d at 184. In establishing that substantive test, the court in *Polk* acknowledged, "[w]e recognize the difficulty of measuring levels of benefit in severely handicapped children. Obviously, **the question whether benefit is de minimis must be gauged in relation to the child's potential.**" *Id.* at 185.

B. Requirement of least restrictive educational environment

■ The duty of the courts to observe the requirements of IDEA extends also to recognizing the "strong preference for mainstreaming" embodied in the Act. *Oberti,* 995 F.2d at 1214. Thus, "an IEP must not only

be designed to confer some educational benefit, but it also must deliver the programming in the least restrictive educational environment." *Scott P.,* 62 F.3d at 535. The Act's preference for mainstreaming "rises to the level of a rebuttable presumption." *Board of Educ. v. Holland,* 786 F.Supp. 874, 878 (E.D.Cal.1992), *aff'd,* 14 F.3d 1398 (9th Cir.), *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2679, 129 L.Ed.2d 813 (1994); *see also Oberti,* 995 F.2d at 1214 ("IDEA's presumption in favor of mainstreaming").

Section 1412(5)(B) of IDEA provides that states must establish:

**"procedures to assure that, to the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature and severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily...."**

20 U.S.C. § 1412(5)(B). The federal and state regulations similarly mandate that handicapped students be educated in the "least restrictive environment," *see* 34 C.F.R. §§ 300.550 to 300.556; N.J.A.C. § 6:28–2.10, and "as close as possible to the child's home." 34 C.F.R. § 300.552(a)(3) & (c); N.J.A.C. § 6:28–2.10(a)(5).

Courts in this and other circuits have recognized the tension that these dual requirements impose on school districts, as well as the courts' duty to " 'be careful to avoid imposing their view of preferable educational methods upon the States.' " *See, e.g., Oberti,* 995 F.2d at 1214 (quoting *Rowley,* 458 U.S. at 207, 102 S.Ct. at 3051). They have sought to accommodate those concerns in providing standards for how the mainstreaming requirement of the Act is to be satisfied in particular cases.

■ The Third Circuit in *Oberti* adopted a two-part test for determining the substantive issue of whether a school is in compliance with IDEA's mainstreaming requirement. The *Oberti* case involved an eight-

year-old child with Downs Syndrome whose parents objected to the district's proposed placement in a segregated special education class outside the district. The parents sought to have him placed in a regular class in his neighborhood elementary school, with supplementary aids and services. The ALJ held for the school district, but the district court concluded that the school district had failed to establish by a preponderance of the evidence that the child could not at that time be educated in a regular classroom with supplementary aids and services. Therefore, the court held that the school district had violated IDEA.[22] The court of appeals affirmed that ruling, giving the first comprehensive discussion of the mainstreaming requirement of IDEA in this circuit.

**The first step in the *Oberti* mainstreaming test is to determine " 'whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily.' "** *Id.* at 1215 (quoting *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir.1989)). **"Second, if the court finds that placement outside of a regular classroom is necessary for the child to benefit educationally, then the court must decide 'whether the school has mainstreamed the child to the maximum extent appropriate,' i.e., whether the school has made efforts to include the child in school programs with nondisabled children whenever possible."** *Id.* (quoting *Daniel R.R.*, 874 F.2d at 1048).

The *Oberti* court identified several factors to be considered in applying the first part of the mainstreaming test that it embraced. Although those factors were not explicitly applied to the second part of the test, logic would dictate that they be considered by analogy in evaluating whether a child who cannot be educated satisfactorily in a regular classroom is nevertheless receiving mainstreaming to the maximum extent appropriate. In other words, if a regular classroom is not a feasible placement for a child in light of the nature and severity of that child's handicapping conditions, then presumably these same factors should be considered, insofar as applicable, in evaluating any more restrictive points on the continuum of possible placements.[23]

The first of the factors to be considered by a court in determining whether a child can be educated satisfactorily in a regular classroom with supplementary aids and services is to:

> "look at the steps that the school has taken to try to include the child in a regular classroom ... If the school has given no serious consideration to including the child in a regular class with such supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated the Act's mainstreaming directive. 'The Act does not permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad.' "[24]

22. The United States District Court for the District of New Jersey (Gerry, Chief Judge) issued two opinions in the *Oberti* case. The first opinion found violations of IDEA by the school district but also identified factual issues precluding summary judgment. The second opinion delivered the court's findings of fact and conclusions of law following a plenary hearing. Those opinions are reported at 789 F.Supp. 1322 (1992) and 801 F.Supp. 1392 (1992), respectively, and are referred to herein as *"Oberti I"* and *"Oberti II,"* as distinguished from the court of appeals decision, referred to simply as *"Oberti."*

23. IDEA regulations specifically require school districts to provide "a continuum of alternate placements ... available to meet the needs of" children with disabilities. 34 C.F.R. § 300.551. Also, the continuum must "[m]ake provision for supplementary services ... to be provided in

conjunction with regular class placement." *Id.* § 300.551(b). Thus, the school "must consider the whole range of supplemental aids and services, including resource rooms and itinerant instruction, speech and language therapy, special education training for the regular teacher, behavior modification programs, or any other available aids or services appropriate to the child's particular disabilities." *Oberti*, 995 F.2d at 1216 (internal quotation and citations omitted).

24. The district court in *Oberti I* made it clear that **it is a *procedural* requirement of IDEA that the school district give adequate consideration to the mainstreaming requirement in creating the individual education plan.** *Oberti I*, 789 F.Supp. at 1330. The procedural aspect of the mainstreaming requirement is also clearly expressed in the language of the Act itself, which states in perti-

*Id.* 995 F.2d at 1216 (quoting *Daniel R.R.,* 874 F.2d at 1048).

■ A second factor in this inquiry is the comparison between the educational benefits the child will receive in a regular classroom (with supplementary aids and services) and the benefits the child will receive in the segregated setting. *Id.* On this subject, the *Oberti* court aptly observed:

> The court will have to rely heavily in this regard on the testimony of educational experts. Nevertheless, in making this comparison the court must pay special attention to those unique benefits the child may obtain from integration in a regular classroom which cannot be achieved in a segregated environment, i.e., the development of social and communication skills from interaction with nondisabled peers.[25]

*Id.*

The third factor to be considered by a court in this regard is the possible negative effect the child's inclusion may have on the education of the other children in the regular classroom. *Id.* at 1217. The court in *Oberti* cautioned, however, that "in considering the possible negative effect of the child's presence on the other students, the court must keep in mind the school's obligation under the Act to provide supplementary aids and

services to accommodate the child's disabilities."[26] *Id.*

■ Once these factors have been considered, and if the court concludes that the school district was justified in placing the child in a segregated special education class instead of the regular classroom, the court must consider the second prong of the mainstreaming test, which is whether the child has been included in school programs with nondisabled children to the maximum extent appropriate:

> IDEA and its regulations 'do not contemplate an all-or-nothing educational system in which handicapped children attend either regular or special education.' ... As the Fifth Circuit stated, 'the school must take intermediate steps wherever appropriate, such as placing the child in regular education for some academic classes and in special education for others, mainstreaming the child for nonacademic classes only, or providing interaction with nonhandicapped children during lunch and recess....' Thus, even if a child with disabilities cannot be educated satisfactorily in a regular classroom, that child must still be included in school programs with nondisabled students wherever possible.[27]

*Oberti I,* 789 F.Supp. at 1326 n. 7.

---

nent part that the state must establish "(A) *procedural safeguards* as required by section 1415 of the title [the due process provisions], [and] (B) *procedures* to assure that, to the maximum extent appropriate, handicapped children ... are educated with children who are not handicapped...." 20 U.S.C. § 1412(5) (emphasis added).

25. Chief Judge Gerry commented in *Oberti I* :

> We are impressed by the common sense of this preference for inclusion. *Brown v. Board of Education,* 347 U.S. 483, 493, 495, 74 S.Ct. 686, 691, 692, 98 L.Ed. 873 (1954), highlighted the importance of education and the inequality inherent in any segregated educational system. The point of the IDEA is to bring children with disabilities back into the community to which they belong. The fact that this approach benefits every member of the community, not simply children with disabilities, is often overlooked. The goal of this type of integration is not only for people with disabilities to learn to live and function in the community, but also for those community members without disabilities to learn to live and function along with them.

26. Additional factors, such as cost, have been identified as possibly relevant to the issue of mainstreaming compliance. *Oberti,* 995 F.2d at 1218 n. 25; *Clyde K. v. Puyallup Sch. Dist.,* 35 F.3d 1396, 1401 (9th Cir.1994). In this case, no evidence of the cost of residential placement was presented, but it was brought out that the services called for in Dr. Margolis' proposed implementation plan, for a minimum of six hours of additional programming 365 days per year, would run approximately $70 per hour for the master's level instructor, who would supervise a bachelor's level teaching assistant costing approximately $40 per hour, based upon estimated agency rates.

27. A reason for this requirement, as the Fifth Circuit also pointed out in *Daniel R.R.,* is that "the language and behavior models available from nonhandicapped children may be essential or helpful to the handicapped child's development. In other words, although a handicapped child may not be able to absorb all of the regular education curriculum, he may benefit from nonacademic experiences in the regular education

*Id.* at 1218 (quoting *Daniel R.R.*, 874 F.2d at 1050). These same criteria are incorporated into the New Jersey regulations requiring the least restrictive educational environment. N.J.A.C. § 6:28–2.10(a)(1), (6), (8).

■■■ The courts of appeals have also clearly stated that **"application of the mainstreaming requirement of IDEA to a particular case is 'an individualized, fact-specific inquiry.'"** *Id.* at 1223 (quoting *Daniel R.R.*, 874 F.2d at 1048).

Just as placement in a regular class with supplementary aids and services is at one end of the continuum of alternate placements required to be made available to special education students under IDEA, placement at a completely segregated, full time residential facility is at the other end of that continuum. *See Oberti v. Board of Educ.*, 801 F.Supp. 1392, 1400 (D.N.J.1992) (*"Oberti II"*) ("[T]here must be available, at one end of the continuum, completely segregated placements within separate schools, and, at the other end, placements within regular classes in public schools."), *aff'd*, 995 F.2d 1204 (3d Cir.1993). The IDEA expressly acknowledges that "the nature or severity of the handicap [may be] such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(5)(B). Thus, the Act does provide for separate classes and even residential placement in certain circumstances. *See* 20 U.S.C. § 1401(a)(16) (defining "special education"); *Id.* § 1413(a)(4)(B) (discussing state plans); 34 C.F.R. § 300.302.[28]

Courts have addressed the issue of whether residential placement was the least restrictive educational environment in an ever-increasing number of individual case determinations under IDEA. *See, e.g., M.C. and G.C. v. Central Reg. Sch. Dist.*, 81 F.3d 389, 393 (3d Cir.) (yes), *cert. denied*, —— U.S. ——, 117 S.Ct. 176, 136 L.Ed.2d 116 (1996); *Diamond*, 808 F.2d at 992(yes); *Kruelle*, 642 F.2d at 692(yes). *But see, e.g., Scott P.*, 62 F.3d at 532(no); *Schreiber v. Ridgewood Board of Educ.*, 952 F.Supp. 205 (D.N.J. 1997) (no); *Lascari*, 116 N.J. at 53–54, 560 A.2d at 1192–93(no).[29]

These case law determinations have not as yet yielded clearly delineated standards to guide the decision-makers (families, school districts, administrative and judicial reviewing officers) in their interpretation of the Act and regulations as applied to the issues surrounding residential placement. While each ultimate outcome has been thoroughly considered and solidly based on the governing law and on specific factual findings, the development of standards of interpretation is not as far advanced in this area as it is, for example, in the area at the other end of the mainstreaming continuum represented by the Third Circuit decision in *Oberti*. Nevertheless, the general outlines of the relevant considerations can be discerned from examining these cases, in light of others involving education of severely disabled children. Also, a case-by-case factual comparison of decisions addressing residential placement reveals the thread of precedential consistency that connects them, as may be seen in the following discussion of relevant factors.

environment." *Daniel R.R.*, 874 F.2d at 1049. Likewise, our court of appeals in *Oberti* said, "[l]earning to associate, communicate and cooperate with nondisabled persons is essential to the personal independence of children with disabilities. The Act's mainstreaming directive stems from Congress's concern that the states, through public education, work to develop such independence for disabled children." *Oberti*, 995 F.2d at 1216 n. 23.

**28.** The federal regulation pertaining to residential placement provides:

If placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care

and room and board, must be at no cost to the parents of the child.

34 C.F.R. § 300.302. The Third Circuit has not attempted to decide whether residential placements fall within the definition of "special education," 20 U.S.C. § 1401(a)(16), or "related services." *Id.* § 1401(a)(17). *Kruelle*, 642 F.2d at 694 n. 23.

**29.** As this brief list of cases demonstrates, it is no longer accurate nor helpful to analysis to suggest, as in dicta found in the *Kruelle* opinion, that "[m]ost courts confronted with the question whether residential placement is necessary to meet the goals of an individual education plan have answered in the affirmative." *Kruelle*, 642 F.2d at 692.

■ Analysis of whether residential placement is required for educational purposes under IDEA must begin with the recognition that by its very nature, full-time residential placement is an extremely restrictive type of placement because it completely removes the child from their home and their community.[30] This is not to say that in certain cases it may not be the only appropriate placement, and thus qualify as the least restrictive environment under the Act. *See, e.g., Kruelle*, 642 F.2d at 695 ("[O]nce a court concludes that residential placement is the only realistic option for learning improvement, the question of 'least restrictive' environment is also resolved.") [31]

States participating in IDEA have come to recognize, however, that many severe disabilities can and must be accommodated in community-based educational settings. *See, e.g., Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 891, 104 S.Ct. 3371, 3376, 82 L.Ed.2d 664 (1984) (EHA required school district to provide in-school catheterization services to a child with spina bifida so that she could attend regular public school); *Polk*, 853 F.2d at 185 (direct physical therapy once a week may be required, in addition to other related services, for non-ambulatory severely mentally and physically handicapped child placed in special class within school district); *Oberti v. Board of Educ.*, 789 F.Supp. 1322, 1331 n. 18 (D.N.J.1992) ("*Oberti I* ") (school not permitted to use lack of toileting skills as excuse to exclude child from inclusive program; "working on such skills becomes part and parcel of the education of the student"), *aff'd*, 995 F.2d 1204 (3d Cir.1993); *Battle*, 629 F.2d at 281 (inflexible 180–day school year policy would violate IDEA rights of severely and profoundly impaired and severely emotionally disturbed students).

■ It is abundantly clear that the fact of having been classified as severely or profoundly mentally handicapped would not, under IDEA, require or even permit a student to be assigned to a full-time residential facility by the school district. *See, e.g.,* N.J.S.A. § 18A:46–17, –19 (permitting exclusion from school of children so profoundly retarded as to be classified eligible for day training; and requiring Department of Human Services to provide programs and transportation for such children attending day training centers); *cf. Battle*, 629 F.2d at 283 (application of across-the-board policy to all severely handicapped children in lieu of individual consideration of their unique needs would be impermissible under the EHA); *see also Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 621 (6th Cir.1990) (issue whether educational placement for legally blind and mentally retarded child functioning at one-month developmental level should be home instruction or school-based program; no issue of residential placement).

It is also recognized that all severely and profoundly mentally handicapped children "tend to learn much more slowly than non-handicapped children and tend much more quickly to forget what they have learned ... [and] tend to have great difficulty generalizing skills they have learned from one environment to another." *Battle*, 629 F.2d at 274. Typically, severely retarded children "may enter the school system without toilet training and lack many basic self-help skills, such as dressing and feeding. Their language deficit is usually significant." *Id.* None of these characteristics have been held *per se* to require or justify residential placement in light of the mainstreaming requirement of IDEA.

---

**30.** The court in *Oberti* went so far as to state that there is a presumption in favor of a local placement. *Oberti*, 995 F.2d at 1224 n. 31 (citing *Barnett v. Fairfax Cty. Sch. Bd.*, 927 F.2d 146, 153 (4th Cir.), *cert. denied*, 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991); 34 C.F.R. § 300.552(a)(3) & (c)). These requirements are also embodied in the New Jersey regulations, N.J.A.C. § 6:28–2.10(a)(5), (7).

**31.** It seems to us that the dicta following this quoted statement in *Kruelle*, which was taken from an unpublished decision in an earlier dis-

trict court case, can be read to imply that a court may begin and end its analysis at the most restrictive end of the continuum. That we believe is not an accurate statement of the mainstreaming requirement of IDEA, and therefore does not bear repeating. The dicta stated: "Only when alternatives exist must the court reach the issue of which is the least restrictive." *Kruelle*, 642 F.2d at 695 (quoting *DeWalt v. Burkholder*, No. 80–0014–A, 3 Educ. Health L. Rep. 551:500, 551:553 (E.D.Va. March 13, 1980)).

The language selected by Congress to authorize removal of handicapped children from the regular educational environment demands, as previously noted, that "special classes, separate schooling, or other removal of handicapped children from the regular educational environment occur only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily...." 20 U.S.C. § 1412(5)(B). Because no additional statutory standard for evaluating residential placement decisions appears in the Act, courts have understood this language to apply not only to the choice between placing the child in a regular or a special class, but also to the choice between placing the child in a special class or in a residential facility. Thus, **the substantive inquiry for residential placement is whether the nature or severity of the handicap is such that education in regular or special classes, with the use of supplementary aids and services, cannot be achieved satisfactorily, under the *Rowley* standard of some meaningful educational benefit.**[32]

Cases presenting the issue of possible residential placement for severely handicapped students have typically involved examination of the types of factors identified in *Oberti*. *See* cases cited in text accompanying note 29. Thus, the focus of the inquiry generally will include consideration of at least these three factors, however articulated:

- First: Consider the steps the school district has taken to try to include the child in a special class within a regular or local community-based school setting ("a local placement"), including curriculum, supplementary services, and mainstream opportunities.

- Second: Compare the educational benefits the child will receive in the local placement (with supplementary aids and services) to the educational benefits the child will receive in the more segregated setting of residential placement.

- Third: Consider the possible effects the child's inclusion may have on the education of the other students in the local placement class and in the school.

When the child has been placed in a segregated special education class instead of the regular classroom, as in this case, the court, in applying these factors, must also consider whether the child has been included in school programs with nondisabled children to the maximum extent appropriate. This is the second prong of the *Oberti* test. *Oberti*, 995 F.2d at 1215, 1218. "As IDEA's mainstreaming directive makes clear, Congress understood that a fundamental value of the right to public education for children with disabilities is the right to associate with nondisabled peers."[33] *Id.* at 1216–17.

In addition to considering factors analogous to those three identified in *Oberti*, as we have described them here, courts applying the dual requirements of the Act in residential placement cases have also considered a number of additional factors. Those factors, which may vary from case to case, have included at least six areas of specific inquiry. We will number these additional factors sequentially after the three *Oberti* factors:

32. For example, the Third Circuit in *Scott P.* applied this analysis as follows:

 Residential placement at ... is not, of course, the least restrictive educational environment. The least restrictive environment is the one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled. *See* 20 U.S.C. § 1412(5)(B) (requiring maximal educational integration of disabled children with children who are not disabled, and restricting separate schooling to situations when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily)....

 *Scott P.*, 62 F.3d at 533–35.

33. "Courts should also consider the reciprocal benefits of inclusion to the nondisabled students in the class. Teaching nondisabled children to work and communicate with children with disabilities may do much to eliminate the stigma, mistrust and hostility that have traditionally been harbored against persons with disabilities." *Oberti*, 995 F.2d at 1217 n. 24.

Fourth: Was the child experiencing physical or emotional conditions which fundamentally interfered with the child's ability to learn in a local placement.

Fifth: Was the child's behavior so inadequate, or was regression occurring to such a degree, as to fundamentally interfere with the child's ability to learn in a local placement.

Sixth: Before the dispute arose, did any health or educational professionals actually working with the child conclude that the child needed residential placement for educational purposes.

Seventh: Did the child have significant unrealized potential that could only be developed in residential placement.

Eighth: Did past experience indicate a need for residential placement.

Ninth: Was the demand for residential placement primarily to address educational needs.

Before we discuss each of these factors in the context of this case, the following illustrations will describe how the additional six factors have been considered in some of the reported decisions.

### FOURTH FACTOR: COMPARISON OF LIKELY BENEFITS

The first of these additional factors (which we have numbered four through nine, as explained above) is whether the child was experiencing physical or emotional conditions that fundamentally interfered with the child's ability to learn in a local placement.

The handicapped child in *Kruelle* was retarded and had cerebral palsy. His IQ was below thirty, and at age thirteen he functioned at a six-month-old level. He could not walk, speak, dress himself, or eat unaided, and was not toilet trained. In addition to his physical and mental impairments, he had a history of emotional problems that caused choking and self-induced vomiting when experiencing stress, which increased in severity during his several day school placements. *Kruelle*, 642 F.2d at 689.

The district court agreed with the parents' expert, who recommended residential placement in order to improve the child's chances

of learning. The expert opined that in that child's case, "inconsistency of approach, environment or caretakers typically led to stress and self-destructive behaviors such as vomiting." *Id.* at 690. The circuit court affirmed, holding that "here, consistency of programming and environment is critical to Paul's ability to learn, for the absence of a structured environment contributes to Paul's choking and vomiting which, in turn, interferes fundamentally with his ability to learn." *Id.* at 694. Thus it held that the child in question had unique needs even as compared to similarly handicapped children:

> [W]e cannot conclude that the district judge misapplied the statutory standard in determining that "because of his combination of physical and mental handicaps, [Paul] requires a greater degree of consistency of programming than many other profoundly retarded children" and that "it would appear that full-time care is necessary in order to allow Paul to learn." Indeed, it would be difficult to conceive of a more apt case than Paul's for which the unique needs of a child required residential placement.

*Id.* (quoting *Kruelle v. Biggs*, 489 F.Supp. 169, 173 (D.Del.1980), *aff'd*, 642 F.2d 687 (3d Cir.1981)). The *Kruelle* court found support for its reasoning in the decision of the Fifth Circuit in *Tatro v. Texas*, 625 F.2d 557 (5th Cir.1980), *aff'd*, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984). That case, which did not involve the issue of residential placement, had held that a clean intermittent catheterization procedure fell within the statutory definition of "related services" under the Act. The *Kruelle* decision observed that the *Tatro* holding "was based on the proposition that without [that procedure] the child could not be present in the classroom at all and thus could not benefit from the special education to which she is entitled." *Kruelle*, 642 F.2d at 694. So, too, in *Kruelle*, the court found that without the services uniquely available in . residential educational placement, the child's physical and emotional conditions were fundamentally interfering with his ability to learn.

## FIFTH FACTOR: BEHAVIOR OR REGRESSION

The next factor in this inquiry is whether the child's behavior was so inadequate, or regression was occurring to such a degree, as to fundamentally interfere with the child's ability to learn in a local placement. Examples of the effects of this factor are seen in the Third Circuit decisions in *Diamond* and *M.C.*

The child in *Diamond* was born with severe physical, neurological, and emotional handicaps. His first placement was in a private day school program provided by the school district. However, when he reached the age of nine, the day school advised that it could no longer provide an appropriate education for him because his learning skills were declining and his behavior was becoming counterproductive. Indeed, in his case, actual regression had occurred in the current placement. The hearing officer (who, it may be noted, was Dr. Howard Margolis (Tr. 11 at 57)) and the district court ordered residential placement. The circuit court affirmed the district court's residential placement ruling (reversing in part on other grounds), based upon the district court's finding that the child's behavioral condition required a "constant, consistent, professionally administered behavior modification program daily, throughout all of [the child's] waking hours." *Diamond*, 808 F.2d at 992.

Our court of appeals explained the significance of the *Diamond* holding in relation to the problem of regression in special education, in its later decision in *Polk* as follows:

Although ... *Diamond* does indeed stand for the proposition that a child who is regressing (and whose regression can be reversed by reasonable means) is not receiving sufficient "benefit" under the Act, we believe that *Diamond* can and should be read more expansively.

Indeed, defendants' distinction of *Diamond*, if carried to its logical conclusion, would arguably render that case more expansive because progress for some severely handicapped children may require optimal benefit. As we noted in *Battle*, 629 F.2d at 269, severely handicapped children (unlike normal children) have a strong tendency to regress. A program calculated to lead to non-regression might actually, in the case of severely handicapped children, impose a greater burden on the state than one that requires a program designed to lead to more than trivial progress. The educational progress of a handicapped child (whether in life skills or in a more sophisticated program) can be understood as a continuum where the point of regression versus progress is less relevant than the conferral of benefit. We note that it is therefore possible to construe *Diamond*'s holding not solely as an issue of progress or regression but also as requiring that any educational benefit be more than de minimis.

*Id.*

A similar result was reached in *M.C.* In that case, the Third Circuit affirmed the district court's order for residential placement. The court's decision was based in part upon its holding that the record supported the findings that the child's significant progress in an earlier special class placement had slowed to limited and varied progress and partial regression, accompanied by severe self-stimulatory behavior unaddressed in the current "day training center" placement. *M.C.*, 81 F.3d at 394.

## SIXTH FACTOR: PRIOR ASSESSMENTS

The next factor is whether, before the dispute arose, any health or educational professionals actually working with the child concluded that the child needed residential placement for educational purposes.

Disputes as to whether residential placement is appropriate under IDEA almost invariably involve the family advocating for the residential placement and the school district in opposition. So it is not surprising that in those instances in which the professionals actually working with the child had identified a need for such placement, at a time before litigation arose, that factor has been described and considered in the review process. For example, in *Diamond* the court noted that after a number of years of private day school placement, the school "advised the

child's parents that it was no longer able to provide an appropriate education for [him] because his learning skills were declining and his behavior becoming counterproductive. Although the [current] placement was determined to be inappropriate, the School Board continued it anyway." *Diamond,* 808 F.2d at 989. Also, in *Kruelle* the court observed that at a relatively recent time before the matter went into the administrative hearing process, "[b]ecause of the severity and increased frequency of the vomiting, both the school authorities and Paul's parents concluded that 24-hour residential placement was needed." [34] *Kruelle,* 642 F.2d at 689; *see also Drew P. v. Clarke Cty. Sch. Dist.,* 877 F.2d 927 (11th Cir.1989) (diagnostician recommended residential placement when child was diagnosed with infantile autism at age three), *cert. denied,* 494 U.S. 1046, 110 S.Ct. 1510, 108 L.Ed.2d 646 (1990); *cf. Abrahamson v. Hershman,* 701 F.2d 223 (1st Cir.1983) (during dispute, private day school designated in district's proposed IEP refused to accept the child unless residential component was also provided to reinforce strict behavioral modification applied in day program).

Just as the existence of a residential placement recommendation in the pre-dispute period is relevant when it is present in a case, the absence of any such recommendation during that period is also a factor that courts may consider in evaluating the necessity for residential placement.

### SEVENTH FACTOR: POTENTIAL

The seventh factor inquires whether the child had significant unrealized potential that could only be developed in residential placement.

The theme of relating educational goals and methods to the potential of the student echoes throughout the educational process, including most especially the process of providing handicapped children with a free appropriate education in the least restrictive environment under IDEA. Thus, even as *Rowley* declared that "[w]hatever Congress

meant by an 'appropriate' education, it is clear that it did not mean a potential-maximizing education," 458 U.S. at 197 n. 21, 102 S.Ct. at 3046 n. 21, courts also recognize that as a practical matter, "the modest objectives of the educational programs of [severely and profoundly impaired and severely emotionally disturbed] children are related to each child's potential...." *Battle,* 629 F.2d at 275; *see also Polk,* 853 F.2d at 185 ("[T]he question whether benefit is de minimis must be gauged in relation to the child's potential.").

Potential is therefore another of the factors considered in assessing whether residential placement constitutes the least restrictive educational environment in a given case. For example, in *Kruelle,* as the court approved of residential placement to address the child's severe emotional problems that were interfering with his ability to learn in the current placement, the court observed, "[t]he evidence before us suggests that [the child] potentially can realize benefits from residential placement." *Kruelle,* 642 F.2d at 696 n. 28. Also in *Diamond,* the court relied in part on the fact that during a period when the child was placed at the parents' expense in a residential behavior modification program for his education, the child "was making remarkable progress." *Diamond,* 808 F.2d at 989.

The district court in the *M.C.* case conducted a supplementary evidentiary hearing specifically to address the issue of the child's potential and whether his progress reflected his abilities or a deficiency in his educational program. *M.C. & G.C. v. Central Reg. Sch. Dist.,* 22 Indiv. with Disabilities Educ. L. Rep. 1036 (D.N.J.1995), *aff'd,* 81 F.3d 389 (3d Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 176, 136 L.Ed.2d 116 (1996). That court stated, "[t]he most difficult aspect in evaluating whether a profoundly retarded student ... is entitled to residential placement under the IDEA is ascertaining whether his minimal progress in day placement is the product

---

34. In *Kruelle,* the court flatly acknowledged that the only real dispute was whether the placement could be viewed as primarily for educational purposes, and thus whether the State Board of

Education was required to supervise coordination of other agencies and funding for the child. *Kruelle,* 642 F.2d at 698. *See* discussion of Factor Nine, below.

of an inappropriate setting or of the student's limited ability." *Id.*

The conclusion that the child in M.C. did have significant unrealized potential to be realized in residential placement was based on facts indicating that previously, his I.Q. scores had been much higher than the profound level of mental retardation at which he was then currently functioning; he had made significant progress and had a variety of skills upon entering the current placement, some of which had deteriorated apparently due to lack of reinforcement; and he had made progress on his own during the current placement, developing some skills not specified in his IEP. *Id.* Based on these findings, the circuit court opined that "[t]he [district] court's decision to use its finding of untapped potential as a basis for residential placement was ... not in error." *M.C.,* 81 F.3d at 394.

A similar analysis, on different facts, led to the opposite conclusion in *Matthews v. Davis,* 742 F.2d 825 (4th Cir.1984). In lengthy prior proceedings, the district court in that case had ordered residential placement for specified intervals and retained jurisdiction to assess the results. The rudimentary goals of the child's IEP, both in the prior placement and in the residential placement, involved basic communication and self-care skills, including toilet training. During the residential placement the child "was successfully toilet trained,"[35] *id.* at 828, and the issue became whether residential placement should be continued in an effort to teach the child "self-initiation of toilet use." *Id.* at 830. The child's neurologist, teacher, and caretaker all agreed that although he had improved significantly during his residential placement, he had "probably reached a point of diminishing marginal returns and would not be able to learn much more." *Id.* They disagreed in this respect:

> The school's witnesses [testified] that reinforcement of [his] skills ... at home, along with continued training ... at school, would be sufficient to maintain [his] current skills ... [and] that the cues [he] had

learned could easily be taught to his family. The [neurologist] thought it might be possible to teach self-initiation of toilet use, which would require continuation of the 24–hour program, yet he could not be reasonably certain of this. The other witnesses, representing the school authorities' views ... and their own views from actual experience training [him], maintained that [he] was unlikely to ever be able to acquire the skills required to self-initiate toilet use. They stated that his mental age is too low to allow him to recognize all of the factors that go into self-initiation; his poor manipulative skills will always leave him dependent upon a caretaker for assistance with his trousers; and implementation of such a program carries a substantial risk of regression [acknowledged by the neurologist] which might destroy his current level of toilet training.

*Id.* The district court, in its ruling which was affirmed, ordered discontinuation of the residential program, leaving all other aspects of the IEP intact, stating, "I didn't think [residential placement] was necessary for the custodial care. I think the child had done as well as could be expected, and whatever can be done in the home outside of the school can be done just as easily by his parents, or someone else, in the least restrictive place, which is his home." *Id.* at 831 (quoting district court's unreported opinion).

Courts have repeatedly emphasized that a showing of untapped potential does not necessarily lead to the conclusion that residential placement is appropriate. For example, in *Scott P.,* the parents and their experts contended that only residential placement could provide the child with the requisite "intensity" of services needed for him to make any progress. The court disagreed, stating,

> [w]e think this argument turns on the alleged superiority of the [residential] program rather than the inappropriateness of the ... IEP. We do not denigrate the quality of [that] program ... and acknowl-

---

**35.** "Success in this instance means that [the child] will respond to a verbal cue to 'go to the bathroom.' Although he will always need assistance with the fastenings of his trousers, his increased bladder control and the program of regular periodic bathroom visits are a significant improvement." *Matthews,* 742 F.2d at 828.

edge that [the child] might have benefitted more from being in it. Nor can we doubt the parents' best intentions in attempting to seek the optimal placement for their son. But we must agree with the district and the appeals panel in holding that program optimality is not the standard. . . . [A] program is appropriate if it confers some benefit; it does not need to be superior to the alternatives.

*Scott P.,* 62 F.3d at 535 (citations omitted).

EIGHTH FACTOR: PAST EXPERIENCE

The eighth factor asks whether past experience indicated a need for residential placement.

Courts find noteworthy the experience of the child in prior placements, if such experience provides significant evidence that efforts short of residential placement have not succeeded. Thus, in *Kruelle,* where residential placement was ordered based upon the child's choking and vomiting which manifested emotional distress in the local special education program, his placement history was relevant. The child's history included a combination special school and group home program in which he adjusted well, and a later placement back into "a mixed class of trainable mentally retarded, which had previously failed." *Kruelle,* 642 F.2d at 689. The circuit court approved of the mainstreaming analysis performed by the district court. The district court carefully weighed past attempts to address the child's educational failures in the local school setting, which included extended services into the home, before ordering the more restrictive alternative of residential placement. *Id.* at 695. The district court in *Matthews* also directed and reviewed the results of an extended weekday program with toilet training before concluding that the child had failed to make sufficient progress and ordering residential placement. *Matthews,* 742 F.2d at 827–28.

■ This analysis, however, also requires a court to consider whether a claimed lack of success is due to a need for residential placement or to other possible causes. In *Scott P.,* for example, the court found significant evidence in the record indicating that there were causes other than a need for residential placement that were impeding the child's educational progress. There, the court concluded that testimony indicating that the student needed more programming, even if credited, would not compel the conclusion that residential placement was necessary in order to provide an appropriate education under IDEA. *Scott P.,* 62 F.3d at 531–32. In this context, courts also appear to have considered whether or not the school district has demonstrated willingness to make a good faith effort to participate with the parents in developing additional programming to address needs identified by the parents. *Id.* at 533–36; *see also M.C.,* 81 F.3d at 392 (child's parents requested parent training and were not informed by district that it could be provided under child's IEP).

NINTH FACTOR: PURPOSE
OF PLACEMENT

The final of these additional factors is whether the demand for residential placement was primarily to address educational needs.

It is clear that courts scrutinize the asserted reasons for residential placement under IDEA in order to determine whether the requested placement is based upon genuine educational need. *See, e.g., Kruelle,* 642 F.2d at 693 ("Analysis must focus . . . on whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process."). Where the educational necessity determination is made in the affirmative, the Act requires the state educational agency to take the lead in coordinating supervision of all programs that will combine to provide the necessary services. *Id.* at 696–99 (citing 20 U.S.C. § 1412(6)); *see* note 34.

■ Where that determination cannot be reached based upon the facts of the case, residential placement under the Act is not appropriate. Thus it has been disallowed, or discontinued, based upon findings that residential placement would be to provide essentially custodial services, *see Matthews,* 742 F.2d at 831; or to address parental concerns

primarily dealing with behavior or social problems at home or after school, *see Schreiber*, 952 F.Supp. at 211–12; or to relieve parents of the burdens of raising a severely handicapped child. *See In Re Scott M.*, 24 Indiv. with Disabilities Educ. L. Rep. 1229 (N.H. Admin. Hr'g, Oct. 22, 1996).

■ Also, for the same reasons, the duration of residential placement, when ordered, has generally been limited by the court, *see Kruelle*, 642 F.2d at 693 n. 19 (six months), or entrusted to the IEP yearly review process. *See M.C.*, 81 F.3d at 394–95.

## V. Burden of Proof under Dual Requirements of IDEA

■ It is now well settled, under case precedents in New Jersey and the Third Circuit, that once the parent or guardian places in issue the appropriateness of the IEP and the educational placement, the school district bears the burden of proving that it is appropriate, not only when the district seeks a change, but also when the parents seek change.[36] *See Lascari*, 116 N.J. at 44–47, 560 A.2d at 1188–90. This burden prevails under each of the dual requirements of the Act: the educational benefit aspect and the mainstreaming requirement. *Id.* It applies at the administrative review level(s) and the trial court level, without regard to which party prevailed at the prior level. *Oberti*, 995 F.2d at 1218–21. The standard of proof is preponderance of the evidence, as

provided in the judicial review section of the Act, 20 U.S.C. § 1415(e). *Id.* at 1223.

■ Our court of appeals has considered and rejected the notion that the school district also bears the burden of proving the inappropriateness of alternatives advanced by the student's parents or guardian. In *Scott P.*, where the parents sought a change to residential placement, the court held that the school district would not be assigned the additional burden of proving the inappropriateness of the placement urged by plaintiffs. *Scott P.*, 62 F.3d at 533.

■ The Supreme Court in *Rowley* devoted a significant portion of its opinion to addressing the issue of the role of the courts in exercising the judicial review granted under § 1415(e)(2) of the Act. *Rowley*, 458 U.S. at 186, 204–08, 102 S.Ct. at 3040–41, 3049–52. That discussion primarily concerned the standard for reviewing the administrative agency proceedings. *See* Section VI. However, in that discussion the Court also made certain rulings which are directly relevant on the issue of the district's burden of proof. The Court thus held in *Rowley* that:

[A] court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these require-

---

**36.** The New Jersey Supreme Court in *Lascari* explained that the original 1978 state regulations under IDEA "had required school districts to provide an education 'according to how the pupil can best achieve success in learning....' (the 'best achieve success-in-learning' standard)." *Lascari*, 116 N.J. at 47, 560 A.2d at 1189 (quoting former N.J.A.C. § 6:28–2.1(a)(1)). Those regulations were changed in 1989 by "adopt[ing] the federal standard, which *Rowley* defines as an education from which the child could benefit." *Id.* at 47–48, 560 A.2d 1180, (citing current N.J.A.C. § 6:28–1.1; *Rowley*, 458 U.S. at 200, 102 S.Ct. at 3047–48). The *Lascari* court noted that the purpose of the change in 1989, as reflected in the Department of Education comments to the revised regulations, was "to clarify that the [state] standard in N.J.A.C. § 6:28 has been the same as the federal standard." *Id.* (quoting 21 N.J. Reg. 1385, 1391 (May 15, 1989)).

Courts have also confirmed that the proper standard for evaluating an educational placement or program under IDEA is appropriateness, rather than a "best interests of the child" standard. *See, e.g., Kerkam by Kerkam v. Superintendent D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C.Cir. 1991) (criticizing the decision of the district court in favor of residential placement as "turn[ing] on its understandable concern for Alexander's best interests rather than on the appropriateness of the educational program proposed by the [school district]") (quoted with approval in *Scott P.*, 62 F.3d at 535–36.) In *Kerkam*, the court of appeals for the District of Columbia reversed the district court's order of residential placement, finding that the public school "alternative program confer[red] some educational benefit," thus satisfying the *Rowley* standard. *Id.* at 88.

ments are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051 (footnotes omitted).

It should be noted here that this two-part inquiry for judicial review announced in *Rowley*, when read in context, clearly refers in part one to the procedural requirements of the Act, and in part two to its substantive requirements. As *Rowley* and later case developments demonstrate, there are both procedural and substantive aspects to the "dual requirements" of meaningful educational benefit and least restrictive environment under the Act. *See* Section IV.

 Finally, in referring to the burden of proof of the school district, the Court in *Rowley* reiterated its long-standing view that courts should be hesitant to dictate educational policy, stating:

> [T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.
>
> . . . .
>
> We previously have cautioned that courts lack the "specialized knowledge and experience" necessary to resolve "persistent and difficult questions of educational policy." . . .

We think that Congress shared that view when it passed the Act. . . . Therefore, once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States.[37]

*Id.* at 206–08, 102 S.Ct. at 3050–52 (footnotes and internal citations omitted).

## VI. Standard for District Court Review of ALJ Decision

As previously noted, when a dispute arises under the Act, the parents or guardian have a right to an "impartial due process hearing" in a state administrative proceeding, 20 U.S.C. § 1415(b)(2), featuring numerous procedural protections. *Id.* § 1415(d). States may choose either a one-tier or two-tier administrative review system. *Id.* § 1415(c), 1415(e)(1). New Jersey employs the one-tier system, and since 1982 the New Jersey Office of Administrative Law has been responsible to conduct such hearings. *Lascari*, 116 N.J. at 39, 560 A.2d at 1185.

The Act permits "[a]ny party aggrieved by the findings and decision" at the final administrative level "to bring a civil action . . . in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." 20 U.S.C. § 1415(e)(2). It provides that the reviewing court "shall receive the records of the administrative proceedings, shall hear

---

**37.** The reason that this language appears to refer equally appropriately to review of the school district's actions as it does to the state administrative due process decision is apparent under the facts of the *Rowley* case. There, the position of the school district (that the Act did not require it to provide Amy with a sign language interpreter in the classroom) was adopted by the hearing examiner and affirmed by the state Commissioner of Education before the matter went to judicial review in the federal district court. *Rowley*, 458 U.S. at 185, 102 S.Ct. at 3040. Thus, the "State" had a consistent position in the matter, and the state Commissioner participated in the administrative decisionmaking. It has subsequently been recognized that an administrative due process structure under IDEA which includes the Commissioner or an employee of the state educational agency would be in violation of the impartiality requirement of §§ 1415(b)(1) and 1415(c) of the Act; and state procedures have been amended accordingly. *See, e.g., Burr v. Ambach*, 863 F.2d 1071, 1077 (2d Cir.1988) (holding in accord with the weight of authority

that employees of the state educational agency, including the Commissioner, may not conduct the due process review at the state level), *vacated*, 492 U.S. 902, 109 S.Ct. 3209, 106 L.Ed.2d 560, *reaff'd, Burr v. Sobol*, 888 F.2d 258 (2d Cir.1989), *cert. denied*, 494 U.S. 1005, 110 S.Ct. 1298, 108 L.Ed.2d 475 (1990). *See also Heldman*, 962 F.2d at 152 n. 5 (noting that in New York effective July 1, 1990, a state review officer, instead of the Commissioner of Education, reviews the initial hearing); *Lascari*, 116 N.J. at 39, 560 A.2d at 1185 (noting that in New Jersey, by regulation effective July 1982, due process hearings were no longer conducted by employees of the state educational agency and were assigned instead to the OAL). Therefore, the procedural route in place at the time of *Rowley*, which allowed participation of the state educational agency as a decision maker in the administrative hearing or review process, is no longer permitted under the impartiality requirement of IDEA as it has been generally interpreted in the courts.

additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.*

The Supreme Court in *Rowley* found in the above provision an "implied requirement that due weight shall be given to those [administrative] proceedings." *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051. However, our courts have also ruled that in reviewing the decision of a state agency under IDEA, the district court "must make an independent determination based on a preponderance of the evidence." *Oberti*, 995 F.2d at 1219 (quoting *Geis v. Board of Educ.*, 774 F.2d 575, 583 (3d Cir.1985)). In addition, the "amount of deference to be afforded the administrative proceedings 'is an issue left to the discretion of the district court.... [T]he district court must consider the administrative findings of fact, but is free to accept or reject them.'" *Id.* (quoting *Jefferson Cty. Bd. of Educ. v. Breen*, 853 F.2d 853, 857 (11th Cir.1988)). The court should, of course, provide some explanation if it decides to depart from the agency's ruling. *See Scott P.*, 62 F.3d at 527 (citing *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir.1991)).

The Court of Appeals for the Third Circuit has provided further guidance to reviewing courts in its decision in *Scott P.*, which grappled with issues of standard of review involving the two-tier Pennsylvania administrative procedure, but made observations that appear to have broader applicability. In that case, the circuit court said that an administrative appeals panel, which has a duty to make an "independent decision" based upon an "impartial review" under the Act, 20 U.S.C. § 1415(c), should ordinarily defer to record-supported credibility determinations of the hearing officer, but exercises plenary review on all other matters such as conclusions of law, inferences from proven facts, and credibility-based findings not adequately supported in the record. *Scott P.*, 62 F.3d at 527–29. In so holding, the court reaffirmed its ruling in *Oberti* that the district court, in making its own independent review, should regard *"Rowley's* mandate to accord 'due weight' to the administrative proceedings as a requirement to consider—al-

though not necessarily to accept—the administrative fact findings." *Id. at* 529 (citing *Oberti*, 995 F.2d at 1219).

We will refer to the district court as the "reviewing court" because the judicial review under the Act could also be provided by a state reviewing court under 20 U.S.C. § 1415(e)(2). The same term was used for that purpose by the Supreme Court in *Burlington*, 471 U.S. at 369, 105 S.Ct. at 2002.

It appears to us that the discretion of the reviewing court is surely as broad as that of an appeals panel in the two-tier administrative process, especially because that panel, like the reviewing court, is required to make an independent and impartial review of the decision of the hearing officer. Therefore, we anticipate that the standard for the reviewing court to apply in evaluating the decision of a hearing officer or Administrative Law Judge in the one-tier review process under the Act will be similar to that announced in *Scott P.* for the review of the hearing officer decision by the administrative appeals panel. This reading also appears to be consistent with the further ruling in *Scott P.* that the reviewing court, in according the "due weight" to the administrative process required under *Rowley*, should give due weight to the appeals panel's decision "when the panel reverses the hearing officer's conclusions of law, inferences from proven facts, and factual findings based on credibility judgments where non-testimonial, extrinsic evidence justified the appeals panel's contrary decision." *Scott P.*, 62 F.3d at 529.

## VII. Discussion

The Court has jurisdiction under 28 U.S.C. § 1331 and 20 U.S.C. § 1415(e)(2). The dispute between the parties over the appropriate placement for R.H. is a continuing one, so although the 1995–96 IEP was challenged, the case is not moot. *See Oberti*, 995 F.2d at 1213 n. 14.

The two issues presented by plaintiff in her prayer for relief in the administrative proceeding were whether the law requires R.H. to be placed in a residential facility, and whether the proposed 1995–96 IEP met the specificity requirements of the applicable

laws and regulations. The administrative opinion was in favor of plaintiff on both of those issues, which remain in contention in this appeal. At this level, two additional issues have been raised: the district alleges bias in the conduct of the administrative proceeding, and plaintiff asserts that the stay-put provision of IDEA required that the ALJ decision be implemented by order of this Court while the matter was pending decision here. Each of those issues is addressed in this section.

 A careful examination of the record shows that there were no issues of historical fact regarding R.H. There were also few credibility disputes other than those surrounding the role of Dr. Margolis, but resolution of those disputes is not essential to decision of the issues before this Court. *See* text accompanying note 12; *see also* note 43. All of the material administrative findings were therefore inferred factual conclusions, ultimate facts, or legal conclusions.[38] Following the standards of review described in *Scott P.*, this Court will exercise plenary review, providing explanations for its decision to depart from the administrative rulings. *Scott P.*, 62 F.3d at 527–29.

## A. Residential placement

### i. Introduction

The issue of residential placement in this case primarily involves the procedural and substantive aspects of IDEA's requirement of the least restrictive educational environment. *See* Section IV(B). In performing that analysis, we must also incorporate the substantive rule of "some meaningful educational benefit" derived from the first of the dual requirements of IDEA. *See* Section IV(A). That may be accomplished most effectively in a case such as this by addressing the "benefit" requirement in connection with the analysis of the substantive factors to be considered for residential placement. Before turning to that analysis, however, it is necessary to set forth certain additional facts about R.H.'s diagnosed condition and the various conceptual models used in describing and evaluating such conditions. Also, the ALJ decision targeted one procedural issue regarding residential placement that bears brief mention before proceeding to the substantive analysis.

### ii. Diagnosis, classification and testing

The term "trisomy 18," in medical parlance, refers to an identified chromosomal aberration that produces the types of conditions displayed by R.H. The condition called trisomy 18 is different from trisomy 21, commonly referred to as Down's syndrome. Many trisomy 18 individuals die very early in life, or have mental retardation and developmental and neurological delays similar to R.H.'s. Most of the trisomy 18 individuals are in a much lower range than those who have trisomy 21. While some of those afflicted with trisomy 21 (Down's syndrome) may be educably mentally retarded, those with trisomy 18 tend to be more severely disabled, and typically will be in the trainable range or occasionally the even lower range referred to as "eligible for day training."

R.H. was diagnosed as having trisomy 18 syndrome at an early age, and she was classified trainably mentally retarded from at least age five. Neither her diagnosis nor her educational classification are in issue. She is a severely handicapped individual, according to the terms used for educational classification under the New Jersey regulations. N.J.A.C. § 6:28–3.5(d)(6)(ii). This is an educational classification rather than a medical definition, or one used for example by the American

---

**38.** The Third Circuit distinguishes among three types of facts: basic facts, inferred factual conclusions, and ultimate facts. "Basic facts are the historical and narrative events elicited from the evidence.... Inferred factual conclusions are drawn from basic facts.... No legal precept is implicated in drawing permissible inferences." Ultimate facts are expressed in the language of a standard of law, "e.g., an actor's conduct was negligent; the injury occurred in the course of employment; the rate is reasonable; the compa-

ny refused to bargain collectively." *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir.1981).

The Third Circuit views the question whether special education provided under IDEA is "appropriate" in a given case as an issue of fact. *See Scott P.*, 62 F.3d at 526. It is clear, therefore, that such an issue is one of ultimate fact, and is subject to the standard of review set forth in *Scott P.* referred to above.

Association of Mental Retardation, which have somewhat different definitional standards. The medical diagnostic criteria for mental retardation uses the general categories of mild, moderate, severe and profound. Under that criteria, R.H. would also be regarded as severe, at the I.Q. range of twenty to approximately thirty-five or forty, or almost up to the level of moderate, at the I.Q. range of approximately thirty-five to fifty-five.

It is difficult to test children such as R.H., due to their degree of mental retardation and their many associated difficulties, such as gross and fine motor problems and basic language difficulties. This dilemma was demonstrated in the testing process administered by Ms. Venino, the school psychologist (which produced the current test data upon which all of the opinion testimony of both parties relied in this case). She testified that she used three different methods of evaluating R.H.'s abilities, of which two relied exclusively upon the observations of those who knew the child (her mother and her teacher), and the third was a standardized intelligence test, the Stanford–Binet Intelligence Test, Fourth Edition.

During the I.Q. testing, the teacher had to be present to interpret any signs R.H. made in answer to questions, so that those nonverbal responses could be included in her score. Ms. Venino explained that the Stanford–Binet is designed to cover a range of ages two to adulthood, and contains approximately fifteen subtests, not all of which are supposed to be given to each child, depending upon their ability level. Using that approach, and offering R.H. the seven subtests appropriate for a two-year-old child, R.H. did not obtain a basic score (two successive correct responses) in most of the areas, so an estimated score below the lowest available score on those subtests had to be assigned.

Ms. Venino stated that based on those test results, she estimated the I.Q. at thirty-six, explaining that according to the definitional standards she employed, "[t]he moderate retardation range goes from a score of thirty-six to fifty-one, so you can see that R.H. was really at the lower end of this, and since she did obtain scores of a zero on several of the subtests, you would assume that her I.Q. is somewhat lower than that." She added that the standard error of measure is five points plus or minus, so the I.Q. range could be as low as thirty-one or as high as forty-one, "[e]xcept since she was at the lowest end, I would assume that the lower of that estimate would be more accurate." The retained experts generally agreed that standardized I.Q. testing in this area produced rather inexact results, which they did not dispute or retest. It was also undisputed that viewing the results under all testing methods employed, R.H. has developmental deficits that pervade all aspects of her functioning, and she falls below the first percentile rank in all areas.

### iii. Residential placement—procedural issue

One of the findings of the ALJ opinion was that the school district has had no intention of seriously considering residential placement for R.H. since she first re-enrolled in January, 1995. This raises an issue under the procedural protections of the mainstreaming requirement of IDEA. *See* note 24. The evidence upon which that finding was based was evidently the testimony of plaintiff in which she described an exchange between herself and Mr. Briard during the first meeting on January 10, 1995, when various placements for R.H. were being discussed, and plaintiff expressed her preference for residential placement:

Q: Did he come right out and say no, no absolutely not?

A: He came right out and told me that it's not done. It wouldn't be appropriate.

Q: As I understood it, you simply mentioned a desire on your part for residential placement?

A: I told him that I preferred residential placement for her at that meeting.

Q: And he, Mr. Briard, Fred Briard said no?

A: He basically told me that the state or, you know, that it is not leaned toward at this time, which I know that to be true.

Mr. Briard was not explicitly asked during his testimony to verify or dispute whether he said that. However, assuming that he made a statement to that effect to

plaintiff, his statement in that context would not constitute a violation of the procedural requirements of IDEA, but rather would be an accurate description of the presumption in favor of mainstreaming embodied in the law. *See* Section IV(B).

There is no evidence that this school district has an inflexible policy against residential placement, either in R.H.'s case or in any other case. To the contrary, the testimony established that in making the initial placement of R.H. into Ms. O'Keefe's class, with the express consent of plaintiff, the child-study team did make a preliminary evaluation of her educational needs and compared that with the continuum of placements that might have been appropriate for her, including residential placement, and that the initial placement in Ms. O'Keefe's class was on a provisional basis which they would and did monitor for any necessary changes. They also testified that the district has favorably considered and provided residential placement for its students where they agreed that a genuine need existed. Further, the response of the district to plaintiffs formal request for residential placement was immediately to respond by setting up a meeting with her and her attorney to consider the request.

The school district has taken the position in this litigation that residential placement is not necessary for R.H.'s education in her case, but certainly that position does not constitute a refusal to consider such placement for R.H. The district is entitled to advocate its reasons for that position in this litigation without thereby being held to have violated the procedural protections of the Act.

iv. Residential placement—substantive issue

a. Factors

■ We come now to the primary claim asserted by plaintiff. That issue is whether the district has established by a preponderance of the evidence that the program it is offering to R.H. meets the substantive requirements of IDEA and related laws, or whether, as plaintiff contends, residential placement is the least restrictive educational environment which is likely to provide R.H. with some meaningful educational benefit.

■ The program that we must examine in making this analysis is necessarily the actual program that R.H. has been receiving at the Ocean Township Intermediate School, because since arriving at the district she has never had an agreed-upon IEP. *See* Section III(A); *Cf. Drinker* v. *Colonial* Sch. Dist., 78 F.3d 859, 867 (3d Cir.1996) ("[W]here . . . the dispute arises before any IEP has been implemented, the 'current educational placement' will be the operative placement under which the child is actually receiving instruction at the time the dispute arises.") (quoting *Thomas*, 918 F.2d at 625–26). Of course, in examining the existing program we may obtain relevant information from all of the documentation which describes that program, including the interim and proposed IEPs (Ex. J–44; Ex. J–48), and all related evaluation and educational materials relied upon by the district in structuring its program for R.H. We may also consider the testimony describing the program.

■ We approach this issue bearing in mind that the substantive inquiry for residential placement is whether the nature or severity of the handicap is such that education in regular or special classes cannot, even with the use of supplementary aids and services, be satisfactorily achieved, under the *Rowley* standard of some meaningful educational benefit. *See* note 17 and accompanying text. In making that inquiry we will consider the pertinent factors bearing on the issue of residential placement identified above in Section IV(B).

1. *Inclusion efforts:* Consider the steps the school district has taken to try to include the child in a special class within a regular or local community-based school setting ("a local placement"), including curriculum, supplementary services, and mainstream opportunities.

The handicapping conditions of someone such as R.H. dictate that her educational program consist of training in basic living skills including communication, gross and fine motor skills, self help and social skills,

and vocational skills. She is not expected to ever reach the level of readiness for any real academic instruction. There is no disagreement on those needs.

R.H. is provided with a day school program that is completely devoted to addressing those categories of basic needs. Her curriculum is based upon a comprehensive Curriculum Guide for the Trainable Mentally Retarded developed by Ms. O'Keefe, from which Ms. O'Keefe selected and amplified what she considered the suitable goals and objectives in relation to R.H.'s individual level of development and learning needs. Thus, the interim and proposed IEPs, (Ex. J–44; Ex. J–48) target skill development in those five main areas. The accompanying Instructional Guide sets forth the class schedule for R.H. as well as individualized techniques and strategies, adaptive equipment and modifications, and applicable instructional materials. Other instructional summaries include descriptions of adaptive multi-cultural activities during the school year, and listings of TMR school and community activities, with related calendar events. Ms. O'Keefe uses the IEP in her daily work with each student, and she sends home an annotated copy of the IEP containing teacher observations each quarterly marking period.

The Ocean Township Intermediate School, located approximately four miles from R.H.'s home, is a large building set on seventy-nine acres with an enrollment of approximately 1,200 students, including six handicapped classes. In January, 1995 there were five students in R.H.'s class, including R.H., all of whom were classified as trainable mentally retarded. That number remained the same the next year, with the departure of one student for transition to an ARC program, and the arrival of one. R.H. is described as fitting into the class at a slightly higher functioning level than one of the students and lower than the other three students.

Ms. O'Keefe, the primary teacher for the class since 1987, has solid credentials and experience. She is assisted in the classroom by a full-time aide who has been with the class for at least the same period of time. There are additional teachers for R.H. in the specialty areas of adaptive and developmental physical education, home economics, art and music. The program for R.H. also includes two 20–minute sessions per week with the speech therapist, a licensed speech-language pathologist with a master's degree.

The TMR classroom was specially designed for teaching the handicapped. It is set up in learning centers which Ms. O'Keefe described in her testimony. There is an entry area, a living room area, a dining room/working area, an area with a bedding arrangement, a listening center, an instructional/chalkboard area, a full kitchen (including a maintenance supply area and planned facilities for a clothes washer and dryer), and a handicapped-accessible private bathroom. Each of the areas is provided with the furnishings, equipment, and materials specific to its uses. R.H. and her classmates are also active in other parts of the school building, including the main entrance and commons area, the combination cafeteria and auditorium, and the Instructional Media Center, in addition to the physical education facilities and the art, music, and home economics classrooms.

R.H. attends the regular school hours, 8:00 a.m. to 2:30 p.m., for the district school year which is listed on the school calendar as having 184 days of instruction. Ms. O'Keefe was asked to estimate how much of R.H.'s weekly schedule is directed to the acquisition of basic life skills, and she replied,

> I would dare to say that R.H.'s entire day is devoted to basic life skills[,] for every single thing that she does from the time she enters in the morning until the time she goes home in the afternoon I am focusing, as the other staff members are, on the development of life skills. She does have a course, in particular, Life Skills that really concentrates ... on the various life skills that are outlined in her IEP, but throughout the entire day I believe that the program is geared to developing R.H.'s total life skills, functioning as a delightful human being within an environment ... that is conducive to learning and going out beyond the classroom doors and extending those skills and applying them.

She also stressed the emphasis on language and communication in the program, stating,

"throughout the entire school day I spend with each of the students developing language, I see it as a very, very important part of their full development[,] and communication as well, whether it is verbal or nonverbal."

The basic class schedule for R.H. includes adaptive classes taught by Ms. O'Keefe in communication, vocabulary development, perceptual development, science and life skills, and vocational training. Ms. O'Keefe and her aide also teach and supervise the lunch period. R.H.'s basic schedule also includes the adaptive physical education program and three half-year units in art, music and home economics, as well as the twice-weekly speech therapy sessions, each taught by specialized instructors.

Two periods each day are set aside for language and communication instruction. Ms. O'Keefe testified that R.H. and another student in the TMR class are basically nonverbal. R.H. communicates by means of a few words, some guttural sounds, some signs that she has been taught, and through gestures and facial expressions.[39] According to the speech therapy evaluation, "R.H. has a good repertoire of signs she can produce when cued/prompted. Rarely are the signs she has learned clinically used in spontaneous contexts for functional purposes."

Ms. O'Keefe indicated that the focus of the communications program is on developing expressive language, both verbal and nonverbal, as well as receptive language in terms of the ability to listen, understand and respond. She explained that she and the speech therapist work with R.H. on developing the ability to use sign language, which Ms. O'Keefe is teaching to the whole class so that they can better communicate with R.H. and the other nonverbal student. She also works on verbal and nonverbal articulation through mouth formation and imitation. She teaches word recognition, "not that [R.H.] can necessarily read the word, but that she has an understanding of the concept," and expression using a communication board and other instruc-

tional materials such as flashcards, picture books and listening tapes. Ms. O'Keefe noted that these techniques are reinforced through instructional television, VCR and computer programs, reading programs using magazines and newspapers, and a weekly visit to the Instructional Media Center.

R.H. and the other members of the TMR class receive developmental adaptive physical education every day, where "the emphasis is on the individual development of skills as outlined in the IEP, with the hopes of strengthening muscle tone, increasing endurance and balance, locomotive skills and participation in sports." Ms. O'Keefe stated that the gross motor training for R.H. also encourages the development of additional independence in moving around the school environment. Working with R.H. in the TMR class, Ms. O'Keefe and the aide also encourage fine motor skills, visual motor skills and eye-hand coordination through the use of various techniques. The art and music units of instruction, in addition to providing creative communication and socialization opportunities, were also described as occasions for development of fine and gross motor skills. For example, as observed by Ms. O'Keefe, "[R.H.] loves to dance and she makes a fine attempt at it. She does really, really enjoy that."

The acquisition of basic living skills and social or behavioral skills is addressed throughout R.H.'s daily program, with special emphasis during the periods designated for math/perceptual development, home economics, lunch, science and life skills. The testimony of Ms. O'Keefe and the exhibits reflecting the program established that functional areas including toileting, tooth brushing, washing, dressing, cooking, eating, housekeeping, laundry, environmental and safety awareness, social conduct and leisure activities are integral components of her educational program. Ms. O'Keefe stated that "in the classroom ... I try to maintain as much as possible a home environment.... It's a very natural and family like learning

---

**39.** For example, R.H. pats the chair next to her to invite someone to sit with her. She expresses concern or distress with facial or physical expressions. She makes the "OK" sign to indicate comprehension or satisfaction. And at home, when the ice cream truck comes down the street, she screams for ice cream.

environment and the purpose of that is ... to extend the skills ... that the child is learning at home and bringing it into the classroom and vice versa."

Ms. O'Keefe described a structured and consistent procedure for assisting R.H. with her toileting needs, incorporating instruction in skills of partially undressing and dressing, and the washing of the hands.[40] She provides R.H. with daily individual training in tooth brushing skills. Hand and face washing are also a part of daily class activities, such as after lunch. Dressing skills are worked on daily in class, involving outerwear such as coats, sweaters, socks and shoes. Ms. O'Keefe testified that she also discusses bathing and other aspects of personal hygiene in her instructional sessions with the children, and gives hands-on practice in various grooming skills such as brushing hair, use of tissues and nail care. She has also given individualized training in more personal aspects of self-care, such as shaving and more specific dressing goals, on request of parents or as agreed in a child's IEP. She stated that within the class program she has not had occasion to completely undress or bathe any of the students. Her qualifications do include serving as a life skills training teacher for DDD outside the school setting.

R.H. receives training in eating procedures and etiquette on a daily basis during the lunch period, which is held in the cafeteria except on Thursdays when the TMR class prepares their own lunch in the classroom. Additional training in eating and food preparation and cleanup is provided during the home economics class, which also has a fully-equipped kitchen including a dishwasher. Ms. O'Keefe reported that R.H. feeds herself and does not have to be spoon-fed, although due to her high arch pallet and difficulty chewing foods, her teachers carefully monitor whenever R.H. is eating so that the foods are soft or are cut into small pieces. Ms. O'Keefe added that she herself has done research on feeding and nutrition for the handicapped child and has consulted with the speech therapist on that subject. The social aspects of eating are also addressed during this training.

R.H. and her classmates cook their own lunch one day each week as a learning experience under the supervision of Ms. O'Keefe and the aide. Ms. O'Keefe described the various tasks taught in the TMR classroom during the meal preparation, serving and cleanup. She said that the process is systematically divided into steps and jobs, which all of the students have the opportunity to perform in rotation. Ms. O'Keefe testified that while R.H. needs close supervision and guidance in these activities, she participates in all of them along with the other students in the TMR class.

The program for R.H. also includes other homemaking skills, in both the TMR and the home economics classrooms. Ms. O'Keefe testified that she has obtained several mini-grants, including a laundry skills training grant that provided the TMR classroom with the opportunity to obtain a clothes washing machine and dryer, in addition to the washer and dryer already in use in the home economics room. In the home economics program, R.H. is taught laundry skills including washing, folding and sorting dish towels. Within the TMR classroom Ms. O'Keefe works on folding and sorting of clothing items, and she anticipated expanding the training in laundry skills when the washer and dryer were installed there later in the fall of 1996. Ms. O'Keefe also described a job training grant which enabled her to purchase maintenance supplies. Those are used to teach homemaking skills in the classroom. She also has the class use the maintenance cart and supplies in their activities in other areas of the school building. *See* note 49.

Occupational skills receive particular emphasis in the TMR program for R.H. because of their recognized importance for her future growth and development. Her vocational training is conducted daily, in order to develop the skills and necessary "attitudes, behavior and work habits" to perform such work. Ms. O'Keefe described a structured procedure in which "R.H. is completely familiar with what the expectations are. I will announce to the class—I always set the goals of the task before the class [—] that at this time

---

**40.** The topic of toileting instruction is addressed in detail below, under Factor Seven.

we are going to do our jobs." She described a typical vocational class as follows:

> [R]ight now she's packaging plastic spoons and there's a lot of skills involved in that . . . to get her to concentrate on picking up the plastic bag, being able to open the bag, place the spoon in and then place that package in another basket. So she's working out of three baskets. So there's a lot of skills involved in that, but she's accomplishing that and after she does perhaps five[,] for every five that she does I will count them out as I do with the other students to determine their rate, their speed and their accuracy and as a form of reinforcement to keep going with the job[,] and from that she's taught . . . to work with other students. I turn on the radio to establish a working environment and I also turn on the timer to time the task.

Other examples of occupational learning include the housekeeping activities described above, and clerical skills such as stuffing envelopes, in which R.H. is working on increasing rate, speed, accuracy and organizing work supplies. Ms. O'Keefe testified that such classes also provide another opportunity for R.H. to improve her "time on task," or attention span, under the guidance of the teacher.

At the end of the work week, as Ms. O'Keefe calls it, she gives the students a simulated paycheck, and she teaches the children about saving, using a simulated bank, obtaining cash, and using cash to make selections and purchase items from a vending machine. Ms. O'Keefe testified that although R.H. is not expected to be able to understand what things cost, she is learning that money is used to make purchases, and she is making vending machine purchases with close supervision. Also, on field trips into the community (described below), the students participate in exchanging money for selected items as a learning experience.

██ All of these occupational educational activities are viewed by the school as having the purpose of helping to prepare the TMR

students for other tasks on the outside, and to help them achieve their potential. Ms. O'Keefe stated that in all of R.H.'s training, and in particular the vocational training, the school staff are "working to maximize her fullest potential that she will be able to be a productive member of society. So all of her goals, while they're presently being addressed, are also targeted towards the future, her future." [41] In that connection, she confirmed that as part of R.H.'s transitional process, organizations such as DDD and ARC would be contacted to participate in the planning for her eventual transition into the community.

The curriculum for R.H. also includes life learning skills and information that Ms. O'Keefe described under the headings of math/perceptual development and science/life skills. She testified that, for example, "the mathematics instructional area for R.H. is basically . . . a development of life learning math skills such as measuring, pouring liquid, using measuring spoons . . . and then developing her perceptual skills like with sizes, colors and shapes." Instruction in that area also includes work on days of the week and weather conditions as related to the calendar, using displays and sign language. The science curriculum is integrated into the whole program, she said, including walks outside on campus in which nature and the environment are explored, and recognition of danger signs and development of safety skills such as street crossing are practiced, with supervision.

Ms. O'Keefe included social and behavioral aspects of the curriculum in her descriptions of all the units of instruction, both on campus and in the community. She also specifically noted that the TMR students have daily opportunities to develop socialization skills further through a variety of leisure and recreational activities, both planned and individually selected. The TMR Calendar of Events, which Ms. O'Keefe testified is presented to the parents at Open House in the beginning of the year, reflects activities both

---

**41.** Here it must be noted that although seeking to maximize the educational potential of each student is a primary goal of all dedicated educators and parents, it is not the substantive requirement for a free appropriate public education under IDEA. *Rowley,* 458 U.S. at 197 n. 21, 102 S.Ct. at 3046 n. 21.

in school and in the community. The in-school social events listed there include classroom celebrations of birthdays and of holidays such as Halloween, the December holiday season, and Valentine's Day.

Community based instruction is considered a very important part of the program for R.H. and her classmates, according to the testimony of Ms. O'Keefe. She stated that Wednesday is designated for community activities involving the TMR class. Those typically have included supervised shopping at the grocery store, pharmacy and mall; visits with the TMR class in the neighboring school district; intramural bowling; field trips such as apple picking at Eastmont Orchards and planned excursions to fast food and fine restaurants, the Paper Mill Playhouse, the Statue of Liberty, and Philadelphia.

The inclusion of R.H. and her classmates in the daily life of the school population is accomplished through many contacts which are actively encouraged throughout the program. Some of these are casual interactions such as in the common area at the beginning of the day, where Ms. O'Keefe or the aide frequently sit with their students and greet staff and other students. Other casual contacts are facilitated in the lunchroom where the TMR class regularly eats their lunch along with nonhandicapped classes. More direct interaction occurs through a variety of planned activities involving both the nonhandicapped students and students in other special ed. classes within the school. One of the ongoing programs is named Pride Club (People Recognizing Individual Differences in Everyone), a volunteer service group of nonhandicapped students at the intermediate school which establishes relationships with the various special education classes both at that school and in the community. One of the activities of that club is called Project Friendship, through which volunteers "work in particular with the TMR class as companions to build ... socialization and working skills." It provides "another way of the nondisabled ... students coming into the [TMR] classroom or our students, the TMR students, going out into the school population and interacting with them at school functions, ... pep rallies, assemblies, and social events." Project Friendship also includes the participation of volunteer eighth graders in the adaptive physical education classes with TMR students.

Ms. O'Keefe testified that the TMR class joins in school functions such as assemblies, celebrations, spirit week activities, and book fairs. She also described specifically designed interactive projects including Special Olympics, Pennies for the Planet, Random Acts of Kindness and Understanding Handicaps. Several of those activities are discussed below, under Factor Three.

Parental involvement in the educational process is emphasized for the TMR class as well as other handicapped students. There is a special ed. parent support group that functions as a specialized PTA, organized by the parents and joined in by the district, entitled FAST (Families Accessing Services Together). They have regular meetings on topics generated by the group, discussing and presenting speakers and training demonstrations. The district also maintains affiliations with DDD and ARC and is available to assist families to coordinate with them.

Ms. O'Keefe provides literature and information to TMR class parents on subjects of possible interest, both on her own initiative and in response to parents' inquiries. She testified that she actively invites frequent communication with parents, through informal exchanges as well as parent-teacher conferences. Thus she stated, "[t]hey can ring me 24 hours a day if they had to, if there was a need, and I've always assured the parents and have never in the nine years that I've been working with the TMR class, have never had a complaint with regards to communication."

2. *Comparison of likely benefits*: Compare the educational benefits the child will receive in the local placement (with supplementary aids and services) to the educational benefits the child will receive in the more segregated setting of residential placement.

 Plaintiff contends, and the ALJ found, that R.H. requires residential placement in order to receive "some meaningful educational benefit" under the *Rowley* standard, and therefore residential placement for

R.H. constitutes the least restrictive environment for her individual educational needs. Our court of appeals said in *Oberti* that in the analogous situation of deciding between a regular and a special classroom for a handicapped student, it is appropriate for a court to consider the educational benefits the child would be likely to receive in the respective settings. *Oberti*, 995 F.2d at 1216. The *Oberti* court also recognized that in making this analysis, courts "will have to rely heavily in this regard on the testimony of educational experts." *Id.* Courts must therefore evaluate the opinions of the experts on this issue, where such testimony is in conflict. *See, e.g., Oberti I*, 789 F.Supp. at 1334–36 (discussing the "Battle of the Experts"). The teaching of *Oberti* also reminds us that in making this comparison, courts must pay special attention to those unique benefits the child may obtain from integration in a local school setting, such as the development of social and communication skills from interaction with nondisabled peers. *Oberti*, 995 F.2d at 1216.

### REQUESTED RESIDENTIAL PLACEMENTS

Plaintiffs initial request for residential placement, through the letter of counsel dated April 19, 1995, did not specify any particular residential facility. At the time that plaintiff formally filed for a due process hearing, the complaint letter dated August 2, 1995 sought that R.H. be placed "in a twenty-four hour residential facility such as the Melmark School." Initially during the hearing, the parties were focusing on Melmark as the requested placement. However, it appears that at some time after the ALJ called the break in the hearing on October 27, 1995 and before the hearing resumed on February 5, 1996, plaintiff raised Bancroft as another residential facility for consideration in the case.

Both Melmark and Bancroft performed initial admissions evaluations of R.H. and determined that she would qualify for admission into their programs. Accordingly, when the hearing resumed, representatives of both schools were presented as fact witnesses, to describe their programs. The ALJ in his decision rejected Melmark and ruled in favor of Bancroft as the required placement.

Neither of the parties' medical experts, Dr. Gallina for plaintiff and Dr. Pietrucha for the district, were called upon to visit or evaluate either facility, or to observe R.H. in her current placement. Each of them reviewed the voluminous documentary history on R.H., and then examined and observed her in their office with her mother, whom they interviewed. The testimony of those two experts related to the issue of whether R.H. needed residential placement, rather than focusing on a particular residential facility. Plaintiff testified regarding her observations of both facilities, as did Mr. Petillo, the district's Director of Special Services. Dr. Rapps visited Melmark only. Likewise, Ms. O'Keefe had occasion to visit Melmark, but not Bancroft. In this section we will first summarize the testimony describing the Melmark and Bancroft programs, then review and analyze the relevant opinion testimony.

Bancroft and Melmark are private facilities located approximately one and one-half to two hours from plaintiffs home, respectively. Both are licensed by the State of New Jersey to provide special education in school and residential components, basically operating twenty-four hours per day, 365 days a year. Each offers various programs for physically and/or mentally handicapped children and adults. The day program available for R.H. at each facility is similar to that offered in her current placement, concentrating on the same general areas of communication, gross and fine motor skills, self help and social skills, and vocational training.

The residential program at each facility is coordinated with the day program, with special emphasis on training in activities of daily living such as toileting, eating, dressing, grooming, and leisure activities. Each program brings the students into the community for activities such as shopping and attending entertainment and restaurants. Parental involvement is also encouraged by each school, and parent training is available. Bancroft provides some regular opportunity for interaction with non-handicapped students at neighboring schools, and each has volunteers from the community who interact with the

students on campus. Bancroft in particular emphasizes the applied behavioral analysis method for its residential students. See discussion of that method in Section VII(B). Pertinent details about each facility are set forth in the full Opinion herein, but are omitted from this abridged version.

### RESIDENTIAL PLACEMENT— OPINION TESTIMONY

The school district does not have the burden of proving that its proposed placement is the best available option, or even that it is better than the more restrictive environment of residential placement. *Scott P.,* 62 F.3d at 533–35. "[P]rogram optimality is not the standard.... [A] program is appropriate if it confers some benefit; it does not need to be superior to the alternatives." *Id.* at 535. Neither does the district have a burden to prove that the more restrictive placement sought by the parent or guardian is inappropriate for the child. *Id.* at 533. It is equally settled in this jurisdiction that the standard for evaluating a proposed placement is not the "best achieve success-in-learning" standard. *See Lascari,* 116 N.J. at 47, 560 A.2d at 1189, discussed above at note 36. Rather, in the context of evaluating a demand for residential placement, it is clear that in comparing the anticipated benefits of the program offered by the district with those of the programs advocated by the parent or guardian, the standard is that the district's program of specialized instruction and related services must be likely to confer some meaningful educational benefit, also referred to as more than de minimis or trivial benefit, as defined in *Rowley* and its progeny. *See* Section IV(A).

The district presented the opinion testimony of Ms. O'Keefe, R.H.'s primary teacher, as well as that of the members of the child-study team and Mr. Petillo, the Coordinator of Special Services for the district, on the issue of whether residential placement was necessary for the educational benefit of R.H. Their testimony was unanimously supportive of the district's contention that R.H. is receiving, and is likely to receive, meaningful educational benefit in her current placement, and does not require residential placement.[42] Ms. O'Keefe testified, for example, that she has recommended residential placement for students in the past, but it is not her opinion that R.H. requires residential placement.

Ms. O'Keefe stated that in reviewing R.H.'s progress during the relatively brief period she had been in the district, "while R.H.'s gains have been slight I do see growth taking place in her life skills training, her vocational areas, her communication skills, [and] her socialization skills." She also referred to growth in R.H.'s "perceptual development, such as an awareness of things in her environment and quantitative and positional concepts." Ms. O'Keefe and other witnesses described some of their observations regarding the benefits noted since R.H.'s arrival. *See* discussion of Factor Five below.

Ms. O'Keefe and Mr. Petillo each observed that the same areas of instruction offered in the residential programs are "firmly in place" in the program provided by the district. Mr. Petillo, who visited and observed the programs at both Melmark and Bancroft, stated that in his opinion, while both were fine programs if a student had to be placed residentially, he did not believe that residential placement was a program that R.H. needed for her educational benefit.

The district also presented the testimony of Dr. Dorothy Pietrucha, a physician who is board certified in pediatrics, psychiatry and neurology with special competence in child neurology.[43] Her practice is limited to

---

**42.** While such opinion testimony by a party or an employee of a party must obviously be evaluated in light of their status in the case, the court may consider it and give it such weight as appropriate. Here, the credentials and experience of each of the district employee witnesses were sufficient to support their offering of such opinions. Their opinion testimony was presented without objection, as appears to be customary in such cases.

**43.** Dr. Pietrucha is the Director of the Division of Pediatric Neurology at the Jersey Shore Medical Center and is also on the staff of St. Peter's Medical Center in New Brunswick, New Jersey, and the New York Hospital at Cornell in New York City. She is on the faculty at Cornell Uni-

child neurology, and she treats many children who have a functioning level similar to that of R.H.

Dr. Pietrucha testified that R.H. at the age of fifteen had reached her full intellectual potential which would not improve, and that because her level was so limited, any further progress that she might make would be "a miniscule progress." Dr. Pietrucha testified that based upon her evaluation of R.H. and all of the information provided in this case, she did not believe that residential placement was necessary for R.H.'s education, stating, "I don't believe that a residential placement is going to have any educational benefit for a child, specifically for R.H., or any child functioning at this level. There will not be any educational benefit to residential placement." She said that she has been asked by parents whether she would recommend residential placement for a disabled child, and has made such recommendations in a few cases. Dr. Pietrucha further testified that R.H. does not

in her opinion have any behavioral problems that would warrant placement within a residential facility.

The opinion testimony of Dr. Pietrucha regarding R.H.'s educational potential, as well as the testimony of the other witnesses on that subject, is set forth and analyzed below, in the discussion of Factor Seven. Dr. Pietrucha added that in her opinion, plaintiff needed some parent training to help her cope with R.H.'s toddler level of behavior, "because her mother can process and understand the training, and R.H. would then benefit." That topic is discussed below, under Factor Nine.

Plaintiff presented two witnesses who expressed expert opinion on the issue of whether R.H. requires residential placement, Dr. David Gallina and Dr. Rhonda Rapps. Dr. Gallina is a physician who is board certified in psychiatry and neurology, as well as forensic psychiatry, and has a private practice in

versity Medical Center in New York, and the faculty at Robert Wood Johnson Medical School in New Brunswick. She was qualified as an expert in child neurology in this case, without objection, but she was cross-examined regarding her objectivity. That challenge was based upon the referral letter sent to her by counsel for the school district, which stated, "we would ask that you kindly prepare a report which counters the conclusions of Dr. Gallina and Dr. Rapps that residential placement is necessary." She acknowledged that at the time she rendered her expert report in the case, she knew what the district's position was on the issues of whether R.H. needed residential placement or six additional hours of instruction. However, she stated that the purpose of writing her report, after reviewing the records and examining R.H. and interviewing plaintiff, was to render her opinion on those issues. She stated, "[t]hat was the specific reason that I also requested seeing the patient herself in the office rather than just looking at these reports, because I felt that I could be much more objective in rendering an opinion about that by actually seeing her and her relationship with her mother."

Dr. Pietrucha testified on direct that she and Dr. Gallina (plaintiffs medical expert) graduated from the same medical school, in 1967 and 1968, respectively, and did their residency in the same hospital, Mt. Sinai; and they both hold board certification from the American Board of Psychiatry and Neurology, although her specialty is in neurology and his is in psychiatry. She noted that both she and Dr. Gallina listed several school districts for which they have done consultations. She also stated that she has been consulted by parents to provide input for child-study

team evaluations, and there is relative equality in her instances of seeing students on request of parents and on request of school districts.

As previously noted, Drs. Pietrucha and Gallina performed identical functions in this case, reviewing the voluminous records pertaining to R.H., then examining and observing her in their office and simultaneously interviewing her mother. Neither made any site visits to the home, school, or residential facilities. Yet the ALJ faulted only Dr. Pietrucha for that procedure. A review of the testimony of Dr. Gallina reveals no such criticism of him by the ALJ. In fact, the ALJ explicitly approved of the exact same procedure when employed by Dr. Gallina. A similar dichotomy of treatment of those two witnesses appears in the ALJ opinion.

We note that in *Oberti*, our court of appeals unblinkingly described the role of an expert witness in precisely the same terms as employed in the letter from the district's counsel to Dr. Pietrucha. There the court stated, "[t]o counter the Obertis' experts, the School District offered [named expert witness], a professor of special education at Glassboro State College." *Oberti*, 995 F.2d at 1212. In this case the tone of the letter from counsel for the district to Dr. Pietrucha may have been improvident. Nevertheless, the expert testimony of Dr. Pietrucha was based expressly upon professional examination, observations and experience; and so was the contrary testimony of Dr. Gallina. Therefore, in our view both of these witnesses, as well as plaintiffs other expert, Dr. Rapps, gave competent testimony which deserves the attention of the Court in evaluating the issues they addressed.

neuropsychiatry for children and adults; he also maintains a learning disability center which is state-certified as an independent child-study team. Dr. Rapps has a Doctor of Psychology degree and is a licensed clinical psychologist and certified school psychologist whose private practice includes doing psychological evaluations for school districts or families, and participating as a member of an independent child-study team.

Dr. Gallina used the assumption in his testimony that the current day program is an excellent program, during the periods of time that it is provided to R.H. His opinion was that no matter how suitable and appropriate the day program might be, it would not be adequate to meet R.H.'s educational needs because of its limitations of time and location. He offered his medical opinion that R.H. requires residential placement or its functional equivalent, in order to provide consistency and structure throughout R.H.'s day and night for the acquisition of daily living skills. He expressed the opinion that plaintiff could benefit from some parent training. However, he said that it would be unreasonable to expect R.H.'s parent, or any parent in the circumstances, to be able to provide training to the child that would equal the quality and quantity that a professional staff could supply.

Dr. Gallina's stated reasons for his opinion were basically twofold: First, he stated that a person with the severity of R.H.'s neurological handicaps requires structure, consistency and reinforcement because of their inability to generalize what they learn in one setting so as to apply it in other settings, and because of their tendency to regress during periods lacking such reinforcement. Second, he asserted that R.H. needed to acquire improved basic self-help skills so that she would be acceptable in a group home setting upon completion of her public education, and would thus be able to avoid being institutionalized. Each of those reasons requires discussion and analysis here.

The first basis for Dr. Gallina's opinion in favor of residential placement was expressed by him in terms such as the following:

I think the problem was, and is very typical from a neuropsychiatric medical view-

point in children like R.H., that the difficulty is, what I call, the transition in time and space. Where the child can't make the transition from utilizing a skill in one set of circumstances, such as a structured program at school, to performing the same skill in a new environment. . . .

[T]he child is simply not able to make the cognitive leap . . . that allows the child to generalize the skill, or to universalize it to a new space, to a new set of circumstances. And in addition, . . . there's the problem of time. Much like with an extremely young child, what we consider short periods of time in adulthood are universally unbelievably long to the child. So . . . a couple of hours away from a certain stimuli, or a certain structure, and the child totally loses the application of those skills.

These statements of Dr. Gallina are similar to the testimony of plaintiff in which she stated that R.H. can generalize from the school to the home environment "some, but very little."

█ It is clear that this asserted basis would not alone constitute adequate support for residential placement. It merely identifies a characteristic that has long been recognized by our courts, and indeed was described by Dr. Gallina, as typical of those who have this degree of mental retardation. In fact, the language used by Dr. Gallina is virtually identical to the language used by our court of appeals in *Battle* to describe the handicaps of individuals thus classified: "[Severely and Profoundly Impaired] children tend to learn much more slowly than nonhandicapped children and tend much more quickly to forget what they have learned. Additionally, SPI children tend to have great difficulty generalizing skills they have learned from one environment to another." *Battle*, 629 F.2d at 274.

While similar language has frequently appeared in the reported cases granting residential placement, each such case was grounded in a fact-specific inquiry that found one or more of the additional factors identified above to be present to such a degree as to be dispositive. *See* Section IV(B). None has granted residential placement based sole-

ly on the acknowledged difficulty generalizing, and the consequent need for structure and reinforcement, which is common to individuals such as R.H.[44]

While it is not necessary to discuss this asserted basis further, it may be noted that the facts in this case are also contrary to the notion that R.H. lacks the capacity to generalize, that is, retain learning over time or space, to the degree suggested by the testimony of plaintiff and Dr. Gallina. The evidence indicates rather that R.H. does tend to retain the limited information and skills that she is capable of acquiring, such that what she can do at one time or place she can do at another, given a familiar cue or command, and what she cannot do she cannot do in either situation.

The second basis of Dr. Gallina's opinion in favor of residential placement, regarding preparation for living in a group home, he expressed in testimony such as this:

> Q: [W]ouldn't the ultimate goal be to have her get to a point where perhaps she could learn some very de minimis day skills, and then perhaps live in a group home type of setting where in fact she would have to be in a different location during the day as she is in the evening? I mean, wouldn't that be the ideal ultimate goal for [her]?
> A: Absolutely. And I think that's probably why we're here today to determine what would be the best educational environment and program for her at this stage of her life that would allow her to learn and to retain and to generalize some of the daily living skills so that you can now take this biological entity, this child, and transpose her into something like a group home,

and reasonably expect that she will have retained and be able to apply the basic living skills that she has been taught in this program so that she can maintain herself or be maintained in that type of a living arrangement which would be terribly important to her and terribly important to society.

. . . .

> And ... if we're wrong in keeping her in a day placement, and she's not able to operate in that group home, the alternative is pretty drastic from both a social as well as a personal point of view, because we probably are talking about institutionalization at some point if she doesn't have those skills. She's not going to function in any type of a mainstream social environment, and that's going to be very costly to her personally, and to society, in terms of institutionalizing her.

. . . .

> It's very important for this child, particularly given the low level of functioning she has, that she is able to make it in a group home at some point, because the alternatives are pretty dire.

That testimony of Dr. Gallina was similar to the testimony of plaintiff, for example when she stated, "[t]he issue is getting her at least more helpful to doing it herself so when she is in a group home, and that is the ultimate plan here, that she's as independently functioning as she can be and that will make the difference between an institution and a group home."

---

**44.** If the contention that a handicapped child lacks the ability to generalize and needs structure and consistency were to be held sufficient to justify a particular educational placement, for example, residential placement, then the inescapable conclusion would be that all children at or below the mental capacity of R.H. should be assigned to such placement, upon demand. Such a rule would represent a drastic public policy shift and would clearly violate the inclusion preference of IDEA. *See* authorities discussed above, in text following note 31.

When asked on cross examination whether this was the implication of his testimony, Dr. Gallina's testimony was equivocal, as he could point to no individual characteristics of R.H. that were not fairly typical of someone with her diagnosis and classification. Counsel for plaintiff objected to this line of questioning. The ALJ permitted it, but indicated that in his own view, the fact that plaintiff is a single parent is a distinguishing feature that could weigh in favor of ordering residential placement for educational purposes. Without addressing the legal merits of such a view, we observe that as a factual matter this Court may take judicial notice that in modern American society, single parent families having children in the school system are neither unique nor uncommon.

The language of this testimony by Dr. Gallina and plaintiff echoes, almost verbatim, the words of the *Battle* court when it said,

> [t]he modest objectives of the educational programs of SPI and SPD children are related to each child's potential and typically include "acquiring additional self help skills, avoiding institutionalization or attaining that level of independence with regard to self care that he or she can live in a community living arrangement or at home and work in a sheltered workshop."

*Battle*, 629 F.2d at 275 (citation omitted). However, there are fundamental legal and factual flaws in attempting to rely upon this reasoning to require educational placement in a residential facility.

First, it has been firmly established as a legal matter since *Rowley* that the goal of increasing self-sufficiency is not the substantive standard under IDEA, any more than the substantive requirement of IDEA is to maximize the potential of handicapped students. *Rowley*, 458 U.S. at 197 n. 21, 201 n. 23, 102 S.Ct. at 3046 n. 21, 3048 n. 23; *accord, Battle*, 629 F.2d at 278, 279 n. 11. *See* Section IV(A).

Second, the factual record in this case demonstrates that on the one hand, R.H. already qualifies for various full-time group home facilities and other temporary residential facilities;[45] and on the other hand, eligibility for placement in New Jersey state-sponsored adult group homes is based upon family need rather than the skill level of the client, as discussed below.

Finally, the record is devoid of any evidence that R.H. is at risk of being "institutionalized," in the sense of being assigned to a large monolithic facility, or even any evidence that such institutions suitable for R.H. exist in this state under the contemporary public policy favoring deinstitutionalization of the handicapped population.[46] Rather, the uncontroverted evidence indicated that if R.H. resides in this state after age twenty-one, for the next decades of the foreseeable future R.H. will remain at home with her mother awaiting placement in a DDD community-based group home.

Plaintiff testified that since returning to New Jersey in 1995, she has requested residential placement for R.H. from DDD, and the response was, "I didn't really get a response from it, just that you are on their list, there's 4,000 kids ahead of R.H." Dr. Gallina, who recommended residential educational placement for R.H. with the goal of preparing her for admission to a group home, had no current knowledge of the requirements or programs of any adult group homes.

Dr. Pietrucha explained that there is a major scarcity of residential facilities for the mentally handicapped in this state, which she described as of crisis proportions. Consequently, she said, the priority for obtaining such placement is based on need only. Thus, many parents have been reaching old age

---

45. R.H. has been evaluated by Melmark and Bancroft as acceptable for their group home programs. R.H. currently receives weekend respite care in community-based homes through enrollment in DDD, and received similar respite services through the St. Joseph's organization in Virginia. R.H. has attended summer residential camping programs in Virginia and New Jersey. The evidence indicates that she made good adjustments to the differing demands of those programs, as she has done in the day program in her current school placement.

46. *See, e.g., J.E. v. State, Dept. of Human Servs.*, 131 N.J. 552, 564, 622 A.2d 227, 233 (1993) (holding that DDD's clients have a constitutionally-protected right to the most appropriate placement available that best can enhance their developmental potential in the least restrictive setting); *New Jersey Assoc. for Retarded Citizens, Inc. v. New Jersey Dept. of Human Servs.*, 89 N.J. 234, 250–51, 445 A.2d 704, 712 (1982) (stating that the public policy behind the least restrictive setting requirement is the assumption that handicapped people are autonomous individuals entitled to the same rights and liberties as all other citizens and that the "State must minimize their segregation from society to the extent feasible."); Robert B. Nichols, *Mission Statement, Division of Developmental Disabilities* at 6 (Apr. 2, 1997) <http://www.state.nj.us/humanser-vices/DDD.html$ ("Over the past several years, the Division's focus has shifted from providing services in large, more restrictive institutions to services in less restrictive community settings...."); 1991 N.J. Dept. of Human Servs. Ann. Rep. at 11 (noting the increased placement of the developmentally disabled into community programs and the reallocation of funding to develop more such programs).

before their adult handicapped family member can be placed.[47]

We next address another facet of Dr. Gallina's opinion, in which he stated that no parent can or should be expected to provide the level of intensity or expertise available in a residential placement. We find that proposition to be accurate and unremarkable, but not useful in determining whether the child in this case requires residential placement. Such a statement is in essence just another way of expressing the ultimate issue (which is commonly referred to as "begging the question"). In other words, if the child needs residential placement, then the parent would not be expected to provide its functional equivalent at home; and if the child does not need residential placement, then the parent also would not be expected to provide its functional equivalent at home. So that mental exercise simply does not assist in answering the issue of whether the child needs residential placement.

Dr. Gallina also made it clear that in his opinion no day school program for this child, even if supplemented with in-home parent training and an extended summer program, would be sufficient to meet her educational needs, which he viewed as extending twenty-four hours a day, 365 days a year. He testified: "[M]y main difficulty medically is not so much the program as it exists from 8:00 to 3:00, as with the structure of the program which is really geared to be [for] a more normally functioning neurological entity, which R.H. is not." He stated:

> [T]hat whole program is really designed for a normal child. We're not making any adjustments when this child ... goes to school in the morning or when she's discharged in the afternoon, or she's not getting different holidays off, or she doesn't come into school on Saturdays when other kids don't, or participate in that same day program during July, when other kids are on vacation. In other words, we're not making any adjustments because she has a 35 IQ, and she has all the difficulties she has. The basic structure of the day program is essentially the same one that's designed just for a normal child that goes there.

The above approach reflects, in our view, a classic example of the logical fallacy known as circular reasoning, in which the conclusion mirrors the starting premise, thus:

● R.H. needs residential placement.

47. Dr. Pietrucha and the ALJ engaged in the following dialogue:

> THE COURT: And in six years she's going to be facing a significant transition no matter what happens in all probability; correct?
> THE WITNESS: I'm sorry?
> THE COURT: She'll be facing a significant transition, in all probably a group home setting?
> THE WITNESS: At what point?
> THE COURT: Is that a fair assumption? When she turns 21.
> THE WITNESS: Well, if you could find that group home for her, everybody in this room would be very happy, because the waiting list is about 4,000 in New Jersey right now and the parents are telling me that they're told that the waiting list is anywhere from 17 to 20 years now for them to get their child placed. And so a lot of these poor parents are looking at a situation where they may be in their sixties before their child gets placed. This is a major, major problem. It's a medical problem, but it's also a social problem. It's a major problem we have. It's nice to say when somebody is 21, they go into a group home. But where is that group home? That is the problem.
> THE COURT: Well, if there's severe retardation as you've testified to, it would appear that she would have a high level eligibility. Wouldn't that seem to be the case?
> THE WITNESS: I have patients as retarded as she is or worse who are home with their parents. Some of them are now 35 and 40 years of age and their parents are 70; they're still home. There's no place.
> THE COURT: But there are some who are not also?
> THE WITNESS: There are a few who are not, but the majority that are home are those whose parents are capable of and emotionally capable of still caring for them. The State of New Jersey prioritizes individuals for group homes in situations where parents are physically not capable anymore or whose parents are really just not part of the program because these children were either abandoned, or placed in foster care, or other situations. So New Jersey says we have a lot of kids who really need group homes because there's no parent, or the parents are drug addicts, or the parents are dead. So they go in first. And those that have sort of caring parents, they're on the waiting list. I deal with this all the time in my office. It's really becoming a crisis situation of what to do with the handicapped population as they get older.

- The district's program is not residential placement.
- Therefore, R.H. needs residential placement.

Having analyzed above the reasons asserted by Dr. Gallina in support of this premise and finding them insufficient in fact and in law, we also find that this circular logic fails to provide support for his stated opinion. Furthermore, to the degree that this aspect of Dr. Gallina's opinion expresses a philosophical preference for the more restrictive environment of residential placement, the Court is obliged to eschew such preference. As Chief Judge Gerry correctly observed in *Oberti I,* "[w]e note that the expert opinions here may represent 'conflicting educational philosophies.' Of course, to the extent that the experts recruited by the Obertis express a preference for inclusion, this 'is a preference shared by Congress and embodied in the IDEA.'" *Oberti I,* 789 F.Supp. at 1336 n. 27 (quoting *Holland,* 786 F.Supp. at 881).

Dr. Rhonda Rapps, the clinical psychologist presented by plaintiff, also expressed an expert opinion that "[a] twenty-four hour placement would provide [R.H.] with an appropriate educational program, within the least restrictive environment." Before rendering her opinion she reviewed the background documentation, observed R.H. in the classroom, interviewed Ms. O'Keefe and plaintiff, and visited the Melmark program. She testified that in her opinion the current educational program for R.H. does confer an educational benefit on R.H. She said that "[i]t's appropriate to meet her needs within the confines of the school day, absolutely." She stated that in her view, residential placement would be "more appropriate and more ideal." Her stated reasons were similar to those expressed by Dr. Gallina, concentrating primarily on the need for consistency and structure in the training of daily living skills.

The opinion testimony of Dr. Rapps in favor of residential placement for R.H. is subject to the same analytical flaws noted in the above discussion of Dr. Gallina's opinions. In addition, to the degree that Dr. Rapps expressed a view that the current program does confer an educational benefit upon R.H. and that residential placement would be "more ideal," such testimony favors the position of the district rather than that of plaintiff. This is because, as explained by the court of appeals for the Third Circuit in *Scott P.,* "a program is appropriate if it confers some educational benefit; it does not need to be superior to the alternatives." *Scott P.,* 62 F.3d at 535.

3. *Mainstreaming effects:* Consider the possible effects the child's inclusion may have on the education of the other students in the local placement class and in the school.

When R.H. arrived at the district in January, 1995, the members of the child-study team were genuinely concerned whether R.H. would fit into the TMR classroom setting at the school. As described by Mr. Briard, their concerns were, "to speak frankly that R.H. was rather seriously handicapped ... and we knew that she would have some needs that would tax the resources of the teacher and the aide there[,]" especially the toilet training, and "we wanted to make sure that our teacher was up to that commitment and also wanted to consider how this might affect the other students in the class." He said that this was candidly discussed by the child-study team with both Ms. O'Keefe and plaintiff. He stated that Ms. O'Keefe accepted these responsibilities

> as something that would be a challenge, would take a lot of cooperation among all of us ... and I think there was some concern whether R.H. would fit in with that group and I think we communicated that to R.H.'s mother but there was no hedging involved. I think it was a wholehearted effort on everyone's part to try to make it work.

Those concerns were quickly dispelled, however, as R.H. made an immediate and successful adjustment to both her own class and the broader school environment. This was directly observed by the members of the child-study team, and especially by her teachers.

The primary social interaction of the students in TMR program at the intermediate school is among the members of the class itself, where their "circle of friendship" is established. There are also numerous oppor-

tunities for both casual and more direct interaction between R.H. and her classmates, and other students in the school. A partial listing of those activities would include the participation of volunteer eighth graders in the adaptive physical education classes with TMR students; attendance of TMR students at school assemblies, book fairs and other school functions; programs such as Special Olympics, Pride Club, Project Friendship, and Random Acts of Kindness which encourage companionship interaction among special education students and nonclassified students; a special presentation by the TMR class to all fifth graders called Understanding Handicaps; and numerous daily informal contacts as the TMR class moves about the school building and grounds with their teachers in the course of the school day.

Those interactions, both within the class group and within the larger student body, were described as conveying meaningful benefit both to R.H. and her classmates, and to the larger community of staff and students.[48] Ms. O'Keefe testified to the effects on the entire student population from the program she presents annually to new students, called Understanding Handicaps:

Q: And will they actually show recognition to your students?

A: Most definitely[,] they pass by, call them by name, it's alleviated many fears. You see the fifth graders now [October] walk by and turn around and are sometimes afraid, and this [presentation] just opens up a whole new world for them.

48. One such example was described by Ms. Beirne, the school learning disabilities teacher consultant, describing one of her observations of learning interaction between R.H. and a volunteer eighth grader in the phys. ed. class:

The other day I was down in the gym and the TMR class was having their D & A class, and the Project Friendship students were there. So each TMR student was paired up with their Project Friendship buddy, who was an 8th grade student, and everybody was having a good time. They played many games, running back and forth, picking something up, bringing it back, putting it in a basket. And each student ran with their buddy, and were coaxed into the activity if they were a bit confused.

This scenario, taken from the actual program at issue in this case, evokes Chief Judge Gerry's observation in *Oberti I* that:

The fact that this approach benefits every member of the community, not simply children with disabilities, is often overlooked. The goal of this type of integration is not only for people with disabilities to learn to live and function in the community, but also for those community members without disabilities to learn to live and function along with them.

*Oberti I,* 789 F.Supp. at 1326 n. 7.

Ms. O'Keefe described R.H.'s participation in school assemblies in these words:

Q: [W]hat are the assemblies about normally?

A: I can think of one most recently as far as traveling on the bus, bus safety. We've had other assemblies on fire prevention and safety. We've had programs on building self-esteem[,] it was kind of like a puppet show type thing.

Q: And does R.H. understand what's being taught or she's sitting there and she's enjoying people . . . interacting?

A: I can't . . . speak of how much knowledge she is gaining. It appears . . . that she has enjoyed them by her attentiveness to them and also . . . her response of clapping . . . with the others, modeling from other students and laughing or, for example, we attended the band concert her response to the sounds . . .

Q: Does R.H. sit in the assemblies by herself or does she need somebody sitting

So R.H. participated in this, and it really went very nicely. But at the end of the class it was very interesting. R.H.'s partner went around and was collecting the basketballs and was putting them on the rack, and without anyone saying anything to R.H., R.H. went around and collected the basketballs all over the gym and put them on the rack. And then R.H.'s partner, there was a rolling rack, and she started to roll it into the storage closet, and without anyone saying anything to R.H. she grabbed the end of the rack and was guiding it into the closet also. And I thought, this is just wonderful.

next to her to make sure that she's not overly distracted?

A: She usually has . . . both the aide and myself are sitting with her and the other students.

. . . .

Q: So there are times when R.H. is sitting next to two students?

A: Most definitely.

This experience appears to be precisely that envisioned by the Fifth Circuit in *Daniel R.R.*, when the court pointed out that a reason for the inclusion requirement of IDEA is that "the language and behavior models available from nonhandicapped children may be essential or helpful to the handicapped child's development. In other words, although a handicapped child may not be able to absorb all of the regular education curriculum, he may benefit from nonacademic experiences in the regular education environment." *Daniel R.R.*, 874 F.2d at 1049.

These benefits to R.H. from her interaction with and observation of nonhandicapped children may be particularly significant to her education, because this is the first time she has experienced an educational placement in a special class in a regular community-based school. These constant opportunities for interaction with nonhandicapped school children, in a protective and supportive environment, may be viewed as a successive step toward the greater involvement with the local community which R.H. will in all likelihood experience in her future.

4. *Physical or emotional conditions:* Was the child experiencing physical or emotional conditions which fundamentally interfered with the child's ability to learn in a local placement.

R.H. is under the care of the pediatrician who has been her primary treating physician during all the years she has resided in New Jersey since she was approximately five years old. Plaintiff testified that R.H. takes prescription medications to reduce her drooling, to reduce hyperactivity, and to prepare for sleep. The school receives and administers the necessary medications during the school day. The record indicates that R.H. has no unmet medical needs. Her physical anomalies and limitations are known and documented, but the record establishes that those are being effectively accommodated in the adaptive facilities and programming provided in her current placement. *See* discussion of Factor One, *supra.*

The emotional status of R.H. in her current placement is likewise stable and normal, relative to her level of handicap. This was noted by Dr. Gallina, plaintiffs expert, who observed that her thought processes appeared to be logical and coherent, with no indication of psychiatric disease.

Dr. Pietrucha, the district's expert, also noted that "the mother . . . told me that the child seemed to be content and happy in the classroom environment and she seemed to get along." This was reiterated by Ms. O'Keefe, who testified,

[S]he does convey her feelings and when we talk about feelings, she can convey her pleasure. She's a very happy and social person. When I say with gestures and facial expressions, she can express her . . . feelings that she's not satisfied with something. For example, a child bumped into her and through a gesture or a facial expression or a reaction, she conveys her feeling. She also conveyed her feeling of fear, and . . . the expression of questioning like that something is not clear.

Ms. Beirne, the learning disabilities teacher consultant on the child-study team, testified that the formal testing in the Koontz Child Development assessment confirmed that R.H.'s mood and emotions were generally appropriate in relation to her level of mental development.

Based upon these facts, it is clear that this case is not one such as *Kruelle*, where unless the child can receive the services uniquely available in residential educational placement, the child's physical and emotional conditions are fundamentally interfering with her ability to learn. *See Kruelle*, 642 F.2d at 694.

5. *Behavior or regression:* Was the child's behavior so inadequate, or was regression occurring to such a degree, as to fundamentally interfere with the child's ability to learn in a local placement.

R.H. presents no unusual behavior problems in the current placement. To the contrary, the school staff reported that she made the significant adjustment to her current school smoothly, and has made progress in her behavioral interactions with children and adults in that setting.

Mr. Briard, R.H.'s case manager on the child-study team, testified that during R.H.'s initial adjustment period he made a special point of keeping in constant contact with Ms. O'Keefe and going into the classroom almost every day. He observed appropriate behavior and a successful transition at that time. Similarly, Mr. Briard stated that at the time of the triennial evaluation in June, 1995, the child-study team "felt that in the brief period of time that we had to work with her, she had adjusted well to the program, and we had seen enough signs of progress that we felt we were on the right track." He also observed that after the summer R.H. was glad to be back in school and showed no behavioral regression.

Ms. O'Keefe testified that R.H. does not present unmanageable behavior problems. She stated that R.H. "is compliant. So ... as we identify or continue her goals and objectives she does comply and when you model or demonstrate or practice with [her] she usually will conform." Ms. O'Keefe described some of the techniques she uses to encourage appropriate behavior for R.H. Ms. O'Keefe also testified that R.H.'s mother had indicated that sometimes at home R.H. would be very fidgety, and that she shared the "quiet hands" technique with plaintiff.

The record similarly established that in other areas of learning, R.H. has shown progress and no regression in her current placement. Ms. O'Keefe summarized the educational progress which she witnessed in R.H. from January of 1995 until her testimony in mid-October 1996, stating, "[w]hen I think of from January through to the present

time[,] while R.H.'s gains have been slight I do see growth taking place in her life skills training, her vocational areas, her communication skills, her socialization skills."

■ As previously mentioned, during the Department of Education mediation session on July 26, 1995, the mediator suggested that the child-study team document their observations of R.H. when she returned to school in the fall, to determine whether she displayed any significant regression. Here it may be recalled that in *Polk*, the Third Circuit declared,

[a]s we noted in *Battle*, ... severely handicapped children (unlike normal children) have a strong tendency to regress. A program calculated to lead to non-regression might actually, in the case of severely handicapped children, impose a greater burden on the state than one that requires a program designed to lead to more than trivial progress. The educational progress of a handicapped child (whether in life skills or in a more sophisticated program) can be understood as a continuum where the point of regression versus progress is less relevant than the conferral of benefit.

*Polk*, 853 F.2d at 184. We understand that to mean that regression in a severely handicapped student is expected, and that a program which addresses the tendency to regress may confer more than de minimis educational benefit even if some regression nevertheless occurs. However, that issue is not presented here, because based upon the detailed evaluations of Ms. O'Keefe and each member of the child-study team, no regression was observed in R.H. during that summer, and indeed some slight additional progress was noted. Also, as the due process hearing continued into 1996, Ms. O'Keefe was again called to testify on February 5, 1996. At that time she reported that R.H. continued to progress in key areas.[49]

49. An anecdotal example provided by Ms. O'Keefe at that time was the following:

Our class adopted an area in the building. We call it the TMR Secret Garden. We had viewed the film The Secret Garden and we requested that we adopt this area, ... to enhance the children's skills, and also ... to be

visible to the rest of the school building in tasks that the students can perform.

And R.H. was asked, we have a maintenance cart that we use, and I asked her to pick up the sign. We had completed the task. We put a sign down wet floor since we sprayed the plants and so on. And I said, I gave her two

Plaintiff in this case initiated her demand for residential placement, through counsel, a scant four months after R.H. was enrolled in the district. The record of R.H.'s performance in her current placement, both before and after this case was initiated, shows that neither her behavior nor her learning experience were of a nature or quality as to fundamentally interfere with her ability to learn in that educational environment.

6. *Prior assessments:* Before the dispute arose, did any health or educational professionals actually working with the child conclude that the child needed residential placement for educational purposes.

When plaintiff arrived at the Ocean Township School District, she had already explored, albeit informally, the prospects of obtaining residential placement in Virginia, and had not been able to accomplish it there. The educational history of R.H. contained no recommendation for residential placement in the past; and the most recent indication from the Virginia school district was that they intended to remove R.H.'s TMR class from the self-contained school for the handicapped and provide her with a class integrated into the regular school setting.

Mr. Briard, the social worker on the child-study team, noted in his testimony that there have been cases in which residential placement through the DDD became necessary for social service reasons, rather than educational reasons, and that the district has under that circumstance become involved in the placement and in payment of the tuition. Mr. Petillo, the Director of Special Services for the district, added that often if DDD detects needs, for example if the respite worker serving the family noticed certain needs of a child that the school should be aware of, that would be brought to the attention of the school district case manager so that DDD and the district could consult to-gether to discuss the needs. He stated that no one from DDD ever contacted the district suggesting a change in the program for R.H.

Plaintiff testified that R.H.'s pediatrician knew nothing about this case, and that she did not ask him whether residential placement would be good for R.H. Finally, as previously noted, plaintiff herself did make a request of the DDD case worker for a residential placement, and was told it was not currently available for R.H. through that agency.

This case does not then present a situation such as *Diamond, Kruelle,* or *Drew P.* in which the professionals actually working with the child, before the dispute arose, identified a necessity for residential placement, either to address educational needs or for any reason. *Drew P.,* 877 F.2d at 928; *Diamond,* 808 F.2d at 989; *Kruelle,* 642 F.2d at 689.

7. *Potential:* Did the child have significant unrealized potential that could only be developed in residential placement.

The discussion about R.H.'s potential centered primarily on the self-help areas of toileting, bathing, tooth brushing, dressing, cooking, and feeding, as well as communication skills. Among these, the topic of toileting received the most attention, and for obvious reasons.

R.H. is not toilet trained. She is not even "time toilet trained." The evidence addressed the entire subject of her toileting situation, including what abilities she does and does not currently have, what efforts have been and are being made with her to achieve toilet training, and the views of the various witnesses concerning her potential to reach that goal.

Ms. O'Keefe testified that R.H. can do the following tasks to assist with her own toileting, under the supervision of Ms. O'Keefe or

directions, but one at a time. I said: R.H., and I always make sure she has the eye contact with me. Pick up the yellow sign on the floor. And pointed. And she went, that's her sign Okay. I understand. And she came back with the sign to me. I said: Place the sign on the cart, or hang the sign on the cart. There is a little hook for it. And she hung the sign right on the cart, exactly where it was to go. You know, that was its place for it.

Q: Now, is this something that you see as a great improvement over last January when she first came?
A: Yes. Because she required more frequent prompts. . . . [A]nd that's . . . a technique that can be used both at home, and school, and the community, that prompting technique.

the aide, in the bathroom specially provided within the TMR classroom: "[S]he opens the bathroom door, she hands me the apron. She assists pulling down her pants. I remove her diaper. She sits on the toilet by herself." (Tr. 3 at 44.) "[W]e usually have her sit there up to about five minutes and step out to provide her that privacy and respect that she is due." (Tr. 2 at 18.) "She wipes herself sometimes with ... hand-over-hand. She can secure toilet paper. She can stand, flush the toilet and she can turn on the faucets and wash her hands." (Tr. 3 at 44–45.)

Both plaintiff and Ms. O'Keefe reported that R.H. does not recognize when she needs to eliminate, and does not initiate any need for toileting. They each said that although R.H. will occasionally use the sign for bathroom, which they use consistently from home to school, when she does use the sign it does not follow that she actually goes when placed on the toilet; sometimes she does and sometimes not. Therefore, when she does use the sign for bathroom she does not necessarily understand what she is supposed to do. They each also testified that she has no predictable pattern of wetting. Ms. O'Keefe noted additionally that the pattern at school has been that R.H. usually does not eliminate, either in the diaper or in the toileting sessions.

Plaintiff testified that she has for a very long time used a timed approach of placing R.H. on the toilet approximately every two hours at home. Plaintiff demonstrated to Ms. O'Keefe her stand-up diapering procedure during R.H.'s first day at school, and expressed her concern that R.H. was not toilet trained. Plaintiff made no specific requests of Ms. O'Keefe regarding how the

toileting should be approached at school. Ms. O'Keefe testified that in the class they try to establish a pattern of toileting on a schedule of one and one half to two hours, and that she and the aide had logged the times that R.H. did eliminate, but they found that R.H. was usually dry. So they set up a consistently structured program of checking the diaper three times a day at regular intervals, and toileting her once a day after lunch.

Ms. O'Keefe stated that she has been at all times willing to consult with the parent and make changes as necessary, in the toileting routine as well as any other areas of concern. She added that plaintiff never complained to her about anything she was doing in class, and that she did not realize until she saw some of plaintiffs experts' reports during the due process litigation that plaintiff may have had any uncommunicated concern about the timing or frequency of toileting R.H. at school. Once having received that information, however, Ms. O'Keefe consulted with plaintiff to try to make the toileting routine in the classroom as much like the home experience as possible, and testified that R.H. was then being toileted routinely at school three times a day, as well as having her fluids and medications coordinated in order to try to address the pattern that R.H. still was not eliminating throughout the school day. Ms. O'Keefe described some of the methods she was using to assist R.H. with toilet training. She also mentioned that she has done research on toileting, reading books and articles on toileting "to see if there was anything else, any other techniques...."[50]

Plaintiff recounted the history of toilet training efforts with R.H., including having an expert come to the house.[51] She testified

---

**50.** A discussion of techniques for toilet training was included in materials supplied by Dr. Margolis. (See Ex. R–28 Attach. (entitled "Chapter 10, Toilet Training").) That article enumerated a series of skills involved in being completely toilet trained, as follows:

1. Recognizing when he has to go
2. Waiting to eliminate
3. Entering the bathroom
4. Pulling pants down
5. Sitting on the toilet
6. Eliminating in the toilet
7. Using toilet paper correctly

8. Pulling pants back up
9. Flushing the toilet
10. Washing hands
11. Drying hands

The testimony from plaintiff and Ms. O'Keefe established that R.H. cannot do the first step, which is recognizing the internal bodily urge to eliminate and understanding that toileting activities are initiated when that sensation occurs.

**51.** Plaintiff testified:

We've had bouts and bouts and bouts of toilet training with R.H. from when she's three and

that the expert to which she referred was a behavior modification therapist affiliated with the school in Virginia. This expert suggested in approximately 1989 that R.H. be given M & M candies for going to the bathroom; however, that had only caused R.H. to want to go into the bathroom and wait for the candy, not understanding that the goal was to eliminate.

Plaintiff was also asked, with reference to her testimony that the toilet training efforts had not been constant over the years, when she had resumed the more intensive efforts. She replied, "It's been about a year this time. It was probably a year [R.H.] hadn't worked on it before that. It varies." That testimony would place plaintiffs renewed efforts at about the time R.H. was enrolled in the district, and the most recent hiatus during R.H.'s last year in Virginia. However, a review of the records in evidence from R.H.'s years in the Virginia school system indicates that, while the available records appear not to be complete for all years, the last mention of toilet training as an educational goal was in May of 1989, and that in the four ensuing years R.H. had no toilet training program reflected in her IEPs. Ms. O'Keefe, on the other hand, clearly included that as a goal in the interim IEP dated April, 1995 (Ex. J–44) and in the proposed 1995–96 IEP, (Ex. J–48), and immediately set about addressing it in her daily program.

The prospects for R.H. to become fully toilet trained were assessed by several of the witnesses, who expressed a limited spectrum of views. None could state with any confidence that R.H. does possess the potential to master the necessary skills. Ms. O'Keefe and the child-study team members were among the more optimistic. Ms. O'Keefe explained that "[t]here has been success with other profoundly retarded students. So I will never say ... that R.H. will never be toilet trained. Under my care that goal with every bit of hope will be accomplished." Ms. Beirne stated, "[w]e have students that have less abilities than R.H. who are toilet trained, so that is certainly something that I see as

possible." Ms. Venino stated, "I would hope that she would be able to toilet herself."

Among plaintiffs experts, Dr. Rapps the psychologist would not venture an opinion on this question. Dr. Gallina, plaintiffs expert neuropsychiatrist, testified that he was not aware of any medical reason why R.H. could not become toilet trained and that he believed she would be capable of achieving it "with repetition and with getting her to pay attention...." However, he qualified his outlook thus:

Q: How about toileting skills? Should she be able to toilet herself?

A: Yes. Perhaps not perfectly, but certainly she should be able to physiologically manage that, and to learn the necessary appropriate skills for toileting. Although certainly this is a child where susceptible [sic] to accidents is going to be present.

Plaintiff testified from her own experience and perceptions as follows:

Q: Do you believe ... that with six hours of additional instruction a day, do you believe that R.H. is going to be able to ever toilet herself?

A: On the toileting subject it would be hard for me to say that I think that R.H. would ever be 100 percent toilet trained. I don't know that. I think you can get her to the point where she could be dryer. I don't know that I ever trust her to take the diaper completely off and never keep it on or a pad or some type of thing. She may, she may not, but I know she can do better than she's doing. She does have the capability of doing it.

Dr. Pietrucha, the district's expert child neurologist, testified in detail on the subject of R.H.'s potential to become toilet trained, concluding:

Q: [D]o you believe ... that R.H. with extensive training or even minimal training is going to be able to toilet herself at some point in the future?

four years old. We ... had toilet training experts coming to the house. We've tried every different method known to man. I've been told to stop for awhile, just leave her alone,

wait a while, try it again. It might be a year, it might be two years that we didn't try and then we would go back to it.

A: No. R.H. is 15 years of age. She's not toilet trained, and she does not have the intellectual capability of understanding that whole concept and being able to learn from experience of people showing her or setting an example. She will not be able to be fully toilet trained, no.

. . . .

Q: Toileting, the need for toileting. Are you saying ... that R.H. will never be able to process that information?

A: Correct.

. . . .

When you're looking at someone whose IQ is very, very low, ... the ability to train that person even with all of these devices that we have available now is extremely limited. And you have to look at that population to appreciate the reality of how limited they are. And in spite of the enormous time, effort, monies and everything that is spent, that's exactly where they're [at] 18, 19, 20 years of age; they're still in diapers, most of them nonverbal, and very, very limited, and still requiring a lot of help with all activities of daily living, constant supervision, and total care. That's reality.

These various viewpoints all tend to support the conclusion that R.H. does not possess significant untapped potential in the direction of becoming fully toilet trained, but that a continued and coordinated effort to improve her participation in her own toileting process may possibly confer additional benefit. There appears to be no strong evidence, however, that such an effort would be likely to produce benefit in the case of R.H., based upon her history. Indeed, it appears that may have been the reason why it was not included in the IEPs in Virginia during her latter years there, after the in-home consultant failed to produce results.

If toilet training is to be included in her educational program, the additional question under the mainstreaming requirement of IDEA is whether her toilet training potential, such as it is, requires the restrictive environment of a residential placement. Plaintiff argues that it does, based primarily on the notion that it is the only alternative

that has not yet been attempted. However, the record is devoid of any evidence that residential placement produces any better results in the toilet training area than any other approach. The one document on toilet training that is in evidence is addressed to parents, not to professionals. Also, the qualifications of the professional staff in the district are in all respects comparable to the qualifications of the staff in the residential facilities reviewed. Finally, and of considerable note, is the fact that none of the witnesses from either Melmark or Bancroft testified to any techniques or record of results that distinguished their services in the area of toilet training. The sum of their testimony was that they too work on toileting skills with their severely mentally handicapped students, many of whom require ongoing toilet training programs.

The evidence on the subject of toilet training in this case shows that R.H. has neither a pattern to her elimination cycle nor the ability to recognize the need to go, and no particular advantage has been identified in the results of residential placement over other less restrictive approaches. Based upon this evidence, there does not appear to be a significant factor of untapped potential favoring residential placement to address R.H.'s toileting deficiencies. This conclusion is further supported by the fact that the current educational program includes a toilet training procedure that is patterned upon the corresponding efforts in the home, and the school has demonstrated commitment and flexibility to work with the parent to try additional techniques.

There was virtually no disagreement in the testimony concerning R.H.'s potential to improve in the other activities of daily living, such as bathing, tooth brushing, dressing and eating. Her present functioning level in those areas is that she does participate, but needs substantial assistance, either physically or by prompting or both. Her mother testified that she showers R.H., who does understand the concept of bathing, and that R.H. can lift her hands and mimics her mother's motions. Plaintiff does not foresee R.H. ever being able to bathe herself without supervision, or being able to do it as well as

plaintiff would do it for her. The same outlook applied to the tooth brushing, except that there plaintiff observed that R.H. has further difficulties because her fine motor skills prevent her from holding on to the toothbrush properly. In each of those areas, plaintiff stated, it was her view that R.H. could be making more progress. In the area of dressing, R.H. can partially undress herself and needs more assistance to get dressed. For eating, her mother reported that, "[s]he's kind of lazy about chewing and she tends to put entirely too much on her spoon.... You have to tell her to chew her food. Not all the time but sometimes ... she just doesn't chew so I just make sure it's small." She can select her food from what is offered, although she needs assistance with the opening and preparation.

As to those types of activities of daily living, plaintiffs testimony was that she believed R.H. could make further progress but would not be fully independent and would always require constant supervision. Plaintiffs testimony in this respect was essentially consistent with that of both expert physicians, Dr. Gallina for plaintiff and Dr. Pietrucha for the district, although plaintiff differed with Dr. Pietrucha regarding the relative degree of potential in the area of daily living skills. Dr. Gallina testified that with supervision, R.H. can be expected to be able to participate in the activities of daily living, but he did not address how much additional progress might be anticipated. Dr. Pietrucha, from her experience in working exclusively with neurologically impaired children, was more emphatic in her conclusions and explanations, but her testimony regarding R.H.'s learning potential was not markedly different in outcome from that which plaintiff and her expert had expressed. Her conclusion was that R.H. will have to be helped to do all of those activities throughout her life, and that her potential is so limited that the possible progress would be "miniscule progress." Thus Dr. Pietrucha stated:

> When you're dealing with someone whose brain, every neuron in that person's brain is an abnormal neuron because it has ab-

normal chromosomal material in it, you can bring in from the outside all the therapies you want, you're still dealing with a brain that doesn't have one normal cell, not one.

. . . .

R.H. can stay in school from now until she's 22 or [whenever] it is that the child-study team's responsibility for the child is over. And at that point in time R.H. will be in a diaper, her mother will be dressing her, she'll need help with activities of daily living. That's the real world, and I think we have to appreciate that.

. . . .

[I]f [the school staff] achieve a little bit of what it is that they set out to achieve, I think that's terrific. And if they don't achieve any of it, I'm not surprised.

. . . .

[T]here's a large body of information in neurology substantiating the fact that when an individual has a trisomy 18 chromosome abnormality and the individual is functioning with an IQ of 30 [sic][52] or less at the age of 15, that we know from many, many hundreds of thousands of individuals like that exactly what the expectations are and how limited these individuals are. So this is not something unique in R.H.'s situation.

The topic of communication skills was also explored in terms of R.H.'s potential. There the testimony indicated that in the area of expressive language, despite being essentially nonverbal, R.H. does have the ability to make her needs and wants known (except regarding toileting), in her primary mode of communication which is by means of gestures, facial expressions, and some words, sounds and signs. She is also using picture cards and a type of communication board in her school program. Dr. Gallina testified without opposition that R.H. has the potential to continue developing her ability to express herself in those modes. Plaintiff expressed a preference that R.H. learn to use more polite forms of expression at home,

---

**52.** The reference to an I.Q. of 30 appears to be a transcription or articulation error, because Dr. Pietrucha demonstrated an awareness of R.H.'s testing score showing an I.Q. level of approximately 36, and discussed that subject extensively in the course of her testimony.

rather than grabbing or screaming for what she wanted. Ms. O'Keefe noted that in the case of nonverbal handicapped children, the use of sign language must be encouraged at home if the family wants the child to use it. She added that not all families, including Ms. O'Keefe's own brother with his handicapped child, choose to utilize sign language in the home. In the area of receptive language, there was general acknowledgment that R.H. has the ability to understand and follow simple directions. But it was also evident that her reasoning powers would not enable her to initiate or carry out more complex tasks.

Plaintiff also focused upon her desire that R.H. acquire training in basic safety skills, such as staying away from hot objects and avoiding entering the roadway. She acknowledged that in her observation, R.H. does not have the capacity to understand that such situations present danger, but she said that as a parent, she employs tone of voice and other negative reinforcements which are generally effective to convey to R.H. that she must stop. Plaintiff added, however, as did Ms. O'Keefe, that R.H. does not have the capacity to be left alone and unsupervised, either indoors or outdoors. Dr. Pietrucha described R.H.'s mental age as equivalent to that of a toddler, a fact also observed by plaintiff. Dr. Pietrucha testified that training techniques such as that described by plaintiff are appropriate for controlling the child for her safety, under supervision.

An area of somewhat greater potential growth was identified in R.H.'s prevocational skills. Ms. O'Keefe testified to the abilities R.H. has acquired in that area, and the progress she was observing in R.H.'s current program. Dr. Gallina confirmed that R.H. did in his observation have some capacity to "attend," aided by her medication, and added that during his appointment with R.H. and her mother, plaintiff was very good at redirecting or refocusing R.H.'s attention so that her tendency to be restless became manageable under the circumstances. Ms. Beirne, the school learning consultant, also identified this as a growth area, indicating the potential to progress to the point where she would be able to function in a sheltered workshop.

Based upon all of the evidence regarding R.H.'s potential, it does not appear that she has significant unrealized potential which can only adequately be developed in a residential placement. This conclusion is particularly compelling here, where the primary area of identified further growth potential is in occupational skills, which would most likely be applied in a sheltered workshop in the community.

8. *Past experience:* Did past experience indicate a need for residential placement.

█ It will be recalled that in some cases dealing with the issue of whether residential placement was necessary for the education of a classified student, significant results in other placements have been included as a factor to consider. *See* Section IV(B), Factor Eight. However, the fact of failing to make adequate educational progress in the past, even if that occurred, generally has not been held sufficient to warrant residential placement. This is because, as our courts have held, the appropriateness of a proposed IEP program must be viewed prospectively. *See, e.g., Scott P.,* 62 F.3d at 534 (the child's failure to make progress in the prior unchallenged IEP, "a judgment made retrospectively," did not render either the prior unchallenged IEP or the current challenged IEP inappropriate).

This is not a case such as *Kruelle,* in which the child had experienced an uncontrollably negative result in a prior similar placement. *Kruelle,* 642 F.2d at 688–89. Nor is it a case such as *Lascari,* in which years of challenged educational programs failed to produce results for a classified student who possessed significant additional potential. *Lascari,* 116 N.J. at 32–33, 37–38,560 A.2d at 1181, 1184.

The court of appeals in *Scott P.* did indicate that an unexplained repetition of identical IEPs could raise a question of the appropriateness of the programs offered in successive years, stating:

As we explained in *Fuhrmann v. East Hanover Board of Education,* 993 F.2d 1031, 1040 (3d Cir.1993), "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date. . . .

Neither the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." ... Of course, if a student had failed to make any progress under an IEP in one year, we would be hard pressed to understand how the subsequent year's IEP, if simply a copy of that which failed to produce any gains in a prior year, could be appropriate.

*Scott P.*, 62 F.3d at 534. In this case the school district staff did refer to the prior IEP in the Virginia school system. (Ex. J–46.) That was done in order to provide continuity for R.H. when she first arrived, and to provide the district with a starting-point in developing their own program and IEP for her. However, the proposed IEP that they developed for her, Ex. J–48, was considerably different from the Virginia IEP in form, as a visual comparison of the two documents readily reveals. The programs were also different in substance. For example, the district's program for 1995–96, as reflected in Ex. J–48, included toilet training and vocational transition planning for R.H., neither of which were provided in the prior Virginia IEP. The court in *Scott P.* observed in similar circumstances as follows:

> [T]he parents gloss over the many assumptions needed to equate the [prior unchallenged IEP] ... with the status of the [challenged proposed IEP]. In particular, the parents believe that the two IEPs are virtually identical although they themselves concede that the [proposed] IEP included additional goals and objectives and an arrangement for psychological counseling.... The parents apparently assume that these are merely formal additions, but that is not so.
>
> . . . .
>
> The differences between the [proposed] IEP and the [former] IEP are not merely formal; they reflect the very essence of an IEP. As we have explained, the statute requires that school districts prepare the IEPs based on the student's needs; so long as the IEP responds to the needs, its

ultimate success or failure cannot retroactively render it inappropriate.

*Scott P.*, 62 F.3d at 534.

Here, the school district had the student for only a few months when plaintiff initiated her demand for residential placement. Thus the district did not have a track record of working with R.H. for any prior recent year. The past educational history was in a different state's educational system and under unchallenged IEPs different in form and substance from that provided currently. We would therefore find it difficult to conclude that such history could have any significant bearing upon the issue of whether the current program and placement are appropriate. Nevertheless, we have examined the record of R.H.'s experience in her prior placements, and have considered the testimony presented by plaintiff and the district on that subject. The record shows that R.H. was considered by her teachers (and indeed by plaintiff) as fitting into the programs and progressing adequately in relation to her acknowledged limitations, during all of her education until just before plaintiff and R.H. moved back to New Jersey in 1995, when plaintiff first raised the issue of residential placement with the teacher in Virginia.

The sum of the testimony on both sides was that R.H. had shown progress in her learning through the years, and that although in some areas her progress could be described as minimal, that appears to have been due to her limited potential rather than the placement or programs. Also, R.H. was shown to have retained those skills that she had learned. On this record, there is no significant past educational history indicating that the current educational program and placement were not appropriate at the time they were offered.

9. *Purpose of placement:* Was the demand for residential placement primarily to address educational needs.

The reasons stated by plaintiff for seeking residential placement centered primarily upon her problems with R.H. in their home life together.[53] Another of plaintiffs stated

---

**53.** The specific home problems described by plaintiff in her testimony at the hearing con-

cerned activities of daily living such as toileting, showering, dressing and eating, and R.H.'s ten-

reasons for seeking residential placement was her contention that R.H. has unmet needs for activities and social contact when not in school. We have previously discussed plaintiffs other contention, that residential placement would be necessary in order to prepare R.H. for admission to a group home facility. *See* note 45 and accompanying text.

Plaintiff strongly asserted that her demand for residential placement was for the purpose of addressing R.H.'s educational needs, rather than for any purpose of obtaining custodial or respite care. However, the district challenged that assertion, based upon the patterns of plaintiffs demonstrated conduct which arguably contradicted her words. During the hearing the district pointed out numerous instances in which plaintiffs behavior was essentially passive in matters pertaining to R.H.'s education, and proactive only in seeking temporary or permanent placements for R.H. out of the home. Accordingly, in this case we must also consider the factor of whether the residential placement demand for R.H. would be primarily to address educational needs, or for some other purposes. *See* cases discussing Factor Nine, cited in Section IV(B).

Plaintiff, the mother of R.H., is a person in her mid-thirties whom the evidence shows to be an intelligent, competent and articulate parent who diligently maintains and cares for her daughter. She attended Long Branch High School and would have graduated in 1978, but she left school in or about 1977. She stated that at some time after leaving high school, she took the courses to complete her GED. She testified, "I did go back to school for the GED, to be quite honest I don't even remember why I didn't take the test, I was taking classes for it, though." She also testified that she took "medical assistant classes," including completing the course requirements for certification in CPR in or about 1992, although she did not receive CPR certification because she did not have her GED. After she left school in 1977 she held several jobs, including working on Wall Street as a clerk for the commodities exchange. (*Id.* at 161–62.) Her only child, R.H., was born three years later, in 1980.

During some of the time when plaintiff and R.H. were living in Virginia, plaintiff conducted a child care business in her home. She took a job with the post office in February, 1995, shortly after returning to New Jersey. As of the time of the hearing, she was not employed.

The record also establishes that plaintiff is a person who, as described by the district social worker Mr. Briard, "is a competent capable woman who knows what she wants, and she can pursue it when she wants to...." What she did pursue since returning to the district from Virginia in 1995, as reflected in the evidence, was residential placement and respite care for R.H. As previously noted, when she first met with the district on January 10, 1995, she advised them of her desire for residential placement. She also immediately took the initiative to contact DDD, and at her first appointment with DDD she registered R.H. for respite care and placed her on the waiting list for residential placement through that agency. Within approximately three months of arriving in the district, plaintiff retained present counsel, with the expressed intention "to seek residential." Consistent with that objective, the opening letter from counsel to the district contained the sole request that the district "start to explore possible residential placements with [plaintiff] in order that R.H. be placed residentially as soon as possible." During the entire period leading up to the commencement of formal due process, the only changes requested on behalf of plaintiff in R.H.'s program or proposed IEP were residential placement and an extended summer program. When the district declined, plaintiff located a sleep away camp for R.H. and obtained two twelve-day sessions with the entire cost paid by DDD.

The district does not suggest that there was anything improper in any of those actions by plaintiff. However, other facts brought out by the district disclose a marked contrast between those actions which plaintiff did take and many other actions which plaintiff could have taken during the relevant time period regarding R.H.'s education and activi-

---

dency at times to resist cooperating with her mother, including at bedtime.

ties, but did not. Some of those examples include the following:

- Plaintiff never observed R.H. in her classroom setting, except for half an hour or less on that first day, January 10, 1995.
- Plaintiff never requested any meeting, formal or informal, with Ms. O'Keefe or any member of the child-study team.
- Plaintiff did not attend the IEP meeting for the interim IEP in April, 1995.
- Plaintiff attended the IEP meeting in June, 1995 without counsel, despite being represented at that time, and her participation in that meeting was limited to signing the proposed IEP with the notation "for attendance purposes only."
- Essentially the only inquiries plaintiff made of Ms. O'Keefe were to seek information regarding after school care and summer camps.
- Plaintiff did not attend the TMR class parent/teacher open house meeting held by Ms. O'Keefe in September, 1996.
- Plaintiff did not attend the meetings of the special ed. parent-teacher organization (Families Accessing Services Together) except the two meetings scheduled closest to the dates of her testimony before the ALJ.
- Plaintiff took R.H. to one social event, which was the birthday party of a classmate, but she did not obtain the names or phone numbers of the TMR class parents or interact or network with them in any way.
- Plaintiff's contacts with ARC, which offered Saturday respite programs and other services and social activities for retarded children and their families, were sporadic and unproductive, as was her exploration of the day care program conducted in the community by the cerebral palsy organization, which she had discovered through ARC.
- Plaintiff went to both Melmark and Bancroft, but she did not take the opportunity to visit the class R.H. would be assigned to at Melmark, or to observe the neighborhood group home where R.H. would live at Bancroft.

Certain of plaintiff's statements, both on the record and as reported by other witnesses, also indicated that relief for herself and enhanced social opportunities for R.H. were important objectives in her quest for residential placement. Mr. Briard, the school social worker and case manager for R.H. at the district, reported in his testimony that based upon his interviews with plaintiff, "the concerns that I thought [plaintiff] had, and ... what I thought she alluded to[,] was that she needed some help in terms of, let me see how to exactly put it, I think she needed some time to herself, and ... as I recall she said basically, my home life is R.H. when I get home." Gallina, plaintiffs expert neuropsychiatrist, also related plaintiffs comments to him regarding the social milieu at the sleep away camp, stating, "that was very encouraging to mother, and she really wanted R.H. to be able to participate in that, which she found particularly difficult when R.H. was home on the weekends, or on holidays, or at other times during the summer when she was not at camp."

█ As our courts have pointed out, parental desires for enhanced social contacts for the child and relief for the primary caregiver are entirely reasonable and understandable concerns in the context of caring for severely handicapped children. However, such concerns do not provide support for residential placement under IDEA absent a showing of educational necessity. *See, e.g., Scott P.*, 62 F.3d at 532; *Schreiber*, 952 F.Supp. at 209–12.

Parent training is the final topic to be addressed in considering this factor. The district witnesses testified that providing information and training to parents of R.H. and her classmates, and the parents of other special education students at the school, is a regular part of the program. The district witnesses also confirmed that additional training and coordination with parents or guardians is available in response to individual needs. Plaintiff testified that in her entire parental experience with R.H. since R.H. was born, she never received or requested formal parent training.

The district witnesses, in their testimony, expressed their willingness to work with plaintiff to provide individual training to her and to R.H. in the home and community, not to the degree which would amount to the functional equivalent of residential placement such as Dr. Margolis had suggested, but for several additional hours each week. Plaintiff, however, did not request such training in this case at any time, before or after filing for due process, and expressed no enthusiasm for it in her testimony.[54] When asked why she did not make such a request, plaintiff testified:

> [W]hen we went in there [referring to pre-litigation meetings between plaintiff, her attorney, and school district representatives] we said she needed extended school year, she needs a twenty-four hour program, she needs, you know, consistency, structure. They knew that. They knew that's what I was looking for. They didn't come back to me with any offer, either.

This Court agrees that based upon the record in this case, the district did indeed know what plaintiff wanted. Hers was a non-negotiable demand for residential placement, and no amount of in-home parent training would satisfy her objectives. This was confirmed in plaintiff's own testimony, and that of her expert witnesses, Dr. Gallina and Dr. Rapps, as well as Dr. Margolis.

Dr. Pietrucha, the expert child neurologist presented by the district, testified strongly in favor of training for parents such as plaintiff in dealing with the needs of their severely mentally handicapped children. She said:

> I think these parents need a lot of help and a lot of training because they're going to be faced with the real world of having to take care of these children. When these children reach adulthood, it's their parents who are now older, who are still having to

assume the primary responsibility. Any help we can give the parent ... that's a help to them to make their quality of life a little bit better so that they can cope with this handicapped child, I think that's an area that's very important and should be emphasized and should be worked with. I think training—and I would say that for any parent, not just R.H.'s mom, but that goes for all the parents of handicapped patients.

Clearly, the district did not disagree with that suggestion by its own expert.

There is no genuine issue involving parent training in this case. It was never requested and it was not specified as part of the relief requested in the due process hearing. Nevertheless, the record establishes that this school district has at all relevant times been receptive to requests for additional parent training, and stands ready to provide it to plaintiff and other parents in a collaborative partnership to meet the educational needs of their students. The evidence is also clear that plaintiff has the ability to absorb and use such training, under the guidance of qualified education professionals.

By its very nature, parent training cannot be effective to benefit either the child or the family unless the parent or guardian is genuinely committed to participating in that process. And even when the parent possesses such commitment, the school district cannot and should not be held accountable for the results of the parent's efforts. Those events are beyond the control of the district. For these reasons, under the facts presented here, the district cannot be said to have violated any duty to R.H. or plaintiff under IDEA for not having offered additional parent training in the proposed IEP for 1995–96.[55]

---

54. The district's willingness to provide parent training in this case is unlike the situation described in *M.C.*, where the parents requested home instruction and were not told that it was available. *M.C.*, 81 F.3d at 392. Plaintiff in this case was represented by eminently qualified counsel from her earliest months in this school system, who were aware that parent training can be specified in an IEP as a related service, and counsel made no such request on her behalf.

55. Counsel for the district has indicated that parent training was included in the proposed IEP for 1996–97, which was prepared after the administrative hearing ended in this case. (Def.'s Reply Br. at 7.) That IEP is not before the Court in this action. However, at oral argument on the pending cross-motions for judgment, we were advised by the school district that plaintiff had rejected the offer of parent training. This rejection was upon advice of counsel, allegedly to the effect that because this

Based upon a review of the evidence relevant to the factor under consideration here, we find that such evidence provides additional support for the district's position that residential placement of R.H. would not be necessary for primarily educational purposes.

b. Conclusion

The IDEA has been interpreted to restrict residential placement of disabled children to situations in which the nature and severity of the disability is such that education in regular or special classes, with the use of supplementary aids and services, cannot be achieved satisfactorily. *See note* 32 and accompanying text.

Based upon the foregoing analysis of the factors relevant to this inquiry, we conclude that the school district has demonstrated by a preponderance of the evidence that the program it provides to R.H. in the current placement is appropriate in the legally relevant sense, because that program is calculated to confer some meaningful educational benefit upon R.H. in the least restrictive educational environment. Accordingly, we hold that the district has met its burden of proof on the substantive issue of whether the current educational program and placement are appropriate. Thus, we also hold that residential placement is not necessary in order to provide R.H. with a free appropriate public education.

Our ruling on the issue of residential placement also addresses plaintiffs renewed motion for enforcement of the order of the ALJ regarding such placement, which we have consolidated with the decision of this appeal on the merits pursuant to Fed.R.Civ.P. 65(a)(2). *See* note 2. As noted, we have prepared a Supplemental Opinion in order to explain the basis of our view that the decision of the court of appeals in *Raelee S.* was not controlling here, and to discuss the rationale and precedential effect of that decision. That Supplemental Opinion will be filed separately. However, the Judgment Order which is filed herewith is final and appealable as to all issues presently before this Court, including the issue which is discussed in the Supplemental Opinion.

B. IEP format—procedural issue

The issue of the appropriateness of the individualized education program in this case arises in an unusual manner. This is due to the fact that R.H. moved to the district in the middle of the school year, and at the request of her mother R.H. was immediately provided with an agreed placement and program, in the TMR class of Ms. O'Keefe, without a written IEP. The district provided R.H. at that time with a program which provided continuity with the program she had been receiving in Virginia. The district did refer to the most recent Virginia IEP, (Ex. J–46), in determining R.H.'s program and placement in January, 1995 when she arrived, until they were able to formulate their own IEP. Thus, as they had advised plaintiff at

Court had declined to order a change in R.H.'s pendent placement on the injunctive application, there could be no change in her existing program during the pendency of that order. Such advice, if given, would in our view be without foundation in law or in fact. We ruled on placement only in our Memorandum and Order denying plaintiffs preliminary injunction application. Under the implementing New Jersey regulation, school districts and parents are free to agree on modifications or additions to the current educational program, even while placement remains in dispute. *See* N.J.A.C. § 6:28–2.7(i) ("Pending the outcome of ... any judicial proceeding, no change shall be made to the pupil's classification, program or placement unless both parties agree....").

This deadlock, as described, evokes an observation by the Court of Appeals for the Ninth Circuit in *Clyde K. v. Puyallup Sch. Dist.*, 35 F.3d 1396 (9th Cir.1994):

Such hardball tactics are seldom productive even in ordinary civil litigation, and are particularly ill-advised in this context. Working out an acceptable educational program must, in the end, be a cooperative effort between parents and school officials; the litigation process *is simply too slow and too costly to deal* adequately with the rapidly changing needs of children.... In addition, litigation tends to poison relationships, destroying channels for constructive dialogue that may have existed before the litigation began. This is particularly harmful ... since parents and school officials must—despite any bad feelings that develop between them—continue to work closely with one another. As this case demonstrates, when combat lines are firmly drawn, the child's interests often are damaged in the ensuing struggle.

*Id.* at 1400 n. 5.

the outset, they worked with R.H. for a brief period, and as of April 3 they had developed and adopted their own proposed IEP, (Ex. J–44), to use as an interim guide until they could complete the triennial evaluation. That evaluation was performed in May and early June. As previously noted, plaintiff did not attend the meeting for the April interim IEP. Nor did she sign that interim IEP when the district instead sent it to her at her request.

The IEP in issue in this case is the proposed 1995–96 IEP. (Ex. J–48.) It was prepared by the district after completing the triennial evaluation. It was signed by plaintiff with the notation "for attendance only" at the IEP meeting which she attended on June 16, 1995. At that time, plaintiff had already requested residential placement through counsel, and was proceeding toward the mediation which occurred on July 26, 1995 and the formal request for due process, which was made by letter dated August 2, 1995. As a result, the 1995–96 IEP was never an agreed upon IEP, although the program and placement were agreed to when R.H. began in January, 1995. In the preceding section of this Opinion we have found that the current program, as reflected in the proposed IEP and described in the exhibits and testimony, complies with the substantive requirements of IDEA, and that residential placement is not appropriate.

Another issue, first raised by plaintiff in the course of the due process proceeding, was whether the existing components of the proposed written IEP met certain of the procedural requirements of IDEA and certain subparts of related state regulations found in N.J.A.C. § 6:28–3.6. That issue is described in detail below. As previously noted, it appears that it was referenced for the first time in the "Relief Requested" section of the due process complaint letter of August 2, 1995, simply by demanding "[r]eformation of the district's IEP in order to comply with the requirements of federal and state law set forth in N.J.A.C. § 6:28–1.1 et seq. and specifically N.J.A.C. § 6:28–3.6." It also appears that such issue was not raised or discussed during any of the prior meetings between the parties. Significantly, it does not appear to have been suggested during the mediation session conducted by an officer of the New Jersey Department of Education, nor raised for the attention of the same officer at the required pre-transmittal conference held on August 10, 1995. *See* notes 9 and 10 and accompanying text. Also, it was not identified in the opening statement of counsel for plaintiff at the administrative hearing.

The first mention of that issue during the hearing, as reflected in the record, was on cross-examination of Ms. O'Keefe on the third day of the hearing, October 16, 1995, in testimony which included the following:

Q: Among other things, would you agree that an IEP needs to contain three critical components, the current educational status section, the goals, and the objectives?

A: Yes, I do. I do agree.

Q: And an annual goal, and I'd like to read you what the New Jersey Administrative Code defines it as, ... at ... 6:28–3.6D3 and it says, "A statement of annual goals which describes the educational performance expected to be achieved under the pupil's individualized education program. Annual goals shall be related to the special education and/or regular education curriculum," and that's your understanding of what an annual goal is?

A: Yes, it is.

Q: And it anticipates where we expect the students to be at the end of a one-year period?

A: Yes, it's supposed to be [a] realistic goal.

. . . .

Q: [A]nd objectives, the IEP needs to have objectives. I'd like to read you what the New Jersey Administrative Code defines as an objective ... at 6:28–3.6D4. "A statement of objectives which describes specific measurable steps between the current educational status and the annual goal." Is that your understanding of—

a: Yes it is.

Q: [S]o the objectives need to be specific and measurable?

A: Yes, they are.

. . . .

Q: Were you aware that the New Jersey Administrative Code requires that an IEP set forth the specific criteria a student must display to achieve mastery?

A: I was aware of that, yes.

. . . .

Q: Can you show me where in this IEP it specifically states anywhere the criteria that R.H. must display for any goal or objective in here to obtain mastery?

A: No.

Similar testimony was elicited from Ms. O'Keefe regarding the requirement of a statement of current educational status, and the requirement of annual goals and measurable objectives, contained in the same regulations. *See* note 56.

That testimony, viewed in isolation, tended to establish that the 1995–1996 IEP was procedurally deficient with respect to the requirements of the three regulatory requirements quoted, namely N.J.A.C. §§ 6:28–3.6(d)(2), (d)(3), (d)(4), and (d)(5)(xiii).[56] The Administrative Law Judge so noted at the time. However, much more transpired both on and off the record before the hearing was eventually concluded. As previously described, the ALJ listened to the balance of the district's initial presentation of witnesses and then initiated and participated in the lengthy settlement hiatus from October 27, 1995 until February 5, 1996. During the period while the hearing was suspended by the ALJ, the school district readily participated in working with the jointly retained consultant, Dr. Margolis, to try to improve the IEP with respect to more measurable goals and objectives. That process did not

break down over the suggested IEP that Dr. Margolis prepared, although discussions between the parties on that subject were not complete when that process ended and the hearing resumed. Those discussions broke down when Dr. Margolis produced the proposed "implementation plan," reflecting in-home coverage which, as we have observed, amounted to the functional equivalent of residential placement. Since that time, the parties have been engaged in litigation at the administrative level and then in this Court. Meanwhile, the district has continued to provide R.H. with her current educational program, and has made an annual proposal of an IEP to plaintiff as required by law, although that IEP is not contained in the present record before this Court. During the remainder of the hearing, both before and after the several months spent in settlement efforts, the district offered testimony directed to the procedural issues involving the IEP which had thus been raised during the cross-examination on the third hearing date.

Dealing with the subject of current educational status, there was testimony from Mr. Briard, the social worker and case manager on R.H.'s child-study team, that each of the reports which constituted the triennial re-revaluation were prepared and used in formulating the proposed IEP. (Ex. J–48.) He stated that at the IEP conference on June 16, 1995, all of those reports were presented to plaintiff "pretty much verbatim, and we had input from the various people that had been working with R.H. . . . ." Also, although the triennial re-evaluation reports were not expressly cited in the proposed IEP, Mr.

**56.** The referenced subsections of N.J.A.C. (as then and now in effect) provide in pertinent part:

(d) . . . the individualized education program shall include, but not be limited to:

. . . .

2. A statement of current educational status, which describes the pupil's present levels of educational performance and adaptive behavior, including academic achievement, cognitive functioning, personal and social development, physical and health status, and where appropriate, language proficiency, communication style, physical education and recreation needs, prevocational, vocational and self-help skills; 3. A statement of annual goals which describes the educational performance expected

to be achieved under the pupil's individualized education program. Annual goals shall be related to the special education and/or regular education curriculum; 4. A statement of objectives which describes *specific measurable steps between the current educational status and the annual goals*; and 5. A description of the pupil's educational program which includes:

. . . .

xiii. The criteria, procedure and schedule to determine if the pupil's goals and objectives are being met[.]

The source language is found in IDEA, 20 U.S.C. § 1401(a)(19)(A), (B), (E), and federal regulations, 34 C.F.R. § 300.344(a).

Briard stated that those extensive evaluations were considered to be part of the IEP.

Addressing the topic of annual goals and measurable objectives, Mr. Petillo, the Coordinator of Special Services for the district, testified that the district has been audited annually by the Department of Education for the format and content of its IEPs and has never been criticized in that regard. Mr. Briard added that the current type of computerized IEP format was actually recommended during a prior monitoring by the Department of Education, and that there has never been a criticism of the form of the IEPs by that Department. Ms. O'Keefe, testifying on the same subject, stated that in her experience the IEP is essentially an outline of the basic and specific goals and objectives targeted. She said that it would be very difficult task to outline every single sequential step toward a goal in the IEP.[57] Mr. Briard explained that in the IEP:

> We have a general task specified, and under that task there are certain subtasks, and then we could go to sub subtasks, then to sub sub subtasks, and these things could be broken down into as many steps as we chose to. But I do think at a certain point Ms. O'Keefe needed [for example] to get on to the business of brushing the teeth.

He summarized the situation in his words as follows:

> You could get into a situation of infinite regress how far do you want to go in

specifying the steps that are needed to teach somebody to brush their teeth. Ms. O'Keefe has worked with a lot of students using various methods in teaching them to brush their teeth. You heard a detailed description of how she prepares healthcare packets for each student. Even took the care to check with the home what kind of toothpaste tube they were using, so we would utilize a similar tube in school, so that the skills in school could be generalized at home. If she didn't write that in the IEP, and somebody could say maybe this should have been included. We could wind up with a document two feet thick and I don't think we could be any closer to teaching R.H. to brush her teeth, than we are with having a very experienced teacher like Kathy O'Keefe using this document to accomplish this purpose.

The "8th draft" suggested IEP prepared by Dr. Margolis consisted of forty-eight pages. It addressed thirteen goals and sixty-seven objectives in the areas of self-care, life skills, academics, social and physical development, targeted to school, home and community.[58] Dr. Margolis said that he could have written another forty pages of IEP on those topics, but in his view the stated goals and objectives were the most relevant at the time. He said they represented "what can reasonably be accomplished within a year's time, within a 12–month period." He criticized certain goals and objec-

---

57. For example, the proposed IEP for 1995–96, (Ex. J–48), stated as a goal, "[R.H.] will maintain personal hygiene and good grooming skills," and under that goal there were a series of objectives including "[R.H.] will be able to brush teeth."

58. The following is an example of goals and objectives as formulated in Dr. Margolis' draft:

TOOTH BRUSHING GOAL 1: R.H. will brush her teeth in school, with adult gestural guidance, for one minute. ·

OBJECTIVE 1: When given a toothbrush with toothpaste on it and firm physical guidance, in front of a bathroom sink in school, R.H. will correctly demonstrate how to brush her teeth, by continuously brushing up and down for 20–seconds. She will achieve this criterion on 10 successive occasions by the end of the first marking period.

OBJECTIVE 2: When given a toothbrush on it and moderate physical guidance, in front

of a bathroom sink in school, R.H. will correctly demonstrate how to brush her teeth, by continuously brushing up and down for 40–seconds. She will achieve this criterion on 10 successive occasions by the end of the second marking period.

OBJECTIVE 3: When given a toothbrush with toothpaste on it and light physical guidance, in front of a bathroom sink in school, R.H. will correctly demonstrate how to brush her teeth, by continuously brushing up and down for 60–seconds. She will achieve this criterion on 10 successive occasions by the end of the third marking period.

OBJECTIVE 4: When given a toothbrush with toothpaste on it and gestural guidance, in front of a bathroom sink in school, R.H. will correctly demonstrate how to brush her teeth, by continuously brushing up and down for 60–seconds. She will achieve this criterion on 10 successive occasions by the end of the fourth marking period.

tives in the district's proposed IEP as unrealistic based upon his understanding of R.H., but acknowledged that there could be areas in his draft IEP where he was wrong.

Ms. O'Keefe stated that all of the goals expressed in Dr. Margolis' suggested IEP were currently being addressed in R.H.'s program, as well other areas such as vocational training, art and music, which were not included in the Margolis version. Also, Ms. O'Keefe took issue with the content of some of the goals and objectives in the Margolis version. However, Ms. O'Keefe and Dr. Margolis both agreed that because it had been offered by Dr. Margolis only as a discussion draft, such items could be addressed in the normal process. Dr. Margolis added that if R.H. were in residential placement, she would be working on the same types of goals and objectives, or a comparable functional set, because he "would have a great deal of difficulty thinking that there would be a set that would be markedly different."

Both Ms. O'Keefe and Mr. Briard expressed the view that it was appropriate to include in an IEP for a severely handicapped child such as R.H. certain skills which she had developed but needed reinforcement to retain, as well as skills which she might not be able to develop completely within the current year. Ms. O'Keefe emphasized her concern, from the standpoint of the teacher working with children such as R.H., that the IEP format suggested by Dr. Margolis might be "setting R.H. up for failure," insofar as it contained strict numerical objectives. In her experience, she said, using the progress key in the IEP format currently in use was more appropriate for students at the functioning level of R.H. She also indicated that in order to make that more meaningful she could share with the parent the teacher observations and data collection which formed the basis of those evaluations.

Regarding evaluative criteria, Ms. O'Keefe testified that she utilizes the IEP, (Ex. J–44), the Curriculum Guide, the completed TMR Performance Profile, and the underlying Teacher's Manual all in conjunction with each other in reviewing a child's progress. The Curriculum Guide contained detailed correlations between objectives and evaluative tools such as the Brigance, Portage, Vineland and other inventories and checklists, as well as teacher observations and parent conferences.

Ms. O'Keefe also provided extensive testimony concerning the annotated IEP which was sent home at the end of each quarterly marking period, upon which she provided progress notes from herself and from R.H.'s other teachers. The annotated IEP contained a key in the margin alongside each of the goals and objectives. There, Ms. O'Keefe would give a letter grade of "A" for Achieved, "I" for Introduced, "P" for Progressing (or "P" with an asterisk for limited progress), and "N" for not addressed, and additional teacher comments would be written nearby. Ms. O'Keefe testified that this document was provided to the family "so that they again will have before them the goals and objectives and individual progress." Ms. O'Keefe was also asked by counsel for the district whether it would "even be possible for you to list all objective or any objective criteria when it comes to that which you actually try to teach R.H. on any given day in [her] TMR class," and she replied, "[t]he feasibility of that would be very difficult to achieve." Similarly, Mr. Briard testified that in his opinion the district's IEP format "provides considerable objective criteria when the annotations are in place."

Dr. Margolis testified that in his opinion the district's form of IEP was so vague as to be unmeasurable, and that therefore it was inappropriate. He advocated that applied behavioral analysis be included in R.H.'s program and reflected in her IEP as it was in his draft, which stated, "in some instances, systematic baseline data and performance data collection may be needed to establish realistic expectations." Dr. Margolis testified that applied behavior analysis in his opinion "has to be" an integral part of R.H.'s program, although he cited no official authority to that effect. Ms. O'Keefe indicated that data collection was part of her procedures, as for example in logging R.H.'s toileting schedule and results. Dr. Nau of Bancroft confirmed that such data collection was part of applied behavior analysis, as it is known in their profession.

Dr. Margolis stated that applied behavior analysis has been developed as part of the experimentation in the evolving field of instructional technology for the severely mentally handicapped. He said that in order to administer a program based on applied behavior analysis, one would need to be highly knowledgeable in that area, possessing "mastery competence in applied behavior analysis." However, he also testified that in New Jersey there is no certification in applied behavior analysis through the Department of Education. The subject is generally included in graduate level courses for a master's in special education or school psychologist in education, but to get some experience in the subject, he said "[i]t involves a lot of reading and a lot of work in applied behavior analysis over the years."

He said that the literature on teaching children with developmental disabilities recommends applied behavior analysis "because it's the only class of interventions that really have a strong research base behind them and research is built into applied behavior analysis." Yet he also advised that "there are textbooks that are hundreds of pages long just on applied behavior analysis, and those are introductory textbooks for graduate students." He further acknowledged that he had no experience in actually teaching trainably mentally retarded students. He also said that he had no idea what proportion of the special education (professional) population has masters level skills in applied behavior analysis, but would say that it would be a small number, perhaps twenty percent. Ms. O'Keefe did testify that her credentials include that expertise. Dr. Margolis also did not disagree that in providing an applied behavioral analysis program designed by a professional possessing such background, the direct care staff at a residential facility or the parent or designated caregiver in the home could do that with appropriate training.

▮ The legal issue thus presented is whether the 1995–96 proposed IEP was inappropriate for failure to comply with the procedural requirements that an IEP contain: (1) a statement of the present levels of educational performance of the child; (2) a statement of annual goals, including short-term educational objectives; and (3) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved. IDEA requires these components in all IEPs, as do the related federal and state regulations. See provisions cited in note 56.

▮ The United States Supreme Court in *Rowley* placed great emphasis upon the procedural provisions of the Act, including the definition of an IEP containing those requirements. *Rowley*, 458 U.S. at 206 n. 27, 102 S.Ct. at 3051 n. 27. The New Jersey Supreme Court, likewise in *Lascari*, has ruled that "[w]ithout an adequately drafted IEP, it would be difficult, if not impossible, to measure a child's progress, a measurement that is necessary to determine changes to be made in the next IEP." *Lascari*, 116 N.J. at 48, 560 A.2d at 1190.

▮ We find that in this case the district met its burden with respect to having a statement of the present levels of educational performance, based upon the thorough and complete evaluations contained in the triennial evaluation reports which were prepared in the process of drafting the 1995–96 IEP, and that the lack of a citation reference to those reports in the actual IEP document was harmless in the circumstances. Such a finding is more difficult to reach with respect to the remaining two requirements, because of the broad wording of the goals and objectives and the lack of objective measurement criteria on the face of the document.

▮ Ms. O'Keefe testified that she used various recognized measures of progress, such as the TMR Performance Profile, and related Teacher's Manual. However, no such criteria were correlated to the goals stated in the IEP, nor did the IEP contain what appeared to be any short-term objectives which could be measured. The district also pointed to the fact that the New Jersey Department of Education had suggested and approved this type of IEP, with its "progress key" to report results to the parents. But a reading of the literal language of IDEA and regulatory provisions seems to require more.

The courts have repeatedly stated their reluctance to dictate to states and school districts how they should select and apply the methodologies of education. It has long been recognized that "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy'." *Rowley*, 458 U.S. at 208, 102 S.Ct. at 3052 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. at 42, 93 S.Ct. at 1301.) The Third Circuit in *Battle* strongly emphasized the difficulty of setting educational objectives for the severely and profoundly handicapped in comparison to the task of educating the nonhandicapped, when it said, "[w]here ... the handicap in question profoundly affects the child's learning ability, this comparison reaches a level of difficulty, which, in the absence of legislative guidance, approaches the perimeter of judicial competence." *Battle*, 629 F.2d at 277. Likewise, in *Polk* the same court acknowledged, "[w]e recognize the difficulty of measuring levels of benefit in severely handicapped children." *Polk*, 853 F.2d at 184. The Supreme Court in *Honig* aptly observed "the inescapable fact that the preparation of an IEP, like any other effort at predicting human behavior, is an inexact science at best." *Honig*, 484 U.S. at 321, 108 S.Ct. at 603.

We do not doubt that the same warnings apply in evaluating the adequacy of the IEP document itself for a student such as R.H. However we find, based upon the evidence before us, that the format of the IEP in issue here did fail to include the required components of some annual goals with specific measurable objectives, and evaluation criteria related to those goals and objectives. We therefore hold that in those two aspects the form of the proposed IEP was procedurally deficient.[59]

 This finding leads us to the issue of appropriate relief. The Administrative Law Judge, in his ruling on this issue, ordered that the district "immediately create and implement an appropriate individualized education program for R.H. which shall accurately and adequately reflect all of her defined needs and [sic] pursuant to the requirements set forth in N.J.A.C. § 6:28–3.6 including but not limited to the specified goals and objectives created on behalf of the parties by Dr. Howard Margolis[.]" That relief, in our view, was at once too broad and too narrow. It was too broad in requiring that "all of her defined needs" be reflected and addressed in the IEP. The IDEA, as interpreted in *Rowley* and its progeny, nowhere requires such a standard.[60] It was too narrow because it purported to dictate to the district the exact contents of the IEP based upon what all agreed was only a draft for discussion, which the parties never finalized before the settlement negotiations ended and the hearing resumed. Certainly it would be within the power of the hearing officer or the reviewing court to order that a school district reformulate its IEP to meet procedural requirements.[61] However, to dictate the exact terms of the IEP would in our view generally exceed both the expertise and the appropriate role of these tribunals under IDEA, and should be avoided if possible, in the exercise of sound judicial discretion.

 Plaintiff in this action seeks relief including an award of compensatory education. (Pl.'s Br. at 39–40.) Under IDEA, a disabled student is entitled to a free appropriate education until he or she reaches age twenty-one. 20 U.S.C. § 1412(2)(B). A court may award compensatory education requiring a school district to provide education past a child's twenty-first birthday, or for example during the summer months, to make

---

**59.** Applying the reasoning of the decisions quoted above, we would not find that applied behavior analysis must be included in the program or the IEP for this child, but rather would view it as one available methodology which the district may employ if it so chooses.

**60.** The Court in *Rowley* expressly rejected such a notion. In discussing one of the two federal cases that prompted Congress to enact the IDEA and its predecessors, it said, "*Mills* also speaks

in terms of 'adequate' educational services, ... and sets a realistic standard of providing some educational services to each child when every need cannot be met." *Rowley*, 458 U.S. at 194 n. 15, 102 S.Ct. at 3045 n. 15 (citing *Mills v. Board of Educ.*, 348 F.Supp. 866, 878 (D.D.C.1972)).

**61.** The IDEA provides with respect to the reviewing court that it shall "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2).

up for any earlier deprivation. *M.C.,* 81 F.3d at 395.

The Third Circuit has recently formulated the standard to be applied here, in evaluating whether to award compensatory education and if so, for what period. *Id.* at 395–97. The standard that it announced was stated to be a formula which "harmonizes the interests of the child, who is entitled to a free appropriate education under IDEA, with those of the school district, to whom special education and compensatory education is quite costly." *Id.* at 397. Thus, rejecting a standard which would be based either on the bad faith of the district or the vigilance of the parent, they held that:

[A] school district that knows or should know that a child has an inappropriate IEP or is not receiving more than a de minimis educational benefit must correct the situation. If it fails to do so, a disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem.

*Id.* In announcing this standard, the court further stated,

[i]t seems clear ... that the right to compensatory education should accrue from the point that the school district knows or should know of the IEPs failure. The school district, however, may not be able to act immediately to correct an inappropriate IEP; it may require some time to respond to a complex problem.

*Id.* at 396–97.

While the standard is thus settled, applying it in the particular circumstances of this case presents some difficulty. Here, we have found that the substantive requirements of IDEA are satisfied in R.H.'s current program and placement, and that residential placement is not required. Most of plaintiffs activities in this case have been directed to the goal of obtaining residential placement; so much so that the district did not even hear of plaintiffs procedural objections to the form of the IEP until the administrative hearing was well underway. The district thus had no opportunity to consider or to revise its proposed IEP based upon those objections, except in the highly charged atmosphere of the litigation before the ALJ, and the equally stressful intervening period during which Dr. Margolis produced his draft IEP, followed by his suggested "implementation plan."

We recognize that under the *M.C.* standard, "a child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem)." *Id.* Here, however, the plaintiff was represented by highly knowledgeable counsel for the entire period during which the interim and proposed IEPs were being formulated, in the format which the district customarily used for its TMR students. Nevertheless, plaintiff as thus represented offered absolutely no participation in that aspect of the process.

As soon as the district staff were made aware of the possibility that R.H.'s proposed IEP had any alleged procedural deficiencies, they took the opportunity, previously denied them by plaintiffs refusal to comment upon any specific aspect of the IEP, and sat down to work with plaintiff and the expert whom the district paid to assist the parties in the drafting process. We see no reason to find that the district should have known of any such deficiencies in her IEP prior to that time, based upon the record in this case. Further, we find that the district responded in a timely manner to correct the situation once they became aware of it. Therefore we hold that no award of compensatory education should be imposed in relation to this issue.

C. Bias allegation by school district against ALJ

The district contends here that the manner in which the ALJ conducted the administrative hearing in this case demonstrated prejudicial bias in favor of plaintiff and against the district, which affected both the hearing and the outcome at the administrative level. (Def.'s Main Br. at 35–40.) The district in its brief asserts that the "improprieties exercised by [the ALJ] throughout the trial process are too numerous to list." (*Id.* at 36.) In support of this contention, the district

identifies examples by reference to both the transcripts and the ALJ opinion, and offers to provide additional testimony of its witnesses as to improper actions off the record. (*Id.* at 35–40; Def.'s Reply Br. at 10–11, 15.) Counsel for plaintiff opposes those arguments in their brief. (Pl's Br. at 14–17, 22–23, 35.)

We did not elect to receive additional evidence on this issue because of the volume of the existing record and for the reasons outlined below. However, we have carefully reviewed the record also with this issue in mind because we recognize that these are serious allegations, never to be taken lightly when raised in the course of a litigation. A description of the legal context in which the allegation of bias arises is necessary before we provide our response on this subject.

 Judges in the New Jersey court system are subject to the disqualification rules promulgated by the New Jersey Supreme Court. *See* N.J. Ct. R. (hereinafter "R.") 1:1–1 (applicability); R. 1:12–1 (cause for disqualification; on the court's motion); R. 1:12–2 (disqualification on party's motion). These rules have been interpreted to apply also to judges of the New Jersey Office of Administrative Law. *See Sheeran v. Progressive Life Ins. Co.,* 182 N.J.Super. 237, 242–43, 440 A.2d 469, 471 (App.Div.1981). Indeed, the New Jersey Supreme Court has stated that "[t]he primary reason for establishing the Office of Administrative Law was 'to bring impartiality and objectivity to agency hearings and ultimately to achieve higher levels of fairness in administrative adjudications.'" *In re Uniform Admin. Procedure Rules,* 90 N.J. 85, 90, 447 A.2d 151, 154 (1982) (quoting *Unemployed–Employed*

*Council of N.J. v. Horn,* 85 N.J. 646, 650, 428 A.2d 1305, 1307 (1981)).

Rule 1:12–1 provides various grounds for disqualification, of which the following two could be relevant here:

> The judge of any court shall be disqualified on the court's own motion and shall not sit on any matter, if the judge
>
> . . . .
>
> (d) has given an opinion upon a matter in question in the action; or
>
> . . . .
>
> (f) when there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so.[62] Paragraph[ ] . . . (d) . . . shall not prevent a judge from sitting because of having given an opinion in another action in which the same matter in controversy came in question or given an opinion on any question in controversy in the pending action in the course of previous proceedings therein . . . .

R. 1:12–1.

The school district made no motion for recusal before the ALJ, as is generally required under R. 1:12–2.[63] *See Magill v. Casel,* 238 N.J.Super. 57, 63, 568 A.2d 1221, 1224 (App.Div.1990) (recusal rests in the sound discretion of the trial judge); *Bonnet v. Stewart,* 155 N.J.Super. 326, 330, 382 A.2d 930 (App.Div.) (recusal is a matter entrusted in the first instance to the discretion of the trial judge himself), *certif. denied,* 77 N.J. 468, 391 A.2d 483 (1978). We understand the primary focus of the district's assertion of bias at this stage of review to be the validity

---

62. Paragraph (f) of this rule is related to the corresponding provision of the Code of Judicial Conduct, Appendix to Part I of the New Jersey Court Rules, which provides in pertinent part as follows:

> [Canon] 3. A Judge Should Perform the Duties of Judicial Office Impartially and Diligently.
>
> . . . .
>
> The judicial duties of a judge take precedence over all other activities. . . . In the performance of these duties, the following standards apply:
>
> . . . .
>
> C. Disqualification (see R. 1:12–1).

> (1) A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
>> (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer. . . .

63. R. 1:12–2 provides that: "Any party, on motion made to the judge before trial or argument and stating the reasons therefor, may seek that judge's disqualification."

of the result which the ALJ reached, and the manner in which he reached it. In other words, most of the arguments of the district which allege bias on the part of the ALJ also go to the merits of the appeal. We have considered and addressed those arguments in performing our independent review of the record in this case. We have thus identified each of the conclusions of the ALJ which in our view are not consistent with the facts and the applicable law.

There is, however, one aspect of the allegation of bias by the school district which cannot be dealt with in the ordinary course of deciding the appeal pending before this Court. That aspect is the possibility that this case on remand, or a future case between these parties arising out of a later IEP, could be assigned to the ALJ who presided here. In terms of a remand of this case, that possibility would be remote because we have not exercised our authority to remand to the administrative tribunal.[64] Likewise, if this case were to be remanded after an appeal to our court of appeals, we would have full authority under IDEA to take additional evidence and enter such orders as appropriate. *See* 20 U.S.C. § 1415(e)(2).

We have reviewed the reported case law pertaining to subsection (d) of R. 1:12–1 as well as cases decided under IDEA, and it is clear that assignment of a subsequent case involving these parties to the same ALJ who presided here would not be prohibited merely because that ALJ had previously presided in this case. *See Woods v. New Jersey Dept. of Educ.*, 823 F.Supp. 254 (D.N.J.1993) (placement dispute involved four due process hearings between same parties before same ALJ), *rev'd on other grounds*, No. 93–5123, 20 Indiv. Disabilities Educ. L. Rep. 439 (3d Cir. Sept. 17, 1993); *cf. State v. Walker*, 33 N.J. 580, 591, 166 A.2d 567, 572 (1960) (the mere fact that a judgment resulting from previous proceedings had been reversed on appeal is not a sufficient ground for recusal), *cert. denied*, 371 U.S. 850, 83 S.Ct. 89, 9

L.Ed.2d 86 (1962). The only possible exception to that interpretation which we have identified might be if witnesses were scheduled to appear in that proceeding whose credibility had previously been the subject of rulings by the ALJ in a related proceeding. *Cf. New Jersey Div. of Youth & Family Servs. v. A.W.*, 103 N.J. 591, 617–18, 512 A.2d 438, 452–53 (1986) (directing assignment of parental rights termination case on remand to different judge because the trial judge had "already heard this evidence and may have a commitment to its findings"); *In re Guardianship of R., G. and F.*, 155 N.J.Super. 186, 195, 382 A.2d 654, 658 (App.Div.1977) (termination case assigned to new judge because "[t]he judge who heard the matter below has already engaged in weighing the evidence and has rendered a conclusion on the credibility of the Division's witnesses"). *But see Hundred East Credit Corp. v. Eric Schuster Corp.*, 212 N.J.Super. 350, 353–54 n. 1, 515 A.2d 246, 247 (App.Div.) (affirming denial of recusal motion in second bench trial before same judge on same fraud issue after initial reversal, even where second trial opinion incorporated by reference the findings and conclusions set forth in judge's opinion following initial trial), *certif. denied*, 107 N.J. 60, 526 A.2d 146 (1986). Otherwise, absent some other reason for recusal, a subsequent case between these parties could, it appears, be assigned to any judge of the Office of Administrative Law, including the hearing officer who presided in this case.

If a subsequent proceeding were to arise between these parties involving a later IEP, the usual course of that dispute would be through the due process hearing proceedings such as we have seen in this case. Presumably the school district would have the opportunity to bring an appropriate motion to recuse before the ALJ at that time, if and when such a case were assigned to the same officer who presided in this case. If such a motion did arise, and were decided adversely by the ALJ, the school district would have a proper record upon which to seek relief through appropriate channels.[65]

---

64. *See Scott P.,* 62 F.3d at 525–26 (district court has authority to remand action to the administrative tribunal).

65. We have not extended our review of the state procedures to determine what avenues of redress are available in the state court system following denial of a motion to recuse addressed to an

No separate relief is sought before this Court based upon the issue of bias as asserted in the briefs submitted by counsel for the district. Also, as we have observed, despite the tangled history of the hearing below, the record made by the parties during that hearing has been sufficient to enable us to decide this appeal on the merits. Furthermore, there is no certainty that future proceedings between these parties will arise in the Office of Administrative Law, or that such proceedings would be assigned to the same ALJ, so as to present the occasion for the school district to consider bringing a motion to recuse before him.

It is beyond question that "[i]mpartiality and the appearance of impartiality in a judicial officer are the sine qua non of the American legal system." *Lewis v. Curtis*, 671 F.2d 779, 789 (3d Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982). The United States Supreme Court has made it clear that " 'a fair trial in a fair tribunal is a basic requirement of due process,' " in administrative adjudicatory proceedings as well as in courts. *Michigan Dept. of Soc. Servs. v. Shalala*, 859 F.Supp. 1113, 1123 (W.D.Mich.1994) (quoting *Withrow v. Larkin*, 421 U.S. 35, 36, 95 S.Ct. 1456, 1459, 43 L.Ed.2d 712 (1975)). Thus, as stated by Justice Kennedy in his concurring opinion in the most recent Supreme Court case construing the analogous federal statute on judicial disqualification, "[i]f through obduracy, honest mistake, or simple inability to attain self knowledge the judge fails to acknowledge a disqualifying predisposition or circumstance, an appellate court must order recusal no matter what the source." *Liteky v. U.S.*, 510 U.S. 540, 563, 114 S.Ct. 1147, 1161, 127 L.Ed.2d 474 (1994) (Kennedy, J., concurring). This is because, as our court of appeals has declared, "[l]itigants ought not have to face a judge where there is a reasonable question of impartiality...." *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 162 (3d Cir.1993). Nevertheless, for the reasons stated here, we will refrain from expressing a view regarding the allegation of bias which has been asserted in this appeal.

### D. Attorneys' fees

The IDEA was amended in 1986 to permit the award of attorneys' fees to the parent or guardian if they were the prevailing party in the due process litigation. *See* 20 U.S.C. § 1415(e)(4)(B).[66] The Supreme Court has held that "the touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792–93, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989). "If the plaintiff has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the party sought in bringing suit,' the plaintiff has crossed the threshold to a fee award of some kind." *Id.* at 791–92, 109 S.Ct. at 1493 (citation omitted). In sum, to be a prevailing party, the plaintiffs success must be more than purely technical or de minimis. *Id.* at 792, 109 S.Ct. at 1493–94.

The Third Circuit Court of Appeals has set out a two-part test for determining whether a party has "prevailed" in an IDEA litigation: (1) "whether plaintiffs achieved relief;" and (2) "whether there is a causal connection between the litigation and the relief from the defendant." *Wheeler v. Towanda Area Sch. Dist.*, 950 F.2d 128, 131 (3d Cir.1991). The first prong of the test

administrative law judge, but we note that under the parallel federal procedure, denial of a motion to recuse by a judge of the federal district court has been reviewed by our court of appeals both on appeal after final decision in the case, and in extraordinary circumstances by means of a petition for writ of mandamus. *See, e.g., In re Antar*, 71 F.3d 97 (3d Cir.1995) (petition for writ); *Blanche Road Corp. v. Bensalem Township*, 57 F.3d 253 (3d Cir.) (direct appeal), *cert. denied*, ── U.S. ──, 116 S.Ct. 303, 133 L.Ed.2d 208 (1995); *see also Heldman*, 962 F.2d at 159 n. 2 (noting issue of when a party may challenge the bias of hearing officer before exhaustion of administrative remedies).

**66.** 20 U.S.C. § 1415(e)(4)(B) provides:

In any action or proceeding brought under this subsection, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents or guardian of a handicapped child or youth who is the prevailing party.

*Id.*

requires only that the plaintiff "achieve[ ] some of the benefit sought in a lawsuit, even though the plaintiff does not ultimately succeed in securing a favorable judgment." *Id.* The second prong is met "where even though the litigation did not result in a favorable judgment, the pressure of the lawsuit was a material contributing factor in bringing about judicial relief." *Id.* The determination of whether this test is met is left to the sound discretion of the court in light of the policies which Congress sought to promote in enacting the fee provisions.

The need to promote cooperative efforts between parents and the public schools serving their handicapped children is recognized throughout the statutory scheme of IDEA, which as we have seen provides extensive rights and opportunities to parents to participate in the formulation of the individual educational programs for their children. *See* Section II; *see also Rowley*, 458 U.S. at 205–06, 102 S.Ct. at 3050–51 (quoted in Section IV(A)). New Jersey regulations governing due process disputes under IDEA further promote disclosure and cooperation between parent and school district. For example, those regulations provide a thirty-day waiting period before filing for due process, to permit the school district to respond to a parent's request. *See* N.J.A.C. § 6:28–2.7(b). Those same regulations provide that the parties shall meet in conference with an official of the New Jersey Department of Education within seven days after the filing of a demand for a due process hearing, so that the issues may be identified and transmitted with the file to the Office of Administrative Law. *See* N.J.A.C. § 6:28–2.7(d)(4).

▆ These necessary and salutary policies would be undercut and frustrated by application of the attorneys' fee rules to permit a parent who, although represented by counsel, failed and refused to make known to the school district an issue regarding the proposed IEP before filing for due process, only raising it for the first time in the course of the administrative proceeding. Based upon our searching review of the record in this case, that is exactly what counsel for plaintiff did here with respect to the issue of the format of the proposed IEP.

As we have detailed above in Section VII(B), plaintiff and her counsel simply did not bring that issue to the attention of the school district at any time before filing for due process. To the contrary, during all of the meetings and communications between the parties before filing for due process, they offered not one single response either to the interim IEP that was adopted in April, 1995, or to the proposed 1995–96 IEP, (Ex. J–44; Ex. J–48), except to inquire about a summer program and to demand residential placement. Even at the mediation session before an official of the Department of Education, who presumably would have had some expertise to bring to bear upon this issue because of the monitoring role of that Department in approving and reviewing IEP forms all over the state, it appears that no mention was made of this as a potential issue. Similarly, the same Department official presided at the required conference identifying the issues to be transmitted to the OAL for adjudication. The result of that conference was a transmittal file prepared by that official which stated that the issues were "program" and "placement," and expressly omitted to identify "IEP" as an issue in the case.

True, a reference to the regulation governing IEP format, N.J.A.C. § 6:28–3.6, was neatly placed in the relief requested portion of the due process complaint letter prepared by counsel for plaintiff. There was at most a vague and oblique reference in the body of that letter to the IEP "not comply[ing] with the requirements of federal and state law." However, those were the only hints of such an issue in the entire course of communications by counsel on behalf of plaintiff, until after the opening statements were complete and the hearing was in the third day of witness testimony. *See* Section VII(B).

The result, as is plainly evident from a reading of the relevant portions of the record, was that the district witnesses and their counsel were taken utterly by surprise that this had become an issue in the case. The district was, in effect, successfully blindsided on this issue at the time of trial. Nevertheless, as also described above, the district immediately dealt with it, candidly and forthrightly, and took the earliest opportunity to

address remedying once it had been identified as a possible deficiency in the performance of its duties to R.H.

We have held that with respect to the substantive and procedural issues involving residential placement, the district has met its burden of proving that the current educational placement is appropriate, and we have found that no relief should be granted to plaintiff on that issue. *See* Section VII(A). We have further held, with respect to the procedural issue involving the format of the proposed IEP, that the school district was deficient in its offerings to R.H. but readily and diligently took steps to correct any such deficiency as soon as it became aware of the alleged problem. Thus, we have found that no relief should be granted by the Court on that issue. *See* Section VII(B). However, during the hearing the district did undertake to participate with plaintiff in improving the IEP. Therefore, we should consider whether to make an award of attorneys' fees limited to that issue.

Based upon the response of the school district when the procedural IEP issue was raised, in the highly tense and adversarial atmosphere of an ongoing trial, we can only conclude that they would have been equally responsive if counsel for plaintiff had been candid and forthright in raising it at a more opportune moment before filing for due process litigation. We find therefore that no award of attorneys' fees is proper because the second prong of the *Wheeler* test has not been met.

We are certain that Congress, in enacting the 1986 amendments allowing attorneys' fees, did not thereby intend to encourage attorneys sophisticated in this specialized area of the law to be rewarded for perpetrating stealth litigation against school districts attempting to serve handicapped children and their families. "Congress repeatedly emphasized throughout the Act the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness." *Honig*, 484 U.S. at 311, 108 S.Ct. at 598. "Congress addressed the problem of how to guarantee substantive rights to a diverse group by relying on a process-based solution." *Heldman*, 962 F.2d at 155. "The Act relies on parental involvement to contribute to the determination of what constitutes an appropriate education for a child." *Id.* Accordingly, based upon the record of these proceedings, we will exercise our discretion not to award such fees for the results obtained in that manner.

VIII. Conclusion

Based upon our review of the record and for the reasons stated in the foregoing discussion, we hold that the school district has met its burden of proof, establishing by a preponderance of the evidence that it has met its obligations to plaintiff and to R.H. under the applicable provisions of IDEA. We reject the findings and conclusions of the Administrative Law Judge as not adequately supported by the record.

Our conclusions on each of the issues presented in this appeal may be summarized as follows:

1. A procedural issue was raised as to whether the district ever seriously intended to consider residential placement for R.H. We have found that there was no violation by the school district in that respect. (Section VII(A)(iii).)

2. The substantive issue regarding residential placement was whether the district established that the current educational program for R.H. met the dual requirements that the program be calculated to provide her with some meaningful educational benefit and that it be provided in the least restrictive educational environment. We have addressed the statutory inquiry as to whether the nature or severity of R.H.'s handicap is such that education in regular or special classes, with the use of supplementary aids and services, cannot be satisfactorily achieved. In making that inquiry, we have identified and considered nine relevant factors. Based upon our analysis of all the evidence bearing upon that inquiry, we have concluded that the district has met its burden in establishing that the current educational placement and program are appropriate. Thus we have found that residential placement is not necessary in order to pro-

vide R.H. with a free appropriate public education. (Section VII(A)(iv).)

3. Plaintiff made a renewed motion for injunctive relief enforcing the decision of the ALJ in favor of transferring R.H. to residential placement during the pendency of this appeal, relying upon the recent decision of the Court of Appeals for the Third Circuit in *Susquenita School District v. Raelee S.*, 96 F.3d 78 (3d Cir.1996). We have addressed that motion in deciding the merits of the appeal in favor of the school district. However, we have also prepared a Supplemental Opinion explaining the basis of our view that *Raelee S.* was not controlling here, and further discussing the *Raelee S.* decision. That Supplemental Opinion will be filed separately, but does not affect the finality of the Judgment Order entered herein. (Section VII(A)(iv)(b).)

4. A procedural issue was raised as to whether the proposed written IEP for 1995–96 adequately included the following required components: (1) a statement of current educational status, (2) a statement of annual goals with objectives describing specific measurable steps, and (3) the criteria, procedure and schedule to determine if the goals and objectives are being met. We have found that with respect to the latter two requirements the form of the proposed IEP was procedurally deficient. We have further found that as soon as the school district knew or should have known of an alleged deficiency in this respect, the district took timely action to correct it. Therefore, we have not made an award of compensatory education. (Section VII(B).)

5. The school district contended that the administrative hearing conducted by the Administrative Law Judge in this case was not impartial as a result of bias on the part of the ALJ. We have refrained from expressing a view on that subject, as we did not need to reach it in order to decide the appeal on the merits. (Section VII(C).)

6. We have considered whether to exercise the discretion conferred upon the Court under IDEA to make an award of attorneys' fees in favor of plaintiff, limited to that aspect of the case in which the school district acted to improve the proposed written IEP for 1995–96 during the due process hearing. We have found that in the circumstances presented here, the second prong of the test set forth in *Wheeler v. Towanda Area Sch. Dist.*, 950 F.2d 128, 131 (3d Cir.1991) is not met. Accordingly, we have declined to make such an award of fees, and have determined that each party should bear their own costs. (Section VII(D).)

7. Based upon these conclusions, we will order that final judgment be entered in favor of defendant, dismissing the claims of plaintiff, and terminating the case in this Court. The order will further provide that either party may move to reopen the case, for good cause shown. *Matthews*, 742 F.2d at 831.